**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee,*<br>v.<br>LEZMOND C. MITCHELL,<br>*Defendant-Appellant.* | No. 03-99010<br>D.C. No.<br>CR-01-01062-PCT-<br>MHM<br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Mary H. Murguia, District Judge, Presiding

Argued and Submitted
February 15, 2007—San Francisco, California

Filed September 5, 2007

Before: Stephen Reinhardt, Pamela Ann Rymer, and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Rymer;
Dissent by Judge Reinhardt

11547

**COUNSEL**

Celia M. Rumann, Assistant Federal Public Defender, Phoenix, Arizona, and Michael P. O'Connor, Tempe, Arizona, for appellant Lezmond Mitchell.

Daniel R. Drake, Assistant United States Attorney, and Vincent Q. Kirby, Assistant United States Attorney, Phoenix, Arizona, for appellee the United States.

---

**OPINION**

RYMER, Circuit Judge:

Lezmond Mitchell, a Navajo, appeals his conviction and sentence for first degree murder, 18 U.S.C. §§ 1111, 1153, felony murder, 18 U.S.C. §§ 1111, 2111, carjacking resulting in death, 18 U.S.C. § 2119, and related federal crimes involving other Navajos on the Navajo Indian reservation in Arizona. A jury convicted Mitchell on all counts. Mitchell faced capital punishment under the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-98, because of his conviction for carjacking resulting in death. Following a penalty phase hearing, the jury unanimously returned a recommendation of a sentence of death as to each of the two victims who were murdered. The district court sentenced Mitchell to death on the carjacking count in accordance with the jury's verdict. We conclude that no error requiring reversal occurred in connection with either conviction or sentence, and therefore affirm.

I

In October 2001, Mitchell, then 20 years old, Jason Kinlicheenie, Gregory Nakai and Jakegory Nakai decided to rob a trading post on the Arizona side of the Navajo Indian reservation. Mitchell and 16 year-old Johnny Orsinger set out from Round Rock, Arizona, for Gallup, New Mexico, on October 27 to look for a vehicle they could steal to use during the robbery. They bought one knife and stole another while there. Hitchhiking back to the reservation, they were picked up by a trucker who took them part of the way.

Meanwhile, on the afternoon of Sunday, October 28, 2001, Alyce Slim (63 years old) and her nine year-old granddaughter, Jane Doe, left Fort Defiance, Arizona to go to Tohatchi, New Mexico where Slim hoped to secure the services of Betty Denison, a traditional medicine person, for leg ailments. It is a 35 minute drive that the two made in Slim's pewter-colored double cab Sierra GMC pickup truck. They got to Tohatchi about 4 p.m. Denison was unable to assist her, but thought another medicine woman, Marie Dale, might be able to help. She, Slim, and Jane drove to Twin Lakes, New Mexico where Slim arranged an appointment with Dale for the next day. The three returned to Denison's home where they dropped Denison off around 5 p.m., then Slim and her granddaughter left. That is the last time they were seen alive.

Somewhere in route, and somehow, Mitchell and Orsinger got into Slim's truck. Slim and Jane were in front, Mitchell in the right-rear passenger seat and Orsinger in the left. Slim stopped near Sawmill, Arizona, to let Mitchell and Orsinger out of the car, but Orsinger started stabbing her with a knife and Mitchell joined in. Slim ended up being stabbed 33 times, both from the left and right, with sixteen incised wounds on her hands that indicated she fought the attack. Once dead, her body was pulled onto the rear seat. Jane was put next to her. Mitchell drove the truck some 30-40 miles into the mountains with Jane beside her grandmother's body.

There, Slim's body was dragged out. Jane was ordered out of the truck and told by Mitchell "to lay down and die." Mitchell cut Jane's throat twice, but she didn't die. Orsinger and he then dropped large rocks on her head, which killed her. Twenty-pound rocks containing blood tied to Jane were found near the bodies.

Mitchell and Orsinger returned to the site with an axe and shovel. Mitchell dug a hole while Orsinger severed the heads and hands of Jane and Slim. Together, they dropped the severed body parts (along with Mitchell's glove) into the hole,

and covered them. The torsos were pulled into the woods. Later they burned the victims' clothing, jewelry, and glasses. Mitchell and Orsinger washed the blood from the knives in a nearby stream; the next day, Mitchell also washed the knives with alcohol to remove any blood.

Jane's mother, Marlene, became concerned when Jane and Slim, who was Marlene's mother, had not returned home. She tried to call Slim on her cell phone Sunday night, then the next morning at home, but got no answer. After checking at Slim's house and Jane's school, Marlene filed a missing persons report on Tuesday.

On Wednesday, October 31, 2001, the Red Rock Trading Post, a convenience store and gas station located in Navajo territory, was robbed by three masked men. Kinlicheenie supplied the masks as well as his parents' car for use after the truck was abandoned; Mitchell carried a 12-gauge shotgun, and Jakegory Nakai had a .22 caliber rifle. Charlotte Yazzie, the store manager, was mopping the floor when one of the robbers assaulted her, striking her with his firearm and pulling her behind a desk. Watching this, another store clerk, Kimberly Allen, ducked behind shelving. A second robber saw Allen and pushed her against the counters. When Allen said she didn't know the combination to the safe, the gunman told her, "If you lie to me or you don't cooperate with us, we are going to kill you." He told Allen to turn on the gas pump. As she did, she saw a pickup truck parked outside, which she described as a double cab beige Chevrolet. Yazzie was taken into a back room where the robbers demanded, and she provided, more money. Mitchell, Nakai and Kinlicheenie emptied the cash registers and safe and then tied down Allen and Yazzie in the vault room. They made off with $5,530 and Yazzie's purse.

The robbers drove back to Kinlicheenie's car and he followed the truck to a place about a mile and a half south of Wheatfields, Arizona, where Mitchell set fire to it using kero-

sene stolen from the Trading Post. They returned to the Nakai residence and split the money. Mitchell got $300 from Kinlicheenie.

As it happens, a customer and his girlfriend pulled into the parking lot while the robbery was in progress and saw two of the masked gunmen, one of whom was wearing purple gloves. The customer also saw a beige, extended cab Sierra or Silverado model truck parked at the fuel tank. The customer's girlfriend took down the license plate number and gave it to one of the Trading Post employees. The next day, a Navajo police officer discovered an abandoned pickup truck a mile and a half south of Wheatfields, Arizona, within the Navajo Indian reservation. The officer detected the odor of gasoline, and portions of the truck's interior were burned. It turned out to be Slim's 2001 GMC Sierra pickup. Criminal investigators discovered a purple latex glove and Halloween masks inside the truck, as well as Mitchell's fingerprints and Slim's blood.

Based on this information and a tip, investigators focused on Orsinger, Orsinger's father, Mitchell, Jakegory Nakai and Gregory Nakai, among others. On the morning of November 4, 2001, FBI Agent Ray Duncan conducted a briefing with criminal investigators and SWAT team officers of the Navajo Department of Law Enforcement. Tribal warrants were issued and executed at the house of Gregory Nakai. Mitchell, Jimmy Nakai, and Gregory Nakai were arrested. Mitchell had been asleep and wore only a t-shirt and shortcuts. He asked for his pants, which he told an FBI agent were near a bunk bed on the floor. As the agent was picking them up, a silver butterfly knife fell from a pocket.

Gregory Nakai and his mother, Daisy Nakai, consented to a search of the house. Two FBI agents, an evidence technician, and a Navajo criminal investigator conducted the search. They retrieved the silver butterfly knife and found a second butterfly knife with a black handle. Trace amounts of blood from the silver knife were matched to Slim. The search also

turned up a newspaper that had a front page story on the Trading Post robbery, and a cell phone belonging to Slim.

Agent Duncan and a Navajo criminal investigator met with Mitchell at the Navajo Department of Criminal Investigations around 1:30 p.m. Mitchell signed a waiver of his *Miranda* rights and, after flipping a coin, agreed to talk. When asked about his whereabouts on the weekend of October 27, Mitchell stated that he had been drinking around Round Rock. He denied being involved in the disappearances and robbery. Mitchell then agreed to a polygraph examination, which FBI Special Agent Kirk conducted about 5:30 p.m. Mitchell was reminded that his *Miranda* rights still applied and he signed an FBI consent form after reading it. Kirk told Mitchell that the test results indicated he had lied. Mitchell made inculpatory statements about the robbery and agreed to a tape recorded interview after again being reminded of his *Miranda* rights. Mitchell admitted his involvement in the Trading Post robbery, and also confirmed that he was present when "things happened" to Slim and Jane. He agreed to help investigators find the bodies. The interview ended around 11:00 p.m.

Orsinger was arrested the next day, November 5, 2001, and he, too, agreed to take agents to the bodies. Orsinger had difficulty doing so, and agents called for Mitchell to be brought out. Mitchell directed Navajo police officers to the site. While there, Mitchell acknowledged to Kirk that his *Miranda* rights were in effect and agreed to answer more questions. According to the agent, Mitchell stated that he had stabbed the "old lady," and that the evidence would show and/or witnesses would say that he had cut the young girl's throat twice. Mitchell said he told Jane to "lay down on the ground and die," and that he and Orsinger then gathered rocks, and with Orsinger leading on, the two took turns dropping them on Jane's head. Mitchell indicated that he and Orsinger retrieved an axe and shovel, severed the heads and hands, buried the parts in a foot-deep hole, burned the victims' clothing, and cleaned the knives in a stream.

Mitchell was returned to tribal jail and taken before a tribal judge on November 7. A federal indictment was issued on November 21, and on November 29 an FBI agent picked up Mitchell from the tribal jail and drove him to the courthouse in Flagstaff, Arizona. Just before arraignment, agents read Mitchell his *Miranda* rights and obtained a signed waiver. Mitchell explained that one to two weeks before the Trading Post robbery, he had talked with Jakegory Nakai about committing a robbery. He and Orsinger hitchhiked from Round Rock, Arizona to Gallup, New Mexico to purchase liquor and while in Gallup, the two visited a shopping mall where they purchased one knife and stole another. They caught a ride to Ya Ta Hey, New Mexico, where they were picked up by an older lady and a young girl near the border. Mitchell asked to be let off near Sawmill, Arizona, and when the truck stopped, Orsinger began stabbing the woman. Mitchell admitted that he stabbed her four to five times. They put the older woman and the little girl into the back, and drove into the mountains where they dragged Slim's body out, threw rocks on the girl's head, and severed the victims' heads and hands. Mitchell said this was Orsinger's idea, because he would also have severed the feet.

On July 2, 2002, a superceding indictment was returned charging Mitchell and Orsinger with murder; felony murder, robbery; carjacking resulting in death; several robbery-related counts; kidnapping; and felony murder, kidnapping. On September 12, 2002, the government filed a notice of intent to seek the death penalty as to Mitchell based on the 18 U.S.C. § 2119 charge of carjacking resulting in death. Jury selection began April 1, 2003. On the same day, the court severed the joint trial of Mitchell and Orsinger. Opening statements were given on April 29, and on May 8, 2003, the jury convicted Mitchell on all counts.

Mitchell indicated that he did not want to be present during the penalty phase, and his attorneys explained to the court that Mitchell had become uncooperative and was breaking off

contact with them. For this reason they felt obliged to with-draw. After time to reconsider, and extended colloquy, Mitch-ell stated that he saw no benefit or relevance to being there and wished to waive his presence, but did not have a problem with his attorneys. Accordingly, the court granted Mitchell's request not to be present but denied counsels' request to with-draw.

The penalty phase began on May 14. The government pres-ented testimony from family members who described what the victims were like and the emotional impact of the murders on them. The defense presented as mitigating evidence the testimony of family members, friends, and teachers of Mitch-ell whom they portrayed as an excellent high school student with no disciplinary problems except for a brief suspension for possessing marijuana, who was an outstanding athlete with college football prospects, a leader both in student coun-cil and in sports, and respectful towards teachers. FBI agent Duncan also testified. He discussed Mitchell's confession, noting that Mitchell claimed to have been drinking heavily at the time of the murders. Duncan also described a separate car-jacking and double murder involving Gregory Nakai and Ors-inger that took place on the Navajo reservation during which Orsinger pistol whipped the two victims and then shot one of them in the head. Nakai shot the other victim five times. *See United States v. Gregory Nakai*, 413 F.3d 1019 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 593 (2005). Evidence was introduced that neither Orsinger nor Nakai would receive the death penalty, and that the Navajo Nation did not condone capital punishment in general or for Mitchell's crimes in par-ticular.

The jury unanimously found all four "gateway intent fac-tors," each of the statutory aggravating factors, and one non-statutory aggravating factor with respect to both victims. At least one juror found the existence of each of the mitigat-ing factors. After weighing the aggravating and mitigating factors, the jury recommended imposition of a sentence of

death. The court imposed that sentence, and this timely appeal followed.

## II

We first consider Mitchell's challenges to jurisdiction of the federal court and to application of the Federal Death Penalty Act (FDPA). He contends that the FDPA does not extend to carjackings committed by one Indian against other Indians in Indian country. In related arguments, Mitchell also submits that he cannot be sentenced to death under the FDPA because the Navajo Nation never opted into the federal capital punishment scheme, and that applying the FDPA in these circumstances violates the First Amendment and the American Indian Religious Freedom Act of 1978 (AIRFA), 42 U.S.C. § 1996.

[1] "Indian tribes initially possessed exclusive jurisdiction over crimes committed by one tribal member against another in Indian country — even when the crime was murder . . . ." David H. Getches, Charles F. Wilkinson, Robert A. Williams, Jr., *Federal Indian Law* 475 (5th ed. 2005). *See also* William C. Canby, Jr., *American Indian Law* 133 (4th ed. 2004). Today, by virtue of the interplay between the Indian Country Crimes Act or Federal Enclave Act, 18 U.S.C. § 1152, and the Major Crimes Act, 18 U.S.C. § 1153, federal court jurisdiction extends to certain major crimes committed by an Indian against another Indian, or by an Indian in Indian country, *see United States v. Bruce*, 394 F.3d 1215, 1220 (9th Cir. 2005); *United States v. Anderson*, 391 F.3d 1083, 1085 n.3 (9th Cir. 2004), and by virtue of decisional law, federal court jurisdiction extends to intra-Indian violations of federal criminal laws of general, nationwide applicability. *Id.* at 1085-86; *United States v. Smith*, 387 F.3d 826, 829 (9th Cir. 2004) (stating that federal criminal jurisdiction extends to intra-Indian violations of 18 U.S.C. § 1513(b), retaliating against a witness, as it is a statute of nationwide applicability); *United States v. Errol D., Jr.*, 292 F.3d 1159, 1164-65 (9th Cir. 2002) (observing

that the federal government could have charged Indian defendant who burglarized Bureau of Indian Affairs facilitates located in Indian country with 18 U.S.C. § 641, theft of government property); *United States v. Begay*, 42 F.3d 486, 499 (9th Cir. 1994) (holding that a violation of 18 U.S.C. § 371, conspiracy, "applies equally to everyone everywhere within the United States, including Indians in Indian country").

**[2]** Mitchell maintains that the Major Crimes Act is the sole source of federal criminal jurisdiction over intra-Indian crimes, and that, because carjacking resulting in death is not one of the crimes identified in the Act, he cannot be prosecuted for it in federal court. However, we have previously rejected this argument. *See, e.g., United States v. Juvenile Male*, 118 F.3d 1344, 1350-51 (9th Cir. 1997) (holding that the district court could properly exercise jurisdiction over the charged federal criminal offense of general applicability, despite its not being enumerated in the Major Crimes Act, in an incident occurring between Indians in Indian country). Mitchell's suggestion that *Juvenile Male* is contrary to two earlier Supreme Court opinions, *United States v. Antelope*, 430 U.S. 641 (1977), and *United States v. Quiver*, 241 U.S. 602 (1916), fails because we are bound by *Juvenile Male*. In any event, both *Antelope* and *Quiver* involved enclave crimes, not crimes of general applicability. *See United States v. Brisk*, 171 F.3d 514, 522 & n.7 (7th Cir. 1999) (rejecting identical arguments invoking *Quiver* and *Antelope*); *see also Begay*, 42 F.3d at 499-500 (rejecting the notion that our case law, including *United States v. Jackson*, 600 F.2d 1283, 1286 (9th Cir. 1979), can be read as indicating that federal laws of otherwise nationwide applicability do not apply in Indian country).

Mitchell proposed at oral argument, for the first time, that our precedent is undermined by legal summaries, contained in the legislative history of 25 U.S.C. § 1301, which predate decisions such as *Begay*. *See* H.R. Conf. Rep. No. 102-261, at 3-4 (1991); S.Rep. No. 102-168, at 2 (1991). This is not the

same statute at issue here. Apart from the fact that a three-judge panel has no power to do what Mitchell asks, we reject the underlying premise that an attempt (presumably a staffer's) to summarize the state of federal jurisdiction over Indian crimes for purposes of a different statute has any authoritative bearing on the question presented here.

In addition, relying on *Ex Parte Crow Dog*, 109 U.S. 556 (1883), Mitchell stresses that the federal carjacking statute does not expressly provide for jurisdiction over intra-Indian violations. From this, he would have us infer that Congress did not intend for it to apply to cases such as this. However, *Crow Dog*, like *Antelope* and *Quiver*, involved the prosecution of an intra-Indian murder charged under federal enclave law; it does not speak to a federal criminal statute that is of general applicability. Beyond this, the general rule is that a federal statute of nationwide applicability that is otherwise silent on the question of jurisdiction as to Indian tribes "will not apply to them if: (1) the law touches 'exclusive rights of self-governance in purely intramural matters'; (2) the application of the law to the tribe would 'abrogate rights guaranteed by Indian treaties'; or (3) there is proof 'by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations . . . ." *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1116 (9th Cir. 1985) (quoting *United States v. Farris*, 624 F.2d 890, 893-94 (9th Cir. 1980)). Mitchell makes no attempt to explain how the federal carjacking statute might fall within one these exceptions, except to suppose that Congress must have intended such an exemption as it employed Interstate Commerce Clause language but not Indian Commerce Clause language in § 2119. But silence in this (or any other) respect does not manifest intent for the law *not* to apply to Indian tribes; rather, the baseline is that federal statutes of nationwide applicability, where silent on the issue, presumptively *do* apply to Indian tribes. *See Smith*, 387 F.3d at 829 n.5; *see also Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960)

(stating that "a general statute in terms applying to all persons includes Indians and their property interests").

Mitchell next argues that § 2119 should not apply in this case because its authorization of the death penalty impinges on tribal sovereignty given the Navajo Nation's longstanding religious and cultural opposition to capital punishment. For this he relies on the Eighth Circuit's view that "if a particular Indian right or policy is infringed by a general federal criminal law, that law will be held not to apply to Indians on reservations unless specifically so provided." *United States v. Blue*, 722 F.2d 383, 385 (8th Cir. 1983). However, *Blue* itself held that a federal district court had jurisdiction over an intra-Indian violation of 21 U.S.C. § 841(a)(1) (distribution of marijuana and possession with intent to distribute) as enforcement of the federal narcotics laws does not impermissibly infringe upon tribal sovereignty or self-government. *Id*. This is in line with our own decisions applying federal criminal laws of nationwide applicability to Indian tribes.

**[3]** We recognize that the Navajo Nation opposes the death penalty on cultural and religious grounds. Indeed, the Attorney General of the Navajo Nation expressed the Nation's opposition to the possibility of the United States seeking capital punishment in this case in a letter sent January 22, 2002 to the United States Attorney for the District of Arizona. We cannot say, however, that ideological opposition to the death penalty by its own force exempts tribal members from the reach of federal criminal laws, or overrides the presumption that federal criminal laws of nationwide applicability apply to Indian tribes.

**[4]** Neither do we believe that the FDPA's opt-in provision for Indian tribes, 18 U.S.C. § 3598, or the lack of an opt-in by the Navajo Nation, renders the carjacking statute inapplicable. Section 3598 provides:

> Notwithstanding sections 1152 and 1153, no person subject to the criminal jurisdiction of an Indian tribal

government shall be subject to a capital sentence under this chapter for any offense the Federal jurisdiction for which is predicated solely on Indian country (as defined in section 1151 of this title) and which has occurred within the boundaries of Indian country, unless the governing body of the tribe has elected that this chapter have effect over land and persons subject to its criminal jurisdiction.

Thus, the FDPA unambiguously requires opt-in only where jurisdiction is based on Indian country, not, as Mitchell would have it, whenever the federal government seeks capital punishment. To construe § 3598 as Mitchell does is inconsistent with the statute's plain language and the basic canon of statutory construction that qualifying language should not be read out of the statute. *See, e.g., Bowsher v. Merck & Co.*, 460 U.S. 824, 833 (1983) (applying the "settled principle of statutory construction that we must give effect, if possible, to every word of the statute"). Mitchell insists that a contrary interpretation defeats the purpose of § 3598 if the government, precluded from seeking the death penalty on the basis of first degree murder, can instead rely on a federal death eligible statute such as § 2119. While a court may refuse to follow the plain language of a statute if it would produce unreasonable results, *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 510 (1989), it is doubtful that Congress would have intended to carve out special exemptions to Indian tribes for the more than 40 death eligible federal offenses covered by the FDPA without expressly saying so. *See Jones v. United States*, 527 U.S. 373, 407 (1999) (providing background information on FDPA) (citing 18 U.S.C. § 3591; §§ 60005-60024, 108 Stat. 1970-1982)). Instead, the opt-in provision appears to afford Indian tribes as much authority as states in determining whether capital punishment may be imposed in circumstances not involving federal crimes of general applicability. The federal government seeks and obtains FDPA death sentences in states that have long since abandoned the death penalty themselves. Michael J. Zydney Mannheimer, *When the Federal*

*Death Penalty is "Cruel and Unusual*," 74 U. Cin. L. Rev. 819, 819 (2006) (reporting that "since 2002, five people have been sentenced to death in federal court for conduct that occurred in States that do not authorize the death penalty"); *see also* 137 Cong. Rec. S8488-03 (daily ed. Jun. 24, 1991) (remarks of Sen. Inouye suggesting that capital crimes will apply without regard to what would otherwise be within the scope of state or tribal jurisdiction). As there is no reasoned basis for departing from the statute's plain language, we decline to accept Mitchell's proffered construction of § 3598.

**[5]** Finally, Mitchell's assertion that given the Navajo Nation's religious opposition to capital punishment, sentencing him under the FDPA violates the First Amendment and AIRFA, is raised for the first time on appeal. Although normally we would review for plain error,[1] it makes no difference whether that, or the de novo review which Mitchell seeks, is the appropriate standard because either way, his claims fail. He makes no showing that the FDPA burdens the free exercise of any Navajo religious belief. In any case, his free exercise challenge cannot succeed because "a rationally based, neutral law of general applicability does not violate the right to free exercise of religion even though the law incidentally burdens a particular religious belief or practice." *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999) (citing *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)). Mitchell's reliance on AIRFA fares no better, as "AIRFA is simply a policy statement and does not create a cause of action or any judi-

---

[1]Many of the issues that Mitchell raises on appeal are subject to plain error review because they were not raised in the district court. Plain error lies where there was: "(1) error, (2) that was clear or obvious, (3) that affected substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Randall*, 162 F.3d 557, 561 (9th Cir. 1998) (citing *United States v. Olano*, 507 U.S. 725, 732-36 (1993)). Normally, the defendant must make a specific showing of prejudice — that the error affected the outcome of the proceedings — in order to establish plain error. *Olano*, 507 U.S. at 734-35.

cially enforceable individual rights." *Henderson v. Terhune*, 379 F.3d 709, 711 (9th Cir. 2004).

## III

A number of issues are presented that relate to jury selection, both of the venire and the panel.

## A

We start with Mitchell's contention that the procedures used to empanel jurors in Phoenix for Navajo reservation crimes, while apparently satisfactory in non-capital cases, *see United States v. Etsitty*, 130 F.3d 420, 425 (9th Cir. 1997), are unsatisfactory for death penalty cases.

"[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). A defendant establishes a prima facie violation of the fair-cross-section requirement by showing "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

In *Nakai*, which involved one of Mitchell's co-defendants, the court "accept[ed] for purposes of [that] appeal the argument that Native Americans in Arizona constitute a distinctive group, although our cases suggest that Hopi and Navajo are far from being a unitary ethnic block." 413 F.3d at 1022. We assume so here as well.

Mitchell asserts that his trial was improperly transferred from Prescott to Phoenix, but abandons the point by develop-

ing no argument with respect to it. He does, however, develop his contention that the jury administrator improperly weeded the 2329 jury questionnaires that were returned (out of 3000 sent) down to 263 "actually qualified" persons. Allowing for jurors who were excused mainly without objection, a venire of 207 was set. Mitchell argues that of this pool, only 30 — or 14.49% — were Native Americans. The district court found, according to the 2000 census, that the adult population of the Prescott Division was 18.64% Native American, that Native Americans comprise 16.7% of the Prescott master jury wheel (from which the jury was drawn in this case), that 17.23% of the 3000 people selected from the wheel in this case resided within Indian reservations, and that 36 of the 207-person venire (17.39%) identified themselves as Native American. Mitchell's numbers are slightly different but even accepting his, an absolute disparity of 4.15% exists between the venire and the adult population of the division. This is less than the disparity that we found constitutionally permissible in *United States v. Esquivel*, 88 F.3d 722, 726-27 (9th Cir. 1996) (finding insubstantial an absolute disparity of 4.9% for Hispanics who comprised 14.6% of the adult citizen population in the district but only 9.7% of the master jury wheel).

Regardless, "a violation of the fair cross-section requirement cannot be premised upon proof of underrepresentation in a single jury. While juries must be drawn from a source fairly representative of the community, the composition of *each jury* need not mirror that of the community." *United States v. Miller*, 771 F.2d 1219, 1228 (9th Cir. 1985). Thus, the defendant in *Miller* failed to satisfy the second prong when he introduced evidence concerning only his particular grand jury venire. *Id.*; *cf. Duren*, 439 U.S. at 362 (defendant showed persistent disparity over eight months of weekly venires). Mitchell points to disparities in the trial of Gregory Nakai, in which 14.1% of the 199-person venire as drawn consisted of Native Americans, but only 6.1% of the pool that reported for duty consisted of Native Americans. *See Nakai*, 413 F.3d at 1022. However, the 6.1% figure was the result of

a telephonic procedure used specially in that case, which the court deliberately avoided using in this one. The 14.1% figure provides a second data point, but this alone cannot demonstrate that the underrepresentation was systematic. Underrepresentation in the master juror wheel would be systematic, but the Prescott juror wheel has only a 1.94% absolute discrepancy.

In *Etsitty*, we expressed concern with the jury selection process in trials transferred from Prescott to Phoenix. However, our concerns in *Etsitty* had to do with the different jury wheels in Phoenix (where Native Americans constitute less of the population) and Prescott (where they constitute more). The district court cured that problem here by using the Prescott wheel. It found there was little reason to suspect that Native Americans in the jury pool would be disparately impacted by the transfer to Phoenix based on local geography and highway access, and Mitchell points to no evidence to the contrary.

[6] Mitchell offers no authority or argument relating the special nature of capital punishment to the need for lower tolerance for disparity in jury pools. Nor is any apparent. The right to a representative jury pool comes from the Sixth Amendment, not the Eighth, and applies to all criminal jury trials.

Mitchell also appears to suggest that the striking of various jurors for cause resulted in an unrepresentative jury. However, the Sixth Amendment imposes "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition." *Taylor*, 419 U.S. at 538. In *Lockhart v. McCree*, 476 U.S. 162, 173-74 (1986), the Court accordingly declined to extend the fair-cross-section requirement to death qualification, or "to invalidate [on fair-cross-section grounds] the use of either for-cause or peremptory challenges to prospective jurors" who

expressed opposition to the death penalty. In *Holland v. Illinois*, 493 U.S. 474, 477-86 (1990), the Court similarly distinguished between the venire stage and panel stage, and rejected the claim that a prosecutor's use of peremptory challenges to remove African Americans from the panel violated the Sixth Amendment right to a representative cross-section. As it explained, "[t]he 'representativeness' constitutionally required at the venire stage can be disrupted at the jury-panel stage" to serve a legitimate interest in permitting the disqualification of jurors for reasons related to their ability to serve in a particular case. *Id.* at 483; *see also Evans v. Lewis*, 855 F.2d 631, 634-35 (9th Cir. 1988) ("[T]he juror's removal was part of the process of selecting the petit jury and did not involve the composition of the venire. Therefore, the fair cross-section right did not attach."); *Harris v. Pulley*, 885 F.2d 1354, 1371 (9th Cir. 1988) ("The fair cross-section rule is limited to the method of summoning the venire panel from which the petit jury is selected.").

**[7]** Because Mitchell does not show that the underrepresentation of Native Americans on venires such as his was either substantial or systematic, and because the right to a representative cross-section does not extend to petit jury selection, Mitchell fails to establish a constitutional violation arising out of the procedures that were followed.

## B

We turn next to issues relating to death qualification and for-cause strikes.

### i

Did the district court violate the equal protection component of the Due Process Clause by engaging in race-based questioning of potential jurors and by making racially-discriminatory decisions to strike?

"For over a century, [the] Court has been unyielding in its position that a defendant is denied equal protection of the laws when tried before a jury from which members of his or her race have been excluded by the State's purposeful conduct . . . . Although a defendant has no right to a 'petit jury composed in whole or in part of persons of [the defendant's] own race,' he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria." *Powers v. Ohio*, 499 U.S. 400, 404 (1991) (internal citations omitted). The same applies to the federal government under the equal protection component of the Fifth Amendment. *Cf. Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Judges, of course, are state actors, and the obligation to refrain from racial discrimination in the selection of jurors extends to all those state actors "who are trusted with jury selection." *Akins v. Texas*, 325 U.S. 398, 403 (1945). To establish a violation, however, "[a] purpose to discriminate must be present which may be proven by systematic exclusion of eligible jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination." *Id.* at 403-04 (articulating principle for a grand jury); *see Alexander v. Louisiana*, 405 U.S. 625, 626 n.3 (1972) (noting that principles prohibiting exclusion from jury service on account of race "are essentially the same for grand juries and for petit juries"). Thus, Mitchell can establish a violation of his Fifth Amendment rights if he can show purposeful racial discrimination by the district court in striking jurors for cause. Because Mitchell did not raise this issue in the district court, we review for plain error.

[8] Mitchell tries to show purposeful discrimination by suggesting that the judge questioned potential jurors differently depending upon whether they were Native American or not. We cannot see how the district court's voir dire abused its ample discretion. *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) (noting that "[b]ecause the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discre-

tion in determining how best to conduct the voir dire"). The judge inquired of all prospective jurors whether there was anything about Mitchell's being Native American that would affect their ability to be fair and impartial, which was unquestionably proper, *see id*. at 191-92, but sometimes hinged questions of similar import to the common ethnicity shared by the juror and the defendant when the juror indicated that he or she, too, was Native American. This was simply a natural way of eliciting possible bias, and does not show discrimination along racial lines. In no way did the court's questioning suggest that it was applying different standards depending upon the juror's ethnicity.

At oral argument, Mitchell attempted to cast his equal protection argument as one under *Alexander*. As we explained in *Esquivel*, an *Alexander*-type equal protection challenge is somewhat similar to a Sixth Amendment fair cross-section challenge, and requires the defendant to make a prima facie case by showing (1) "that the group, of which the appellant is a member, is 'one that is a recognizable, distinct class, singled out for different treatment under the laws' "; (2) a substantial underrepresentation of the group, "by comparing the proportion of the group in the total population to the proportion of the group called to serve as . . . jurors, over a significant period of time"; and (3) discriminatory intent, which may be satisfied by showing that the selection procedure is "susceptible of abuse or is not racially neutral." 88 F.3d at 725 (quoting *Castaneda v. Partida*, 430 U.S. 482, 494 (1977)). Mitchell fails to establish a prima facie case because he has not shown substantial underrepresentation over a significant period of time and because, as in *Esquivel*, he has not explained how the venire-selection process was susceptible to abuse. *Id.* at 727-28. Mitchell appears to assume, as he did with his fair cross-section claim, that the *Alexander* framework should extend past the venire stage and into strikes for cause. He offers no authority for doing so, and no persuasive reason why it should. "[A] defendant has no right to demand that members of his race be included" on the final jury, *Alex-*

*ander*, 405 U.S. at 628, and since the record is fully developed as to the basis for each strike, Mitchell must show why each was discriminatory or pretextual.

Mitchell complains that of 30 Native Americans who appeared for voir dire, 29 were dismissed by the trial court before peremptories. However, we consider his appeal only with respect to prospective jurors #3, #22, and #24 because he fails to explain why the others may have been dismissed for race-based reasons. As to them, the district court only pressed questions of racial bias when the jurors gave answers implicating their impartiality, where it was entirely appropriate to do so.

The lengthy questioning and discussion relating to #3 had almost nothing to do with race; he was excused for cause on account of his perceived inability to set aside religious opposition to the death penalty.

Race played some role in the voir dire of #22, who was a Navajo and who indicated in response to questioning by the government that she thought she was biased for the Native American. Most of the questioning focused on this prospective juror's stated moral opposition to the death penalty. The district court found from #22's answers that it would be "extremely difficult, if not impossible" for her to set aside her opinions regarding the death penalty and that her bias toward Native Americans and against the government was also "troubling." Both findings are well-supported in the record.

Prospective juror #24 himself injected race into the voir dire by responding to the court's inquiry about whether he had an opinion about the death penalty, "Well, as a Native American, this is something that we don't have in our laws on the reservation." He thought being Native American would affect his ability to be fair and impartial. He said that having to sit in judgment of another Navajo would "have a long-term affect on [him] . . . emotionally and to a certain extent spiritu-

ally," at least if he were to "come out to a certain result," because Navajo ceremonies are based on valuing life; therefore, it would be "difficult" for him to sit as a juror against a fellow Navajo. He also indicated that he thought it would be wrong for the United States government to put a Navajo to death for murder. The district court recognized that this last statement was not an automatic disqualifier, but given how difficult #24 said it would be for him to sit as a juror because of his beliefs, and to sit in judgment on a Navajo, the district court concluded #24 would be substantially impaired from being able to perform his duties. In this, the court was not impermissibly drawing inferences from #24's race, but permissibly from his own responses about his beliefs.[2]

ii

**[9]** Did the procedures used to select the jury impermissibly exclude jurors on the basis of their Navajo traditional religion and culture, thereby violating the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, and the American Indian Religious Freedom Act of 1978 (AIRFA), 42 U.S.C. § 1996? On this issue, our review is for plain error as it was not raised in district court.

---

[2]For the first time in his reply brief, Mitchell argues that the exclusion of jurors #2, 3, 19, 22, and 24 also violates *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and *Gray v. Mississippi*, 481 U.S. 648 (1987), because these jurors were dismissed merely for expressing moral scruples against the death penalty. We deem these arguments waived. *United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

Similarly, in a footnote, Mitchell contends that the district court improperly excluded jurors #1, 2, 9, and 11 in part due to their use of Navajo as a first language without providing interpreters, thereby erroneously applying the Jury Selection Act and violating "equal protection, due process, a fair trial and a reliable sentencing determination." However, "[t]he summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal." *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.4 (9th Cir. 1996).

RFRA "suspends generally applicable federal laws that 'substantially burden a person's exercise of religion' unless the laws are 'the least restrictive means of furthering [a] compelling governmental interest.' " *United States v. Antoine*, 318 F.3d 919, 920 (9th Cir. 2003) (quoting 42 U.S.C. § 2000bb-1(a)-(b)). Mitchell does not identify what specific federal rule or procedure burdened the exercise of Navajo religion. We understand his argument to be that the rule disqualifying jurors whose traditional Navajo views on the death penalty would prevent or substantially impair the performance of their duties as a juror in accordance with their instructions violates RFRA, because the Navajo religion is opposed to the death penalty. Mitchell points out that the government has no compelling interest in keeping traditional Navajos from serving on juries, or in obtaining a death sentence against a Navajo for a crime arising in Indian country against another Navajo. But this misplaces the focus. The question is whether a juror is able to follow the law and apply the facts in an impartial way, which *is* a compelling government interest. And the rule excluding jurors who are unable to do so is the least restrictive means to achieve that end; jurors are not excluded simply because they are opposed to the death penalty on religious grounds, but only if they are unable to set those views aside and apply the law impartially. *See Wainwright v. Witt*, 469 U.S. 412, 420-26 (1985).

Mitchell simply asserts, without explanation, that AIRFA was also offended, but as we have already noted AIRFA creates no judicially enforceable individual rights.

iii

**[10]** Did the district court err by refusing to strike for cause several prospective jurors (#31-38, except for #32 and #34) who were biased in favor of capital punishment?

A defendant has a constitutional due process right to remove for cause a juror who will automatically vote for the

death penalty. *See Morgan v. Illinois*, 504 U.S. 719 (1992). But the Supreme Court has made clear that a court's failure to strike for cause a biased veniremember violates neither the Sixth Amendment guarantee of an impartial jury, *Ross v. Oklahoma*, 487 U.S. 81 (1988), nor the Fifth Amendment right to due process, *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), when the biased veniremember did not sit on the jury, even though the defendant must use a peremptory challenge to strike him. Of the veniremembers whom Mitchell challenges, only #36 sat on the jury. Mitchell attempts to distinguish *Ross* and *Martinez-Salazar* by arguing that his claim is not based on his compelled use of a peremptory challenge, but this only shows that Mitchell has asserted no injury at all.

A district court's refusal to strike a juror challenged for cause is reviewed for abuse of discretion. *United States v. Miguel*, 111 F.3d 666, 673 (9th Cir. 1997). However, our review here is for plain error under Fed. R. Crim. P. 52(b) because Mitchell did not ask the court to excuse juror #36 for cause. *Cf. United States v. Mendoza-Reyes*, 331 F.3d 1119, 1121 (9th Cir. 2003) (review of voir dire is for plain error where defendant does not object); *United States v. Ross*, 886 F.2d 264, 266 (9th Cir. 1989) (district court's treatment of juror reviewed for plain error where defendant made no motion to remove after juror announced desire to leave). Although in response to one question #36 indicated that she thought the only punishment for certain kinds of "horrific" crimes should be death, she later qualified that response by indicating "well, death or imprisonment." Thereafter she said in a number of ways that she could keep an open mind. Neither side moved to strike, and the court did not plainly err in not striking her *sua sponte*.

iv

**[11]** Did the district court err in striking #39 for cause merely because she expressed conscientious scruples against imposing the death penalty?

A prospective juror may be excluded for cause because of her views on capital punishment when "the juror's views would 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.' " *Wainwright*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The juror need not indicate that she would "automatically" vote against the death penalty, nor need the bias be shown with "unmistakable clarity"; the trial court need only be left with a "definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 425-26. Deference is owed to the trial judge who sees and hears the juror. *Id.*

Because this rule is grounded in the Sixth Amendment's guarantee of an impartial jury, and not the Eighth Amendment, exclusions under it are no different from exclusions of jurors for any other form of bias. *Id.* at 423, 429. A district court's decision to excuse a juror for actual bias is reviewed for abuse of discretion. *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000).

Prospective juror #39 gave answers to the written prescreening questionnaire that show her beliefs about the death penalty would substantially impair her ability to perform her duties. Among them, she checked the box indicating she "could never, under any circumstances, return a verdict which recommended a sentence of death." She wrote as an explanation for why she couldn't reach a verdict of guilty as to a crime for which the defendant could be sentenced to death, "No one has the right to take another person's life — regardless of the evils done by that person — it reduces society to the level of the evil doer." She checked boxes reflecting that she would *not* follow the instructions given by the court in deciding whether a defendant was guilty or not guilty if a death sentence would result, that her views about the death penalty would prevent her from recommending the death penalty as a punishment, that she would automatically vote to recommend a sentence of life without the possibility of

release, that she would not consider all the evidence before making a decision to recommend either a death or life sentence, that she would disregard the law and hold the government to a higher burden of proof than beyond a reasonable doubt, and that she would not want to serve as a juror in this case.

Her oral responses at voir dire were more nuanced; for example, she would have "a difficult time" imposing the death penalty or following related instructions; she could possibly have sentenced to death Charles Manson and a serial killer from Florida (presumably, Ted Bundy); "off the top of [her] head," she didn't think she could set aside her beliefs, but she would be open to listening to all of the evidence; "offhand," she didn't think she could fairly consider either sentence, but she couldn't know for sure without being in the position and seeing the evidence; she would "probably" vote for a life sentence, but wouldn't automatically vote for a life sentence regardless of the evidence and would keep an open mind; and she would "like to think" she could be open to either death or life and deliberate without prejudgment. In response to the judge's final question whether she could set aside her views and listen to the facts and law that the court gives and keep an open mind and consider imposing either sentence if she felt it was appropriate, #39 responded "I could only try . . . . I do feel very strongly about the value of human life, no matter what that life has done. But I — I like to think I would listen; I would be open. It would be up to the prosecution and the defense to convince me. I can't give a definitive answer at this time. I'm sorry."

Although the court found that #39 tried to be candid, it was left with the "firm impression, based on her demeanor here in court, that she would struggle to the point that I don't think she would honestly consider the death penalty in accordance with the instruction and her duty as an oath." In addition, it noted that the questionnaire answers were compelling where #39 wrote in by hand that no one has the right to take another

person's life, and that she could not follow instructions if a death sentence would result. Accordingly, the court concluded that #39 "would be substantially impaired to follow her oath as a juror in this case and follow the law that the Court gives to her," and so was not qualified. As the overall landscape of #39's answers supports a definite impression that she would be unable faithfully and impartially to apply the law, and the district court applied the correct standard in so determining, we see no abuse of discretion in the dismissal of #39 for cause.

C

The government used a peremptory challenge to strike the only African American member of the venire which was, in Mitchell's view, contrary to *Batson v. Kentucky*, 476 U.S. 79 (1986). This followed a strike of a Native American that the court disallowed on *Batson* grounds.

To establish a prima facie case of a *Batson* violation, a defendant must show "(1) the defendant is a member of a cognizable group; (2) the prosecution has removed members of such a group; and (3) circumstances raise an 'inference' that the challenges were motivated by race." *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir. 2002). The burden then shifts to the government to offer a race-neutral ground for the challenge. Finally, the district court determines whether the defendant has proven purposeful discrimination. *Id.* Although the burden rests with the defendant to prove purposeful discrimination, the court must evaluate the persuasiveness of the proffered justification and determine whether it should be believed. *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (en banc).

Native Americans constitute a cognizable group for *Batson* purposes, *see id.*, as do African Americans, *see Fernandez*, 286 F.3d at 1077. Mitchell, a Native American, may raise *Batson* challenges to the exclusion of African Americans as

well as Native Americans. *See id.* (citing *Powers v. Ohio*, 499 U.S. 400, 409-16 (1991)).

Whether the government's reason for exercising a peremptory challenge is an adequate race-neutral explanation is an issue of law reviewed de novo. *See United States v. Steele*, 298 F.3d 906, 910 (9th Cir. 2002). The district court's findings of fact as to the racially discriminatory use of peremptory challenges are reviewed for clear error. *See United States v. Annigoni*, 96 F.3d 1132, 1136 n.3 (9th Cir. 1996) (en banc). Whether a defendant has made a prima facie showing of racial discrimination is reviewed for clear error. *United States v. Steele*, 298 F.3d 906, 910 (9th Cir. 2002).

The government used its first peremptory strike against the only remaining Native American member of the jury panel. The district court found that under the totality of the circumstances, the use of a first strike against the only Native American panel member when the defendant and victims were Native American established a prima facie case. The government offered the explanation that the juror indicated he would look to the court for direction at sentencing. The district court found that he was not the only juror to express uncertainty due to lack of knowledge of the law, and that the juror had repeatedly indicated that he would follow the court's instruction and understood that the court would not direct a sentence. On that basis, the court found the government's explanation unpersuasive, and denied the strike.

The government then used another peremptory challenge to strike the only African American member of the panel. Responding to Mitchell's *Batson* challenge, the government offered the explanation that it struck that juror along with another because both had prior experience on juries that had acquitted defendants. The district court determined that most of the reasons for finding a prima facie case against the only Native American juror did not apply to the African American juror, and that no prima facie case had been made out. Alter-

natively, the court found that the government's explanation was neutral, non-discriminatory, and permissible; that the juror had indicated that he had participated in an acquitting jury in Colorado in the mid-1980s, although he could not recall the circumstances; that the explanation was sufficient; and that Mitchell had failed to carry his burden.

We recognized in *Fernandez* that the relevant circumstances surrounding strikes include a prima facie case of discrimination as to another cognizable group. 286 F.3d at 1078 (holding that prior strike of an Hispanic prospective juror supported an inference of general discriminatory intent germane to strike of two African Americans). Here, the government struck the only African American venireperson, which is less compelling evidence of discrimination than in *Fernandez* because two African Americans were struck there and it is more difficult to infer discrimination based on one strike than two. At the same time, the court here had actually found discrimination by the government in exercising a strike against a Native American, whereas the trial court in *Fernandez* had previously only found a prima facie case. We can't tell from what it said that the district court factored this into its ruling.

**[12]** But we need not decide whether, following *Fernandez*, under the totality of the circumstances, including the prior discriminatory attempt to strike the only Native American juror, the district court's finding that there was no prima facie case of discrimination as to the African American venireperson was clearly erroneous, because Mitchell does not show how the district court's alternative finding — that the prosecution's justification was valid and persuasive — was incorrect. That a juror acquitted in a prior case is a valid, race-neutral reason to strike. *See United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987). Mitchell notes that the acquittal had been 20 years earlier, but the inquiry is not whether the ground is strategically sound, but whether it is believeable. *Kesser*, 465 F.3d at 359. Nor does Mitchell contest the fact that the government had moved to strike another, non-African American

juror for the same reason. *Cf. id.* at 360-61 (discussing comparative juror analysis). The finding of discrimination where the government used its first strike against the only Native American juror when the defendant and victims were Native American does not compel a finding of pretext against the African American juror when a non-race-based reason is proferred. Therefore, Mitchell's *Batson* claim fails.

D

[13] Mitchell faults the district court for having alleviated the government's burden of proving the elements of the MCA crimes beyond a reasonable doubt when it told jurors during voir dire that he was a Native American or Navajo, that the crimes occurred on an Indian reservation, and that the deaths of the victims had been "murders." In doing so, he posits, the district court informed members of the jury that these elements of the charged crimes were true, thereby impermissibly shifting the government's burden at trial. Because Mitchell did not object on this or any other ground in the district court, our review is for plain error. *See Mendoza-Reyes*, 331 F.3d at 1121.

Of course, the government bears the burden of proving every element of a crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). However, a judge does not plainly err by making a statement in the course of voir dire to determine whether a prospective juror can be fair and impartial in relation to a charge made in the indictment. *Mendoza-Reyes*, 331 F.3d at 1121. That is all the court did here. Mitchell never contested that he was a Native American, and, in fact, offered to stipulate to it. Advising the jury that the murder counts were being prosecuted pursuant to the Major Crimes Act was an entirely accurate summary that shifted no burden at all to Mitchell. The same goes for asking prospective jurors whether testimony or pictures of a graphic nature regarding the murders in this case would affect their ability to be fair and impartial. There was no question that

murders had occurred; the question was whether Mitchell was responsible, and the court's query did nothing to suggest that he had to prove he wasn't. Indeed, Mitchell's counsel himself prefaced juror voir dire by relating his "impression that there are certain crimes which, like many people, you would find very troubling and very disturbing to hear about . . . . And among them might be a crime involving the murder of two people, a nine-year-old and a 65-year-old."

Mitchell submits that structural error of the *Sullivan v. Louisiana*, 508 U.S. 275, 279-80 (1993), sort occurred, but *Sullivan* involved a jury instruction containing an unconstitutional definition of "beyond a reasonable doubt." No such thing happened here. The district court instructed the jury that it "must not read into . . . anything the court may have said or done any suggestion as to what verdict you should return," that the defendant was presumed innocent and the government had the burden to prove every element of the charges beyond a reasonable doubt, and that the government had to prove beyond a reasonable doubt that Mitchell was an Indian and that the offenses occurred in Indian Country for all counts under the Major Crimes Act.

Because the district court did not tell the jury that certain facts were established or shift the burden to Mitchell, but rather stated the charges for explanatory and bias-probing purposes at voir dire, and because Mitchell cannot in any event show prejudice, there was no plain error. *Cf. Neder v. United States*, 527 U.S. 1, 10-11 (1999) (explaining that errors in omitting, misdescribing, or conclusively presuming an element of an offense are not structural).

E

**[14]** Orsinger was severed from Mitchell's trial on the morning that jury selection began. Mitchell now claims that this decision dramatically changed the nature of the case for which he was selecting a jury, but at the time did not object

or request a continuance. He points to nothing in the record that indicates any effect of this decision on counsel's strategy or that calls into question his counsel's judgment in going forward with voir dire. There was no plain error.

Nor did the court plainly err in proceeding with jury selection rather than, *sua sponte*, starting it anew after the severance. Mitchell argues that his jury was tainted by Orsinger's participation in drafting the juror questionnaire, listing stipulated juror excusals, and making arguments at a hearing with respect to for-cause dismissals. Yet he points to no evidence (and does not claim) that he and Orsinger disagreed over any decision along the way, or that Orsinger took any action that prejudiced Mitchell. No plain error appears.

## IV

Mitchell sought to suppress his post-arrest statements on the ground that they were involuntary, and seeks reversal on this footing and because they were taken in violation of his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and his right to counsel under the Fifth and Sixth Amendments.

## A

FBI Agent Purscell had been working on the disappearance of the Orsinsger/Nakai victims, and got an anonymous call on November 2 offering information on those murders and another possible homicide and robbery. The call turned out to be from Jimmy Nakai, with whom agents met that night. The next day, FBI agents and tribal investigators held a joint meeting at the Gallup FBI office, led by Duncan and Purscell, to share information and discuss courses of action. Tribal investigators had found Slim's truck, though that incident was still being investigated as missing persons with possible criminal circumstances.

At some point Purscell, an FBI supervisor, and an Assistant United States Attorney (AUSA) participated in a conference call. It was decided that there was not enough information to obtain probable cause for a federal search or arrest warrant. The AUSA suggested possibly attempting to seek tribal arrest warrants. One of the tribal investigators thought he could get a tribal warrant, and it was decided that the suspects should be picked up tribally because of concern for public safety. A tribal warrant was in fact obtained, Mitchell was arrested, and FBI agents interviewed him.

Mitchell posits that he was not actually in tribal custody when he confessed to FBI agents, but in federal custody, because federal and tribal authorities acted in collusion to circumvent his federally-protected rights to a prompt arraignment, to remain silent, and to the assistance of counsel. He submits that collusion is evident given that a federally-funded task force conducted the criminal investigation using tribal investigators as "an additional source of manpower," that the investigation was based on a tip to the FBI, that a tribal arrest warrant was issued only after FBI agents conferred with an AUSA, that this route was chosen as a way to contact Mitchell and interview him, and that FBI agents were the officials who interviewed him three times. Consequently, in Mitchell's view, his confessions are inadmissible as they were involuntarily given under 18 U.S.C. § 3501.

As the government points out, Mitchell did not raise this specific issue at trial. Mitchell requested (and received) a hearing on the voluntariness of his custodial statements. So did Orsinger. In argument at the first evidentiary hearing, Orsinger's counsel suggested that the tribal arrest and custody had been a facade orchestrated by the FBI to deprive Orsinger of federal procedural rights for a juvenile, such as the speedy presentation of federal charges to a federal judge and the prompt appointment of counsel. (Orsinger was a juvenile, but Mitchell was not.) During his argument, Mitchell's counsel said he joined in the remarks of Orsinger's counsel about

"what happened in this case," adding: "Rather than file federal charges and implicate not only the juvenile rights that [Orsinger's counsel] said were violated with respect to Mr. Orsinger, but also the obvious rights that would have attended the filing of federal charges including the right to the immediate appointment of counsel for Mr. Mitchell, essentially Mr. Mitchell was stashed in the tribal jail for more than three weeks on these tribal charges which no one connected with this case believed were ever going to proceed."[3] Other than this passing comment, Mitchell's presentation was pitched entirely to *Miranda* issues. The court issued a reasoned order denying Mitchell's motion to suppress based on the voluntariness of *Miranda* waivers. After the initial hearing, Orsinger filed a motion that addressed the collusion issue more specifically; Mitchell did not join in this motion. The court ultimately held another evidentiary hearing on Orsinger's motion, for which Mitchell and his counsel were present but in which they did not join or participate. The court issued a detailed ruling on delay and collusion issues with respect to Orsinger. Understandably, it made no findings or conclusions on these issues with respect to Mitchell; and Mitchell neither sought to correct the court's impression that he did not raise them, nor to adduce evidence and elicit a ruling that would have determined these issues discretely as to him.

[15] At most, therefore, our review is for plain error. But even if Mitchell's passing comment at the first hearing sufficed to piggyback on Orsinger's pursuit of the point thereafter, no reason appears for the district court to have treated the co-defendants differently. There is no apparent difference

---

[3]The Sixth Amendment right to counsel does not apply in tribal court proceedings. *See United States v. Percy*, 250 F.3d 720, 725 (9th Cir. 2001). The Indian Civil Rights Act, 25 U.S.C. § 1302, provides for a right to retained counsel only. *Percy*, 250 F.3d at 724 n.2. The record here shows that the Navajo Tribe at the time of Mitchell's arrest did at least in some circumstances appoint advisors for indigent defendants, but these advisors were not necessarily licensed attorneys, and that some such non-lawyer advisor was appointed for Mitchell.

between the two that would affect disposition of the collusion and delay issues that Mitchell now poses. The federal rights that Mitchell asserts were circumvented, found in § 3501 and Fed. R. Crim. P. 5(a)(1), are substantively similar to the corresponding rights for a juvenile in 18 U.S.C. § 5033.[4] Mitchell developed no record that distinguishes his situation from Ors-

---

[4]Section 5033 provides, in pertinent part:

> Whenever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer shall immediately advise such juvenile of his legal rights, in language comprehensive to a juvenile, and shall immediately notify the Attorney General and the juvenile's parents, guardian, or custodian of such custody. . . .

> The juvenile shall be taken before a magistrate judge forthwith. In no event shall the juvenile be detained for longer than a reasonable period of time before being brought before a magistrate judge.

Although Mitchell doesn't say so, presumably his argument rests in part on Fed. R. Crim. P. 5(a)(1), and in part on §§ 3501(a) and (b). Rule 5(a)(1) provides:

> A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officers as Rule 5(c) provides [if a magistrate judge is not reasonably available], unless a statute provides otherwise.

Sections 3501(a) and (b) together provide that a confession shall be admissible if voluntarily given, and that the trial judge in determining voluntariness shall take all the circumstances into consideration, including the time elapsing between arrest and arraignment, if the confession was made in the interim; whether the defendant knew the nature of the offense with which he was charged or of which he was suspected; whether the defendant was advised or knew he was not required to make statements and that any such statement could be used against him; whether the defendant had been advised prior to questioning of his right to counsel; and whether the defendant was without the assistance of counsel when questioned. Section 3501(c) allows the government a six-hour safe harbor during which a confession made while a person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency shall not be inadmissible solely because of delay in bringing such person before a magistrate judge.

inger's; indeed, he developed no record on the point at all. Applying our opinion in *United States v. Doe*, 155 F.3d 1070, 1076 (9th Cir. 1998) (en banc), the district court found on the basis of testimony by federal agents and tribal investigators during the evidentiary hearings that after concluding there was insufficient evidence to obtain federal search or arrest warrants, participants in the November 4 briefing determined there was sufficient evidence to obtain arrest warrants on tribal charges, and jointly decided on that course in the interests of public safety. It concluded that Orsinger had not met his burden to demonstrate actual collaboration between federal and tribal authorities to deprive him of his federal procedural rights.[5]

[16] Alternatively assuming that Mitchell preserved issues arising out of collusion and delay, and our review is under the normal standards instead of for plain error, we cannot say that the district court clearly erred in its findings or that its conclusion did not follow the law. Mitchell had the burden of showing "actual collaboration" intended to deprive him of federal procedural rights. *Doe*, 155 F.3d at 1078. Having heard the agents and investigators who were involved in the decision to seek a tribal warrant testify in Orsinger's case, the court found that the testimony of Agents Purcell and Duncan was credible. This means that the difference in rights afforded to those in federal and tribal custody was not discussed, the federal officers concluded there was insufficient evidence to obtain federal search or arrest warrants, the tribal officers concluded there was sufficient evidence to obtain arrest warrants on tribal charges, both were concerned about public safety, and they jointly decided to pursue a tribal warrant. While the court could have found otherwise, it was not obliged to do so as its findings are not without support in the evidence. *See United States v. Michaud*, 268 F.3d 728, 735 (9th Cir. 2001) (stating that the district court's factual determination regarding the

---

[5]We resolved Orsinger's appeal in an unpublished memorandum disposition. *United States v. Orsinger*, No. 03-10500 (9th Cir. June 27, 2005).

existence of collusion is only reversed for clear error). In light of what it found, Mitchell was not functionally arrested on federal charges when he was arrested, and held, by tribal authorities on November 4; put differently, he was not arrested tribally in order to deprive him of federal procedural rights. Proof of deliberate intent to deprive a suspect of federal procedural rights is required to trigger the protections of § 3501, *Michaud*, 268 F.3d at 735; *Doe*, 155 F.3d at 1078, but is lacking in Mitchell's case. Therefore, he was not federally arrested until November 29. Interviews by federal authorities in the meantime were permissible and statements obtained were admissible. *Michaud*, 268 F.3d at 734 (so stating with respect to a defendant in state custody); *United States v. Percy*, 250 F.3d 720, 727 (9th Cir. 2001) (so stating with respect to a defendant in tribal custody); *see also United States v. Alvarez-Sanchez*, 511 U.S. 350, 358-59 (1994) (holding that a person questioned by a federal officer while being held on state charges was outside any protection afforded by 18 U.S.C. § 3501(c)).[6]

[17] Given this, to the extent Mitchell maintains that delay alone is enough to require suppression of his confessions, the relevant delay is not the period from November 4 until November 29, but is the period on November 29 between the time when Mitchell was picked up at the tribal jail and when he was presented to the magistrate judge in Flagstaff. Although Mitchell notes that his statements got progressively more incriminating, with the third — and most incriminating — occurring after his arrival at the federal courthouse but before arraignment, he points to no evidence (and does not

---

[6]The dissent suggests that the delay between when federal agents knew enough to make an arrest and when they did compels a finding of collusion. Dissenting op. at 11662-64. Not so. *See Percy*, 250 F.3d at 723-24, 727 (upholding a finding of no collusion where cross-certified federal/tribal agent arrested the defendant on tribal charges despite knowledge of an outstanding federal arrest warrant; the defendant was interviewed 17 days later; and he was then placed under federal arrest).

argue) that his November 29 confession should have been suppressed under § 3501 due solely to delay that morning.[7]

B

**[18]** Mitchell did not object at trial to evidence about the knife that fell out of the pocket of his pants at the Nakai residence, but now maintains that it violated *Miranda* because he had been arrested at that point but had not yet been advised of his rights. As Mitchell admitted, the officer probably would not have gone to retrieve his pants if he — Mitchell — had not asked for them. In these circumstances, the officer cannot possibly have believed that asking Mitchell where his trousers were would be reasonably likely to elicit anything incriminating.

C

**[19]** Finally, Mitchell asserts that his confessions were involuntary in that agents implied that things would go in a positive way if Mitchell cooperated, and told him he would have the right to have a lawyer appointed for him when, in fact, no appointment was possible for individuals in tribal custody. The district court credited the agents' testimony and its findings were not clearly erroneous. Mitchell offered no evidence that he was confused by any promise made by the agents, or that he ever asked for counsel.

---

[7]Mitchell mentions the Sixth Amendment but neither raised any Sixth Amendment claim in district court nor develops any argument with respect to it here. In any event, no plain error appears. *See United States v. Percy*, 250 F.3d 720, 726-27 (9th Cir. 2001) (explaining that an arguably tribal, arguably federal defendant who does not retain counsel, does not indicate that he wants the assistance of counsel, and executes a valid waiver of his Fifth Amendment right to counsel, also waives any Sixth Amendment right to counsel he might have) (citing *Patterson v. Illinois*, 487 U.S. 285 (1988)).

## V

Other guilt phase issues center on joinder and discovery; evidentiary rulings that Mitchell claims ran afoul of his rights to confrontation, due process, and a fair trial; the aiding and abetting instruction; and declining to grant a mistrial for misconduct in opening statement and closing argument.

## A

Joinder difficulties permeated pretrial proceedings. Mitchell, Orsinger, and Gregory Nakai were slated to be tried jointly but Gregory was only charged in the armed robbery counts and Orsinger was only charged in the murder counts. The district court decided to sever Gregory out, but also to keep Gregory and Mitchell together on the robbery counts while Mitchell and Orsinger were left together on the carjacking counts. Then Mitchell's trial on the robbery counts was severed from Gregory, and Orsinger was severed on the carjacking counts when Mitchell filed a motion to introduce impeachment evidence against him five days before jury selection was to begin. The district court then granted the government's motion to rejoin the robbery and carjacking counts against Mitchell, finding that they were parts of a common scheme and that joinder would cause no prejudice.

Mitchell presses error only under Fed. R. Crim. P. 14(a). He has the burden of proving that the joint trial was "manifestly prejudicial" in that his right to a fair trial was abridged. *United States v. Lewis*, 787 F.2d 1318, 1321 (9th Cir. 1986). While he believes this standard is wrong, a three-judge panel has no power to change it. Applying this standard, the district court was not compelled to exercise its discretion to sever the counts. Evidence on the robbery charges would have been largely admissible in a separate trial on the carjacking counts. *See United States v. Irvine*, 756 F.2d 708, 712 (9th Cir. 1985) (holding that there is no manifest prejudice in such circumstances); *United States v. Kenny*, 645 F.2d 1323, 1345 (9th

Cir. 1981) (same). The carjacking on October 28 provided the get-away vehicle for the robbery on October 31. The two sets of crimes were part of a common plan or scheme, rendering evidence of one legally relevant as to the other; as the crimes are correlated, knowing about one helps explain the other and so makes it more likely.[8] Mitchell also faults the court for failing explicitly to conduct a Federal Rule of Evidence 403 analysis in determining whether evidence on one set of charges would have been admissible in a trial on the other. However, the court found that limiting instructions (which it gave) would ameliorate the risk of unfair prejudice. Mitchell does not argue this is incorrect.

Further, Mitchell suggests, without supporting authority, that severance was required because the carjacking count was death eligible. But the potential for prejudice turns on the factual evidence relating to that count, not on whether a given count is death eligible. There is no reason to suppose that evidence of the carjacking, which was death eligible, was more prejudicial than evidence of the murder, which was not.

Mitchell finally argues that the rejoining of counts so late in the game prejudiced him. We fail to see how. Mitchell was himself responsible for the late decision, having moved for the first time to introduce prejudicial evidence against his co-defendant only three business days before jury selection was to begin. That prompted the district court to sever Orsinger from Mitchell, and the prospect of having four separate trials prompted the decision to rejoin all of Mitchell's counts.

[20] In sum, joinder of the robbery and murders counts was permissible and declining to sever them was not "manifestly prejudicial" because they were, in fact, related, and the evidence would have come in anyway.

---

[8]Mitchell suggests that even if this were so for purposes of the guilt phase, it wasn't for the penalty phase, but we disagree. Evidence of the robbery was also relevant to show the pecuniary gain aggravating factor.

B

Mitchell complains that the government committed two discovery violations affecting the guilt phase. We review the district court's discovery rulings for abuse of discretion. *United States v. Danielson*, 325 F.3d 1054, 1074 (9th Cir. 2003). For reversal, the defendant must show that the district court abused its discretion, and that "the error resulted in prejudice to substantial rights." *United States v. Amlani*, 111 F.3d 705, 712 (9th Cir. 1997).

[21] No plain error appears with respect to his first contention, that he was not given the questions or answers to the polygraph examination. Mitchell did move for a mistrial when the government sought to introduce anatomical drawings to aid in the medical examiner's testimony. However, counsel acknowledged that he had been told that diagrams were being made and the district court offered a break, which counsel accepted. In these circumstances, Mitchell's substantial rights were not affected, nor did the court abuse its discretion in denying a mistrial.

C

Mitchell finds various violations of the Confrontation Clause in the record. We do not. We review the district court's construction of a hearsay rule de novo, and its exclusion of evidence under a hearsay rule for abuse of discretion. *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000). Alleged violations of the Confrontation Clause are reviewed de novo. *United States v. Ballesteros-Selinger*, 454 F.3d 973, 974 n.2 (9th Cir. 2006).

i

[22] First, Mitchell was not allowed on cross-examination of Agents Kirk and Duncan to elicit exculpatory statements that he made during interviews to the effect that he had coop-

erated with law enforcement, that he had denied killing any-
one, and that he and Orsinger had been drinking in Gallup.
These statements were inadmissible hearsay; as Mitchell was
attempting to introduce them himself, they were not party-
opponent admissions, nor did the fact that they were made in
a more broadly self-inculpatory confession bring them within
the statement-against-interest exception. *Ortega*, 203 F.3d at
682 (citing *Williamson v. United States*, 512 U.S. 594, 599
(1994)). Mitchell asks us to ignore *Ortega*, but this panel can-
not do so. He also argues that this case should be distin-
guished because it involves capital punishment, but offers no
authority in support of the claim that the hearsay rules operate
differently in capital cases. Additionally, he submits that
*Ortega* has been undermined by *Crawford v. Washington*, 541
U.S. 36 (2004), but *Crawford* is inapposite. *Crawford* stands
for the proposition that it is improper in certain circumstances
to admit hearsay testimony against the accused even if it falls
into one of the hearsay exceptions. It says nothing about when
a defendant ought to be able to compel the admission of hear-
say evidence in his favor.

Neither was Mitchell's constitutional right to cross-
examine witnesses severely restricted, nor were his due pro-
cess rights offended. The inculpatory statements elicited on
direct examination of Agents Kirk and Duncan were not taken
out of context or otherwise distorted. *See Ortega*, 203 F.3d at
683 (no violation in such circumstances, when a defendant
testifies himself as to exculpatory statements) (citing *United
States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988) (per
curiam)); *Nakai*, 413 F.3d at 1022 (same, without consider-
ation of whether the defendant testified or not). That Mitchell
told Duncan he had been drinking had nothing to do with his
ability to impeach the agent on the testimony that the agent
did give. And Mitchell's purported reason for seeking to elicit
statements in which he denied killing anyone — the need to
clarify and refute Agent Kirk's testimony that Mitchell lied

during questioning — was removed when the trial court struck that testimony.[9]

ii

**[23]** During its opening statement the government referred to statements made by Orsinger and elicited those statements during examination of Agent Kirk. Mitchell argues this ran afoul of *Bruton v. United States*, 391 U.S. 123 (1968). An alleged *Bruton* violation is reviewed de novo. *United States v. Angwin*, 271 F.3d 786, 795 (9th Cir. 2001), *overruled on other grounds*, *United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc).

"Under *Bruton* and its progeny, the admission of a statement made by a non-testifying codefendant violates the Confrontation Clause when that statement facially, expressly, clearly, or powerfully implicates the defendant." *Id.* at 796. However, *Bruton* applies only where co-defendants are tried jointly, and is inapplicable when the non-testifying co-defendant is severed out, as was the case here. *See United States v. Gomez*, 276 F.3d 694, 699 & n.4 (5th Cir. 2002) (citing *United States v. Briscoe*, 742 F.2d 842, 847 (5th Cir. 1984) ("For *Bruton* to apply, however, there must be a joint trial with co-defendants. Briscoe's trial was severed from that of the other defendants; thus *Bruton* is inapplicable.")).

iii

Evidence came in without objection regarding the license plate of the truck used by the Trading Post robbers; informa-

---

[9]Mitchell's argument that exclusion of his exculpatory statements violated Fed. R. Evid. 106 is waived because he raised it for the first time in reply. It is also foreclosed by *Ortega*, 203 F.3d at 682, where we rejected a similar argument. Rule 106 applies only to written and recorded statements, not unrecorded oral confessions, and Rule 106 does not render admissible otherwise inadmissible hearsay.

tion received by law enforcement from an unidentified informant that Slim's truck had been in the area of Mitchell's grandfather's house; and the value of the goods taken during the Trading Post robbery. Also, the fingerprint examiner testified that his conclusions had been verified by someone else, and the medical examiner testified about incised wounds to Doe's neck and a diagram of injuries that may have been the work of an assistant. Mitchell now claims *Crawford* error. Our review is for plain error. *United States v. Jawara*, 474 F.3d 565, 583 (9th Cir. 2007).

The Confrontation Clause does not apply to non-hearsay, that is, it "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted," nor does it apply to hearsay by a declarant who appears for cross-examination at trial. *Crawford*, 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985) and *California v. Green*, 399 U.S. 149, 162 (1970)). Statements made in the course of police interrogation are nontestimonial when made "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," but are testimonial when "circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 126 S. Ct. 2266, 2273-74 (2006).

**[24]** No plain error appears. Testimony by a patrol officer about information an eyewitness gave her about the car parked at the Trading Post was offered as a basis for action, not for its truth. Even if the tip that Slim's vehicle had been in an area near Mitchell's grandfather's house were hearsay, nothing came of it and there was other, direct testimony to similar effect. Mitchell waived error with respect to the value of the goods by agreeing to allow the government to reopen for Agent Duncan to testify to what he was told. The fingerprint examiner's testimony was harmless in light of his proper

testimony as to his own conclusions and the abundant other evidence linking Mitchell to the crime. And the medical examiner who conducted and supervised the examination and completion of the diagram was available for cross-examination, so Mitchell's substantial rights were not affected even if some annotations were someone else's out-of-court statement.

Mitchell also argues that his *Crawford* rights were again violated in the penalty phase because all of the evidence received during the guilt phase was admitted during the penalty phase as well. Assuming (without deciding) that *Crawford* applies during a capital sentencing phase, there was no plain error. As we have explained, there was no obvious or consequential *Crawford* error, and Mitchell makes no effort to explain how, if there were, it affected his substantial rights during the penalty phase.

iv

**[25]** Jason Kinlicheenie was a cooperating witness who testified for the government pursuant to a written plea agreement. Mitchell was able to elicit that Kinlicheenie had entered a plea agreement; that he had been facing four counts relating to armed robbery with a potential minimum sentence of 62 years; that if "things were to go [his] way" under the agreement he would instead receive a minimum sentence of 7 years, a reduction of 55 years; that the plea agreement required him to testify truthfully regarding the robbery and the murders of Slim and Doe, as well as the murders of two other victims (Begay and Sam); that in order to obtain the benefit of the agreement, he had to tell the truth as determined by the government prosecutor in Mitchell's case; and that the prosecutor could prosecute him for any crime and seek the maximum penalty if the prosecutor did not believe he was telling the truth, as well as inform the Bureau of Prisons which could result in a loss of protective custody status. Mitchell was not, however, allowed to go into the details of

the Begay and Sam murders because, in the district court's view, discussion of those murders would be too prejudicial under Rule 403. He claims this was an undue restriction on his right to confront and cross-examine.

We disagree that there was any such undue restriction. In order for the Confrontation Clause to be satisfied, "where a plea agreement allows for some benefit or detriment to flow to a witness as a result of his testimony, the defendant must be permitted to cross examine the witness sufficiently to make clear to the jury what benefit or detriment will flow, and what will trigger the benefit or detriment, to show why the witness might testify falsely in order to gain the benefit or avoid the detriment." *United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2005). This was allowed. It was not necessary for the jury to hear in detail about the Begay/Sam murders (in which Orsinger and Gregory Nakai, but not Mitchell, were involved) in order to assess the benefit Kinlicheenie received for his cooperation, and thus his motivation to lie. It would have been distracting and of marginal probative value. Mitchell adduced ample evidence of what the plea bargain was objectively worth — 55 years off of a 62 year sentence — and of its subjective value to Kinlicheenie as he was willing to cooperate against Mitchell, his longtime friend and relative.

Mitchell also contends that the district court violated Fed. R. Evid. 608(b) as well as his constitutional rights by preventing him from questioning Kinlicheenie about a prior arrest for theft. This would have been only weakly probative of Kinlicheenie's character for truthfulness; regardless, cutting off this line of inquiry cannot have prejudiced Mitchell as the other evidence he was able to elicit from Kinlicheenie, including admissions that Kinlicheenie had lied on several occasions, was far more effective impeachment and rendered insignificant any additional value from the theft. Mitchell cites no authority for his argument that a district court's refusal to permit a defendant to ask a witness about a past instance of criminal misconduct in order to prove a poor char-

acter for veracity violates a defendant's constitutional rights to confrontation or due process. Nor could he, unless every exercise of discretion under Rule 608 adverse to a defendant is a constitutional violation.

V

Mitchell cites a number of discrete items of evidence that he claims were improperly admitted. Our review is for abuse of discretion, *United States v. Alvarez*, 358 F.3d 1194, 1205 (9th Cir. 2004), unless no objection was made in which event we review for plain error, *United States v. Tisor*, 96 F.3d 370, 376 (9th Cir. 1996). Harmless error analysis applies to the preserved objections; we will reverse a conviction only if an erroneous ruling more likely than not affected the verdict.[10] *Alvarez*, 358 F.3d at 1205. Addressing his assignments of error in turn:

[26] *Medical Examiner Hearsay.* An adequate foundation was laid for admission of the diagram made during the autopsy as a business record under Fed. R. Evid. 803(6).

[27] *Post-mortem Mutilation.* Evidence of post-mortem decapitation and dismemberment, thus of photographs depicting it, was relevant to show motive, premeditation, and consciousness of guilt; it tended to show that Mitchell needed to, and tried to, obscure the identity of Slim and Doe in order to have an untraceable vehicle for use in the Trading Post robbery that he and his cohorts planned to commit. Beheading and dismembering Slim and Doe to conceal who the victims were also shed light on the veracity of Mitchell's theory of defense — that he was present but did not participate in the killings — because a glove linked to Mitchell through DNA evidence was found in the hole where severed parts were buried, tending to show participation in the mutilation, thus consciousness of guilt, thus participation in the killings. Also, as the district court observed, the medical examiner had to discuss severance of Doe's head in order to explain the difficulty

---

[10]We note Mitchell's suggestion that the Federal Death Penalty Act is infirm in failing to allow for plain-error review, but we have no need to address the question here because the government does not argue that any of his claims are not subject to plain error analysis under the FDPA.

in determining whether and how her neck was sliced, and why the examiner could not determine whether the slicing wounds were fatal. Cause of death was obviously important because it bore on details related in Mitchell's confession. The district court painstakingly scrutinized graphic photographs offered by the government, making refined judgments about which should be received into evidence, and how they should be cropped or displayed to minimize prejudicial impact. It did not abuse its discretion in balancing probative value in relation to prejudicial effect under Rule 403.

Mitchell's suggestion that the court erred by not considering elements of any charge other than murder in conducting its Rule 403 analysis is unsupported, but even so, would fail because he neither asked for, nor argues that it was a mistake not to give, a limiting instruction. Likewise, Mitchell's argument that the risk of prejudice in the penalty phase compelled exclusion of the evidence in the guilt phase fails if for no other reason than, as we shall explain, it was admissible on the gateway intent factors and on one or more of the aggravating factors.

[28] *Victim Vulnerability*. Evidence of Slim's leg injuries was relevant both to explain why Slim set out to see a medicine person and to premeditation because it tends to show that Slim posed no threat to Mitchell and Orsinger, and they only killed her because it furthered their plan to obtain an untraceable getaway car. Mitchell did not object, and there was no plain error.

[29] *Victim Impact Evidence*. Testimony by Doe's mother that Doe didn't want to go with Slim on the trip, but her mother made her, was not so plainly inflammatory that it should have been excluded *sua sponte*. Nor, in light of the overwhelming evidence of guilt can it possibly have been plain error, in the absence of a motion to strike, for the court to let stand an observation by the medicine woman whom Slim saw that day that Slim or Doe had been a beautiful per-

son, and "it was a shame." The same is true of testimony by two robbery victims about going to the hospital as a result of having been hit with a gun and having been scared and pushed around the counters. This was relevant to show that the taking was done by force or violence, an element of robbery.

[30] *Opinion Evidence*. An investigative agent testified, without objection, that he took pictures of "blood splatter" on the inside of the truck; he authenticated the photos but did not express any opinion about what the photos signified. Similarly, an FBI agent testified about photographs of rocks that he believed had blood on them, but did not testify that the substance on the rocks *was* blood. As there was no expert testimony by the agents, there was no plain error in allowing it without qualifying them.

[31] *Hearsay from Informant and Photos of "Mitchell's Canyon."* A tribal investigator was permitted to explain why he went to an area near where Mitchell's grandfather lived to confirm information that he had gotten from an informant that the Slim vehicle was supposedly there at some point. Although he testified to finding tire tracks and footprints, he also admitted that no "efforts were made to match either the tire tracks that [he] saw or the footprints that [he] saw to any tires or shoes that belonged to someone in this case." This cannot have been plainly erroneous.

[32] *Items Seized in Nakai's Home*. Investigators testified to finding a newspaper with a front-page story on the robbery and a police scanner and codes in the Nakai residence on the morning that Mitchell was arrested there. Mitchell's argument that the newspaper was hearsay is meritless. The paper obviously came in for the fact of its presence in the home, not for its content. In any event, the story could not be read as the court only allowed the jury to see the paper and headline from afar. Mitchell did not object to the court's solution. This evidence was not irrelevant, as Mitchell contends, because the

fact that he and others suspected of committing the Trading Post robbery were staying together in a house where a police scanner and a newspaper article covering the robbery were also found corroborates other evidence that Mitchell and those men actually did commit the robbery. Of course there are other possible explanations for why Mitchell was found in a place with these things, but that he was is probative circumstantial evidence of his involvement in the crime. Even if there were error, it would be harmless given the strong evidence linking him to the robbery.

[33] *Height, Weight, and Age*. Mitchell did not object at the time to evidence of Orsinger's height, weight, and age and his own; having second thoughts later, he argued that it opened the door for him to put in bad act evidence about Orsinger and moved to strike. The evident purpose of the Orsinger evidence was to counter the defense theory that Mitchell was intimidated by Orsinger even though Orsinger was younger than he. There was no error.

[34] *DNA Evidence*. Mitchell argues that the court should not have admitted confusing, misleading, and irrelevant DNA testimony, and also suggests that doing so fell short of the *Daubert* test. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (making federal courts the gatekeeper for reliability of scientific evidence). *Daubert*, however, was never mentioned in district court and no argument is developed with respect to it in this court. No plain error is apparent; the real difficulty with the DNA evidence in this case lay with the coherence of the expert's explanation of what constituted a "match," an "exclusion," and a "cannot exclude" — not with the inherent integrity of the methodology or results.

According to the government's expert, a "match" exists when the person possesses all 14 of the "alleles" (DNA sequence segments) taken from a sample at different "loci" (positions on a chromosome), but the person is "excluded" when he possesses none of the alleles taken from the sample.

Mitchell's complaint centers on confusion about what it meant that a person "could not be excluded." Undoubtedly the expert's explanation was not a model of clarity. She basically said it meant that alleles of more than one person are present in the sample, yet never clearly articulated what exactly the fact that a person cannot be excluded from a sample says about the probability that the person's DNA is present in the sample, or how likely it would be that a person would possess any given number of alleles in a mixture and yet still not have contributed the DNA.

Mitchell suggests that "cannot exclude" is the very definition of non-probative. Thus, he submits, evidence beyond that matching Slim's blood to the truck and knives found in the Nakai house, and matching Doe's blood to the rocks, should not have been admitted because it told the jury nothing. We do not agree; the expert's testimony indicates that a "cannot exclude" finding can tell a lot, and can increase the probability that the person's DNA is present, depending on the number of loci at which the person cannot be excluded.

Apart from the evidence that Mitchell concedes was properly admitted, the jury was told that there was a mixture of at least three person's DNA on the black butterfly knife from which the expert concluded that Mitchell and Jakegory could not be excluded at all 14 loci, Slim could not be excluded at 13 of the 14, and Orsinger's father and Gregory Nakai also could not be excluded; that there was a mixture of at least two people on the chrome knife, and Slim matched the major component at all 14 loci, which would be expected to occur in 1/650 billion Navajos; that Mitchell could not be excluded at 12 of 14 loci on Slim's cell phone; that Mitchell could not be excluded from a Halloween mask because he had some of the alleles found, but alleles he could not have produced were also present; and that Mitchell could not be excluded as a contributor at all six loci that could be tested on a glove buried with the body parts. The jury likely understood from this evidence that DNA linked Mitchell to the black knife and Slim's

cell phone, and somewhat linked him to the mask and glove. It definitely connected Slim's blood to the chrome knife found in Mitchell's pants. In sum, Mitchell has shown no plain error.

D

Mitchell requested the aiding and abetting instruction that was given (Ninth Circuit Model Jury Instruction 5.1), but now claims that it omitted the element that the accused had the requisite intent of the underlying substantive offense. *United States v. Garcia*, 400 F.3d 816, 819 n.2 (9th Cir. 2005) (listing elements). Giving the instruction was not plain error, however, because it included the statutory language in 18 U.S.C. § 2(a) and stated that someone must have committed the crime charged. *United States v. Armstrong*, 909 F.2d 1238, 1244 (9th Cir. 1990).

E

Mitchell identifies three instances of misconduct in the government's opening statement. A district court's response to an objection on the grounds of prosecutorial misconduct, including denial of a mistrial, is reviewed for abuse of discretion. *United States v. Steele*, 298 F.3d 906, 910 (9th Cir. 2002). When objected to, misconduct is subject to harmless error review, while conduct to which the defendant failed to object is reviewed for plain error. *United States v. de Cruz*, 82 F.3d 856, 861 (9th Cir. 1996).

[35] First, the AUSA mentioned statements made by Orsinger, which Mitchell claimed was in violation of the court's order not to refer in opening statement, or during the case-in-chief, to any of Orsinger's statements that refer to Mitchell. The AUSA stated that between Orsinger and Mitchell the bodies of Alyce Slim and Jane Doe were located; that according to Kinlicheenie, Mitchell and Orsinger admit that they killed an old lady and a young girl; and that when Agent Kirk

told Mitchell "We have talked to Johnny Orsinger. He says you stabbed Grandma," Mitchell responded by saying "I did. I stabbed Grandma a few times." The district court agreed with Mitchell that the government should not have made the last statement under its prior order, but denied Mitchell's request for a mistrial. Mitchell argues that Orsinger's hearsay statements implicated him, but they either did not, or did so obliquely as not to be prejudicial. The court also emphasized to the jury that statements by the lawyers are not evidence. For both reasons the court did not abuse its discretion in refusing a mistrial.

Second, the AUSA asserted that "Mitchell was asked, 'Did you yell at her or did you yell that the bitch won't die'? 'Lay down and die, bitch.' And he admitted that he said words to that effect and the little girl laid down on the ground." Mitchell interposed no objection. Agent Kirk, whom the government expected to testify that he had been told Mitchell said this, testified only that "after he slashed the young girl's throat, he told her, in essence, to lay down on the ground and die." Absent any suggestion that the statement was in bad faith (and there isn't any), this was not plainly misconduct, nor could it have affected Mitchell's substantial rights in light of the instructions.

Third, the AUSA stated: "When we find the hole, next to [Doe's] head is a pair of latex gloves. And you will hear that there is DNA material in that glove similar to the defendant's. . . . We found masks in the truck. And you will hear that there's some DNA material linking all three defendants to the masks that were worn during the robbery." Again, Mitchell did not object. At trial, the DNA expert testified that, as to the glove, the partial DNA profile obtained "was a mixture of at least two individuals and that Mr. Lezmond Mitchell could not be excluded as a contributor," and as to the mask, the profile "was a mixture of at least three individuals. And that Mr. Lezmond Mitchell could not be excluded as a contributor to this mixture. There were other individuals who were excluded

as contributors." There is not enough difference to the lay ear to constitute plain misconduct.

In addition to these statements, Mitchell complains about the government's identifying Slim as a Navajo. Neither this reference, nor testimony to the same effect by Yazzie and Kinlicheenie, was racially inflammatory or in any way invidious. What the jury was told, and learned, about their ethnicity was unavoidable.

**[36]** Mitchell points to many statements made in closing that he claims were improper, but to which he neither objected at trial nor develops much of an argument on appeal. We have reviewed the closing arguments with close attention to each of the comments about which Mitchell complains. While some things might have been put more felicitously, we cannot see prejudicial impact from the remarks, singly or collectively.

## VI

**[37]** Sometime during the guilt phase, members of the victims' family apparently sat in the courtroom wearing buttons with pictures of Slim and Doe. This could be a problem if it were "so inherently prejudicial as to pose an unacceptable threat" to a defendant's right to a fair trial, meaning that "an unacceptable risk is presented of impermissible factors coming into play," *see, e.g., Norris v. Risley*, 918 F.2d 828, 830 (9th Cir. 1990); *Musladin v. Lamarque*, 427 F.3d 653, 656-57 (9th Cir. 2005), *vacated on other grounds*, *Carey v. Musladin*, 127 S. Ct. 649 (2006), but there is no basis for supposing the conduct here posed any such risk. All the record reflects is that Mitchell's counsel told the court a week later, and in connection with a different matter, that some members of the victims' family were wearing buttons and that he and government counsel had worked it out informally. There was no plain error.

## VII

**[38]** On two occasions the district judge met ex parte with the United States Marshals Service, once to discuss security concerns relevant to the court's reconsidering its decision to transfer the case to Phoenix, and another prior to the penalty phase after Mitchell announced his refusal to be present. He claims both incidents violated Fed. R. Crim. P. 43 and implicated his right to be present at a critical stage of the proceedings. No objection was lodged at the time. With respect to the first instance, the court determined that it should hear from the Marshal without anyone in attendance because of the Marshal's concern about testifying in open court on security matters; however, the court invited counsel to suggest questions to be pursued. With respect to the second, Mitchell's counsel asked the judge to speak with the Marshals about Mitchell's complaint that the Marshals had "forced him" to be present when he did not want to be. During the conference that followed with the Marshal, the Marshal apparently told the judge that Mitchell had stated his intent to fight any attempt to bring him to court for the penalty phase. The judge relayed this information from the bench, with Mitchell present, the next day. As we indicated in *United States v. Olano*, 62 F.3d 1180, 1191 (9th Cir. 1995), and *Unites States v. Dischner*, 974 F.2d 1502, 1512-13 (9th Cir. 1992), meetings of this sort are not "stages" of the trial for purposes of Rule 43. Securing facilities and transportation is a matter largely within the province of the Marshal, to which it is unlikely that Mitchell could have contributed anything substantial beyond his suggested questions. Mitchell had every opportunity to challenge what the Marshal said about his acting out, and to state his own position. Mitchell does not suggest how he was prejudiced on either occasion.

Nor has Mitchell shown any constitutional violation. Neither discussion bears any connection to evidence presented against Mitchell at trial. Thus, there was no Confrontation Clause violation. *Cf. Kentucky v. Stincer*, 482 U.S. 730, 739-

40 (1987) (indicating that the Confrontation Clause "may well" protect right to presence at a witness competency hearing because of the relationship to trial testimony); *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam) (indicating that the Confrontation Clause largely protects the right to presence, but the Due Process Clause is implicated instead "where the defendant is not actually confronting witnesses or evidence against him"). Likewise, there is no suggestion that these discussions interfered in any way with Mitchell's right to have the assistance of his counsel, from whom he was not separated and no information was withheld. No improper material was communicated to the jury so as to deny him a fair trial. Finally, for all the reasons that there was no Rule 43 violation, there was no due process violation. *Id.* at 526 (the due process right to be present attaches only when the defendant's presence " 'has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge . . . .' ") (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)) (alterations in original); *Stincer*, 482 U.S. at 745 (recognizing a defendant's right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure).

## VIII

Mitchell raises a number of issues with respect to capital sentencing under the Federal Death Penalty Act, including constitutionality of the scheme itself and how it was applied to him.

In order to consider death as a sentencing option, the FDPA requires that the court or jury — in this case, the jury — first unanimously find beyond a reasonable doubt: (1) the defendant was 18 years of age or older at the time of the offense; 18 U.S.C. § 3591(a); (2) the defendant had at least one of four enumerated mentes reae (often referred to as "gateway intent

factors"),[11] *id.* § 3591(a)(2); and (3) the existence of at least one of sixteen statutorily defined aggravating factors, *id.* § 3592(c). If the jury makes these threshold findings, the defendant is eligible for the death penalty. In that event, the jury decides whether to impose a sentence of death or life imprisonment without possibility of release. In determining the appropriate sentence, the jury considers whether any non-statutory aggravating factors alleged by the government have been proven beyond a reasonable doubt, and whether any mitigating factors have been proved by the defendant by a preponderance of the evidence. A finding of a mitigating factor may be made by one or more members of the jury, and it may be considered regardless of the number of jurors who concur. If (as here) at least one mitigating factor is found, the jury then decides whether all the aggravating factors found to exist "sufficiently outweigh" the mitigating factors found to exist. *Id.* § 3593(e); *see also United States v. Brown*, 441 F.3d 1330, 1365-66 (11th Cir. 2006) (outlining process). Special findings must be returned identifying any aggravating and mitigating factors found to exist. *Id.* § 3593(d). Based upon its consideration of the aggravating and mitigating factors, the jury by unanimous vote recommends whether the defendant should be

---

[11]The four factors/mentes reae are:

(A)  intentionally killed the victim;

(B)  intentionally inflicted serious bodily injury that resulted in the death of the victim;

(C)  intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

(D)  intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

sentenced to death, to life imprisonment without possibility of release, or some other lesser sentence. *Id.* § 3593(d), (e).[12]

A

Mitchell first asserts that each of the aggravating circumstances is unconstitutional facially or as applied or both.

Six statutory aggravating factors were presented to the jury: pecuniary gain; the manner of committing the offense was especially heinous, cruel, or depraved; substantial planning and premeditation; vulnerability of the victim; multiple killings; and the death of Jane Doe occurred during the commission and attempted commission of another felony, kidnapping. 18 U.S.C. § 3592 (c)(8), (6), (9), (11), (16), (1). One non-statutory aggravating circumstance was presented: that the defendant caused injury, harm, and loss to the victim's family. The jury found each of these factors to exist.

Mitchell urged as mitigating factors that he did not have a significant prior criminal record, *id*. § 3592(a)(5); that another person, equally culpable in the crime, will not be punished by death, *id*. § 3592(a)(4); that if life in prison were directed, it would be without any possibility of release; that he responded well to structured environments; that his capacity to appreciate the wrongfulness of his conduct was impaired, *id*. § 3592(a)(1); and that other facts in his childhood, background, character, and record mitigated against imposition of the death sentence, *id.* § 3592(a)(8). The court also instructed that in addition to these six factors, members of the jury could consider anything about the circumstances of the offense, or

---

[12]When, as here, an appeal is taken, the statute directs the court of appeals to review the entire record in the case including the evidence submitted during the trial; information submitted during the sentencing hearing; the procedures employed in the sentencing hearing; and the special findings returned under § 3593(d). 18 U.S.C. § 3595(a), (b). We have done so.

anything else relevant that anyone individually believed miti-
gated against imposition of the death penalty. All members of
the jury found the first three factors to exist by a preponder-
ance of the evidence; two found Mitchell responded well to
structured environments and would make an excellent adjust-
ment if sentenced to life imprisonment; one found his capac-
ity to appreciate his conduct impaired; six found other factors;
and seven wrote-in that they found the letter from the Navajo
Nation an additional mitigating factor.

It is a constitutional requirement of capital sentencing
schemes that they "perform a narrowing function with respect
to the class of persons eligible for the death penalty . . . ."
*Jones v. United States*, 527 U.S. 373, 381 (1999) (citation
omitted). Therefore, "[w]hen the purpose of a statutory aggra-
vating circumstance is to enable the sentencer to distinguish
those who deserve capital punishment from those who do not,
the circumstance must provide a principled basis for doing
so." *Arave v. Creech*, 507 U.S. 463, 474 (1993) (citing *Lewis
v. Jeffers*, 497 U.S. 764, 776 (1990)). Overbreadth is therefore
a relevant concern and the basic rule is that factors "can be
overbroad if the sentencing jury 'fairly could conclude that an
aggravating circumstance applies to *every* defendant eligible
for the death penalty." *Jones*, 527 U.S. at 401 (quoting *Arave*,
507 U.S. at 474). Vagueness is also an applicable doctrine,
though review is "quite deferential;" if "an aggravating factor
has a core meaning that criminal juries should be capable of
understanding, it will pass constitutional muster." *Id.* at 400
(citing *Tuilaepa v. California*, 512 U.S. 967, 973 (1994)). We
consider each of the factors at issue here in light of these prin-
ciples.

**[39]** *Pecuniary Gain.* The first statutory aggravating factor
the jury was instructed on required a finding that Mitchell
"committed the killing as consideration for the receipt, or
expectation of receipt, of anything of pecuniary value."[13] *See*

---

[13]In addition to the statutory language, the court defined terms for the
jury:

18 U.S.C. § 3592(c)(8). Mitchell did not object on any basis; he now complains that this factor is unconstitutional because it fails to narrow the class of offenders and is unconstitutionally vague and overbroad. The contention is foreclosed by *Woratzeck v. Stewart*, 97 F.3d 329 (9th Cir. 1996), which rejected a similar "narrowing" challenge to Arizona's almost identical pecuniary gain aggravating factor. *See also Williams v. Stewart*, 441 F.3d 1030, 1058-59 (9th Cir. 2006) (same). Mitchell's vagueness challenge also lacks merit. The "core meaning" of the pecuniary value factor is obvious from the face of the language and the definitions provided to the jury.

Mitchell further contends this factor is unconstitutional because it automatically triggers capital eligibility for every carjacking that results in death. He reasons that "pecuniary value" as an aggravating factor provides no narrowing function because every carjacking is by definition committed "in the expectation" of obtaining something of value. The plain reading of § 3593(c)(8) is that it applies "in the murder-for-hire scenario . . . or in the robbery scenario (if the defendant committed a concomitant *murder* 'in the expectation of the receipt of anything of pecuniary value')." *See Brown*, 441 F.3d at 1370. Mitchell proffers no alternative construction. Nor does he suggest when § 3592(c)(8) is appropriately considered by the jury if "pecuniary value" could not include Alyce Slim's truck or the Trading Post robbery. Limiting § 3592(c)(8) to murders-for-hire would read the second clause out of the statute. And Mitchell's insistence that § 3592(c)(8)

---

"Consideration" in this context means a payment or promise of payment in return for services. The Government need not prove that something of pecuniary value actually changed hands. The words "receipt, or expectation of receipt" should be given their ordinary, everyday meaning which includes obtaining or expecting to obtain something. "Anything of pecuniary value" means anything in the form of money, property, or anything else having some economic value, benefit or advantage.

is unconstitutional because it "encompasses every carjacking" is the same argument that was made and rejected in *Woratzeck*. Mitchell's motivation for killing was directly tied to pecuniary gain, and his crime spree was ongoing — he needed to kill Slim and Jane so the vehicle used in the robbery could not be traced to him. That distinguishes this case from *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002), on which Mitchell relies, where the Fifth Circuit held that it was error to instruct on pecuniary value as an aggravating factor where the carjackers shot victims to prevent them from reporting their crimes. Mitchell's reliance on *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), is also misplaced. *Chanthadara* held that the phrasing of the pecuniary value instruction given in that case was error because it "failed to specify the 'offense' to which it referred was the homicide, not the underlying robbery, and thereby failed to impose a necessary limitation." *Id.* at 1264. In contrast, the instruction here specified that the "Defendant committed the *killing* as consideration . . . ."

Section 3593(c)(8) by its plain terms applies to robbery scenarios in which the defendant is motivated to kill for pecuniary reasons. That is not the case in every carjacking-murder scenario but it aptly described what happened here. Slim and Jane were not murdered incidentally, or solely to cover up a crime, but because "pecuniary gain was expected to flow directly from the homicide." *Bernard*, 299 F.3d at 483-84. Accordingly, there was no plain error.

**[40]** *Heinous, Cruel and Depraved.* The second aggravating factor upon which the jury was instructed required it to find that Mitchell "committed the killing in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Alyce Slim and/or [Jane Doe]." *See* 18 U.S.C. § 3592(c)(6). Mitchell submits that this factor is unconstitutional, but this can't be so given that Congress defined what it meant by "especially heinous, cruel, or depraved" when it specified that for this manner of killing to

be aggravating, it must involve "torture or serious physical abuse to the victim." *See Maynard v. Cartwright*, 486 U.S. 356, 364-65 (1988) (strongly suggesting that such a narrowing construction would be constitutional); *Walton v. Arizona*, 497 U.S. 639, 654-55 (1990) (approving of such an aggravator), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002); *United States v. Jones*, 132 F.3d 232, 249-50 (5th Cir. 1998). Alternatively, Mitchell maintains that the court's charge defined the statute in overbroad terms,[14] particularly

---

[14]The court's instruction, essentially adopted verbatim from an instruction before the Fifth Circuit in *United States v. Hall*, 152 F.3d 381, 414 (5th Cir. 1998), stated:

The second statutory aggravating factor alleged by the Government is that the Defendant committed the killing in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Alyce Slim and/or [Jane Doe].

"Heinous" means shockingly atrocious. For the killing to be heinous, it must involve such additional acts of torture or serious physical abuse of the victim as set apart from other killings.

"Cruel" means that the defendant intended to inflict a high degree of pain by torture or serious physical abuse of the victim in addition to killing the victim.

"Depraved" means that the defendant relished the killing or showed indifference to the suffering of the victim in addition to killing the victim.

"Torture" includes mental as well as physical abuse of the victim. In either case, the victim must have been conscious of the abuse at the time it was inflicted; and the defendant must have specifically intended to inflict severe mental or physical pain or suffering upon the victim, apart from killing the victim.

"Serious physical abuse" means a significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, unconsciousness, extreme physical pain, substantial disfigurement, or substantial impairment of the function of a bodily member, organ, or mental faculty. Serious physical abuse—unlike torture—may be inflicted either before or after death and does not require that the victim be conscious of the abuse at the time it was inflicted. However, the defendant must have specifically intended the abuse apart from the killing.

because it permitted the jury to consider conduct that occurred after Slim and Doe lost consciousness or were dead.

There is no question that post-mortem mutilation may constitutionally be considered as an aggravating factor in death sentence determinations. *See, e.g., Richmond v. Lewis,* 506 U.S. 40, 48, 51 (1992) (holding that Arizona's narrowing construction of its "especially heinous, cruel or depraved" factor to include "needless mutilation of the victim" after death is constitutionally adequate) (citing *Lewis v. Jeffers*, 497 U.S. 764, 777-78 (1990)). This is so even when the mutilation occurs the next day and is done to conceal evidence; such a factor plainly narrows the class of those eligible for the death penalty and rationally identifies those who are more blameworthy on account of their depravity or cold-bloodedness. The question here, however, is not the reach of the constitu-

---

Pertinent factors in determining whether a killing was especially heinous, cruel, or depraved include: infliction of gratuitous violence upon the victim above and beyond that necessary to commit the killing; needless mutilation of the victim's body; and helplessness of the victim.

The word "especially" should be given its ordinary, everyday meaning of being highly or unusually great, distinctive, peculiar, particular, or significant.

In order to find that the Government has satisfied its burden of proving beyond a reasonable doubt that the Defendant committed the killing in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim, you may only consider actions of the defendant.

*Hall* rejected vagueness and overbreadth challenges, noting that the instruction made clear that what was contemplated was abuse "apart from" the killing, and rejected Hall's argument that the definition of "serious physical abuse" was suspect because it allowed the jury to consider conduct after the victim lost consciousness. The court saw no reason why the jury should be precluded from considering such conduct because it was evidence that the killing was committed in a depraved manner in that it provides an indication that Hall relished the killing. *Id.* at 415.

tion, but of the statute. A good argument can be made that the text on its face does not encompass post-mortem mutilation, as this factor is narrowed to focus on the manner of committing the murder, i.e., on specific kinds of suffering inflicted beyond the act of killing itself — not what happens afterwards. On the other hand, as the government points out, other circuits have accepted the proposition that post-mortem mutilation is encompassed within the "serious physical abuse" aggravator. *See Hall*, 152 F.3d at 414 (holding that this is constitutional, and suggesting that it is also correct as a matter of statutory interpretation); *Chanthadara*, 230 F.3d at 1261-62 (observing that there is no authority suggesting an alternate to *Hall*'s construction of § 3592(c)(6)); *Brown*, 441 F.3d at 1362-63 (holding there was no error or only harmless error in admitting post-mortem evidence because the FDPA does not limit the "heinous, cruel, or depraved" aggravating circumstance to abuse inflicted while the victim was alive).

However, in this case we do not need to resolve the reach of § 3592(c)(6) because even if it were error to allow consideration of post-mortem mutilation as a statutory aggravating factor, it was undoubtedly harmless. The reason is the jury found five other statutory aggravating factors; only one is required for passing through step three of the statutory process to make the defendant death eligible. Therefore, Mitchell remains death eligible even if this one statutory aggravating factor is disregarded. Beyond step three, the district court held that evidence of mutilation was relevant on the non-statutory aggravating factor, victim impact, and Mitchell does not challenge that ruling on appeal. Even if post-mortem mutilation may not inform the *statutory* aggravating factor, it *could* inform a *non*-statutory aggravating factor encompassing mutilation after death; as noted, such a factor would plainly be constitutional. *Cf. Brown v. Sanders*, 126 S. Ct. 884, 892 (2006) (noting constitutional error arises only where the jury could not have given aggravating weight to the same facts and circumstances under some other sentencing factor). This would make no difference in outcome here, because Mitchell

had notice that the government would use this aggravator, *see* 18 U.S.C. § 3592(c), and once Mitchell became death eligible, all of the aggravating factors — statutory and non-statutory alike — and all of the mitigating factors were thrown into the pot to be weighed by the jury as it saw fit.

We recognize that the government does not argue that if there were instructional error, it was harmless. Nevertheless, we are not foreclosed from considering prejudice ourselves. Indeed, under the FDPA we *must* consider whether error in a sentence of death is harmless, for § 3595 instructs that "the court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." *See Jones*, 527 U.S. at 402-05. Regardless, we may overlook the government's failure to mount a harmless error argument when, as here, considerations of length and complexity of the record, certainty of how harmless the error is, and the consequences of reversal ("protracted, costly, and ultimately futile proceedings in the district court") counsel in favor of doing so. *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1100 (9th Cir. 2005).

Unlike most harmless error inquiries, this is not a fact-based inquiry where the length and complexity of the record might deter appellate courts from *sua sponte* conducting a harmless error analysis. Rather, the analysis here is straightforward, and certain: the jury found a statutory aggravating factor that is surplus if invalid; we know for sure what the jury would find as to a non-statutory aggravating factor based on mutilation. Accordingly, we leave the full reach of § 3592(c)(6) for another day. Error in this case, if any, was harmless beyond a reasonable doubt.

**[41]** *Substantial planning and premeditation; victim vulnerability; multiple killings*. Mitchell insists that the statutory aggravators — "substantial planning and premeditation,

§ 3592(c)(9), victim vulnerability, § 3592(c)(11), and multiple killings in a criminal episode, § 3592(c)(16) — are vague and overbroad in that the jury was left without sufficient guidance to determine what constitutes "substantial," "youth," "infirmity," and "single criminal episode." We disagree. Aggravating factors "are by necessity somewhat general," and the Constitution does not demand "mathematical precision." *See Tuilaepa*, 512 U.S. at 973 (quoting *Walton*, 497 U.S. at 655). The Supreme Court has "found only a few factors vague, and those in fact are quite similar to one another" in their tendency to involve pejorative adjectives that describe a crime as a whole. *Id.* at 974; *Arave*, 507 U.S. at 472. That is not the case with any of these particular factors. Nor could these aggravating facts apply to "*every* defendant eligible for the death penalty." *Id.* at 474. Not all kill a sixty-three year old grandmother and a nine-year old girl, pursuant to a plan to obtain a car for use as a get-away vehicle in a robbery.

**[42]** *Kidnapping*. The jury was permitted to consider as a statutory aggravating factor that "the death of [Jane Doe] occurred during the commission and attempted commission of [her kidnapping]." *See* 18 U.S.C. § 3592(c)(1). Mitchell contends that because the kidnapping charge was brought pursuant to the Major Crimes Act, the Navajo Nation must have opted-in to the FDPA under 18 U.S.C. § 3598 before it could be used as an aggravating factor permitting the jury to recommend death. However, as we have explained, Mitchell was subject to a capital sentence on account of his violating § 2119 (carjacking resulting in death), a crime of general, nationwide applicability that is an "offense for which a sentence of death is provided." 18 U.S.C. § 3591(a)(2). Having been convicted on the § 2119 count, his offense under § 1201 (kidnapping) was relevant to "determining whether a sentence of death is justified for an offense described in section 3591(a)(2)." *Id.* § 3592(c).

**[43]** *Non-statutory aggravating factors.* Mitchell complains for the first time on appeal that the provision within

§ 3592(c) authorizing the government to pursue non-statutory aggravating factors is an unconstitutional delegation of legislative power. Assuming (without deciding) that such an authorization even constitutes a delegation of legislative power, it would be "permissible so long as there are intelligible principles' by which to exercise the delegated authority." *United States v. Jensen*, 425 F.3d 698, 707 (9th Cir. 2005) (citing *United States v. Mistretta*, 488 U.S. 361, 371 (1989)), *cert denied*, 126 S. Ct. 1664 (2006). Mitchell insists that the government is "limited only by its imagination" in deciding what qualifies as an aggravator. That is incorrect. As the Fifth Circuit pointed out in rejecting this identical argument, there are a number of limitations on the government's power to pursue non-statutory aggravators, including that the defendant must have been given notice of the factor, *see* 18 U.S.C. § 3592(c); that the Supreme Court has articulated several constitutional limitations on the use of aggravating factors; that "the district court functions as a gatekeeper to limit the admission of useless and impermissibly prejudicial information"; and that "the jury find at least one statutory aggravating factor beyond a reasonable doubt before it may consider the non-statutory factors." *Jones*, 132 F.3d at 239-40; *see also United States v. Frank*, 8 F. Supp. 2d 253, 266 (S.D.N.Y. 1998). Mitchell's vagueness and overbreadth challenge to the non-statutory aggravator used here, that he "caused injury, harm, and loss to [the victim's] family," likewise fails given the Supreme Court's rejection of vagueness and overbreadth challenges to a similar aggravator. *See Jones*, 527 U.S. at 378, 400-01 (observing that jury would have no trouble "comprehending" that the factor "asked it to consider the victim's personal traits and the effect of the crime on her family"); *id.* at 401-02 ("Because [the] factors . . . directed the jury to the evidence specific to this case, we do not think that they were overbroad in a way that offended the Constitution.").

B

**[44]** Based on *Ring*, where the Court held that the Sixth Amendment requires a jury rather than a sentencing judge to

find the existence of any aggravating factor "necessary for imposition of the death penalty," 536 U.S. at 609, Mitchell contends that the FDPA is unconstitutional because it does not require statutory aggravating factors to be charged in the indictment. Regardless, Mitchell's indictment *did* charge statutory aggravating factors upon which the government proceeded. Therefore, his facial challenge is unavailing. *See Brown*, 441 F.3d at 1367; *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004).

Mitchell also complains that the government failed to present and charge non-statutory aggravating factors, but there is nothing to suggest that this is constitutionally required. The rationale underlying the requirement that statutory aggravating factors be charged is that the existence of at least one is a prerequisite to increasing a defendant's sentence from life imprisonment. A non-statutory aggravating factor by itself cannot trigger death eligibility. *See, e.g.*, *United States v. LeCroy*, 441 F.3d 914, 922 (11th Cir. 2006); *Brown*, 441 F.3d at 1368.

**[45]** Mitchell also submits that the FDPA's procedural protections are inadequate because the Act authorizes admission of evidence at the penalty phase that would not be admissible under the Federal Rules of Evidence, and that § 3593(c), allowing information without regard to its admissibility under the rules for admission of evidence at criminal trials, violates due process and the Confrontation Clause.[15] The Rules of Evidence do not apply to sentencing proceedings. *See* Fed. R. Evid. 1101(d)(3). To the extent Mitchell suggests that they, or similar constraints, constitutionally must apply, we disagree.

---

[15]Section 3593(c) states in relevant part:

> Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

While capital punishment demands increased reliability, "the Supreme Court has . . . made clear that in order to achieve 'such heightened reliability,' *more* evidence, not less, should be admitted on the presence of aggravating and mitigating factors[.]" *United States v. Fell*, 360 F.3d 135, 143 (2d Cir. 2004) (citing *Gregg v. Georgia*, 428 U.S. 153, 203-04 (1976)); *accord United States v. Lee*, 374 F.3d 637, 648 (8th Cir. 2004) (agreeing that "the admission of more rather than less evidence during the penalty phase" enhances reliability). Moreover, the FDPA allows the district judge to exclude evidence if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. This provides a constitutionally sufficient procedural safeguard for evidentiary reliability. *Id.*; *cf.* Fed. R. Evid. 403 (allowing for exclusion when the probative value is "substantially outweighed" by prejudicial effect); *see also United States v. Fulks*, 454 F.3d 410, 438 (4th Cir. 2006) (stating that the FDPA's balancing test is a "ready mechanism" with which trial courts can protect defendants).

C

Section 3593 is not unconstitutional, as Mitchell proposes, because it places the burden of proving mitigating factors on the defense while giving the government the right to argue first and last.[16] The order of march is the same as for trials

---

[16]18 U.S.C. § 3593(c) provides in pertinent part:

The government and the defendant shall be permitted to rebut any information received at the [sentencing] hearing . . . . The government shall open the argument. The defendant shall be permitted to reply. The government shall then be permitted to reply in rebuttal. The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information.

generally under Fed. R. Crim P. 29.1. In addition, the FDPA "requires more exacting proof of aggravating factors than mitigating ones — although a jury must unanimously agree that the Government established the existence of an aggravating factor beyond a reasonable doubt, § 3593(c), the jury may consider a mitigating factor in its weighing process so long as one juror finds that the defendant established its existence by preponderance of the evidence, §§ 3593(c), (d)." *Jones*, 527 U.S. at 377.

## D

Mitchell argues that the FDPA is unconstitutional because it is a "weighing statute" that includes non-statutory aggravating factors yet does not provide for proportionality review. Proportionality review refers to the notion that imposition of the death penalty would be "unacceptable in a particular case because [it is] disproportionate to the punishment imposed on others convicted of the same crime." *Pulley v. Harris*, 465 U.S. 37, 43 (1984). *Pulley* squarely rejected the claim that the Constitution requires proportionality review in death sentences. *Id.* at 43-45; *Allen v. Woodford*, 395 F.3d 979, 1018 (9th Cir. 2005). Mitchell cites no authority suggesting that *Pulley* is distinguishable merely because the FDPA authorizes consideration of non-statutory aggravating factors, and we join other circuits in rejecting this proposition. *See, e.g. United States v. Higgs*, 353 F.3d 281, 320-21 (4th Cir. 2003); *United States v. Jones*, 132 F.3d 232, 241 (5th Cir. 1998) ("As long as the statute prevents an arbitrary death sentence, the inclusion of relevant nonstatutory aggravating factors at the sentencing stage does not render the death penalty scheme unconstitutional."). *Zant v. Stephens*, 462 U.S. 862 (1983), upon which Mitchell relies but which preceded *Pulley*, does not suggest otherwise. It contemplated that non-statutory aggravating factors were constitutionally permissible. *See id.* at 878 (observing that while "statutory aggravating circumstances play a constitutionally necessary function . . . . the

Constitution does not require the jury to ignore other possible aggravating factors").

E

Mitchell asserts that his death sentence violates the Eighth Amendment because he was less culpable than Orsinger and Nakai, neither of whom was sentenced to death. To the extent his claim rests on a right for inter-case proportionality review, it is foreclosed. *See Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1308 (9th Cir. 1996) (observing that there is "no federal constitutional requirement of an inter-case proportionality analysis of death sentences"). In any event, Nakai's culpability in a *separate* double murder is irrelevant. Mitchell's presumption that he was less culpable than Orsinger is also unavailing. As with Nakai, it is irrelevant that Orsinger was also involved in the separate double murder. As to the crimes at issue in this case, the jury implicitly rejected Mitchell's theory that he was less culpable than Orsinger in finding Orsinger was "equally culpable in the crime." Further, Orsinger's ineligibility for the death penalty had nothing to do with his factual culpability; he was categorically ineligible for capital punishment because he was 16 years-old at the time of the murders. *See Roper v. Simmons*, 543 U.S. 551, 569-74 (2005). Thus, there is nothing arbitrary about the sentencing disparity between Orsinger and Mitchell. Neither was the jury precluded from evaluating this very issue during penalty phase. It was, indeed, the focal point of Mitchell's case in mitigation.

F

Mitchell maintains that it would violate the Eighth Amendment to sentence him to death because of his age and maturity level (he was 20 at the time of the offenses). According to Mitchell, there is little practical difference between himself and an offender under the age of 18, who is categorically excluded from being subject to the death penalty by *Simmons*. 543 U.S. 551 at 578-79. The Court drew this line well aware

of the "objections always raised against categorical rules," *id.* at 574, driven by two rationales: there was "objective indicia of consensus" against sentencing juveniles to death in that, for example, most States had already rejected it; and the death penalty "is a disproportionate punishment" because juveniles as a class are less culpable. *Id.* at 563-69; *see also Allen v. Ornoski*, 435 F.3d 946, 952 (9th Cir. 2006).

[46] Mitchell suggests that "evolving standards of decency" weigh against sentencing a 20 year-old such as he to death, but offers no "objective indicia" that this is so. Mitchell also fails to explain how his level of culpability is such that his death sentence is a disproportionate punishment. Of course, "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18," *Simmons*, 543 U.S. at 574, so it may well be true that Mitchell is less mature than the average 20 year old. But whether true or not, and whether that mitigates against his crime, is a question the Constitution permits to be answered on a case-by-case basis.

[47] Mitchell insists that it is unconstitutional in his case because he suffers from the same infirmities as a juvenile. As we explained in *Allen*, there are "three traits of juveniles which, as a class, render them less culpable and therefore unsuitable to be placed in the worst category of offenders: (1) "a lack of maturity and an underdeveloped sense of responsibility resulting in impetuous and ill-considered actions and decisions; (2) a heightened vulnerability to negative influences and outside pressures; and (3) personality that is more transitory, less fixed." 435 F.3d at 952 (quoting *Simmons*, 543 U.S. at 569-70) (internal quotations omitted). There is nothing to suggest, nor does Mitchell claim, that the jury was not permitted to consider traits such as these as mitigating. Nor does anything presented by Mitchell in the penalty phase indicate a manifestly underdeveloped level of maturity. He was described as a "very excellent student," "active in student council," who spoke at his high school graduation, and knew

"the difference between right and wrong." In sum, his death sentence is not barred by the Eighth Amendment.

G

Mitchell asks us to declare the FDPA unconstitutional but offers no particulars. In a single sentence he asserts that the death penalty is racist and "represents an intellectually dishonest Congressional response" to the nation's crime problem; vests uncontrolled discretion in prosecuting authorities; no longer comports with evolving standards of decency; and results in the execution of innocent people. In a related claim, Mitchell provides statistical data from a web site and a Department of Justice report to suggest that the federal death penalty disproportionately applies to minorities, in violation of the Eighth Amendment and the Equal Protection Clause.

**[48]** We resolve these points summarily. The bare allegation that the federal death penalty is "racist to its very core" cannot sustain a constitutional challenge. It is axiomatic that "capital punishment be imposed fairly, and with reasonable consistency, or not at all," *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), but Mitchell makes no effort to explain in what manner race has infected the FDPA sentencing process. His related claim regarding disproportionate impact relies solely on statistical data and is, without more, likewise insufficient. *See McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) ("[T]o prevail under the Equal Protection Clause, McCleskey must prove that the decisionmakers in *his* case acted with discriminatory purpose."); *Harris v. Pulley*, 885 F.2d 1354, 1374-77 (9th Cir. 1988). His unexplained and unsubstantiated claim regarding prosecutorial discretion is foreclosed. *See Campbell v. Kincheloe*, 829 F.2d 1453, 1465 (9th Cir. 1987) (observing that a challenge to a state capital punishment statute on the ground that it "vests unbridled discretion in the prosecutor to decide when to seek the death penalty . . . has been explicitly rejected by the Supreme Court") (citations omitted). Similarly unavailing is his contention that capital

punishment is incompatible with society's values or otherwise categorically violates the Eighth Amendment. *See Gregg*, 428 U.S. at 187. Whether contemporary values dictate a different answer today is for the Supreme Court to decide; the Eighth Amendment does not authorize this court to overrule Supreme Court precedent "even where subsequent decisions or factual developments may appear to have significantly undermined the rationale for [an] earlier holding." *Simmons*, 543 U.S. at 594 (O'Connor, J., dissenting) (internal quotations and citation omitted).

Finally, Mitchell cites no authority suggesting that the risk of executing an innocent defendant renders capital punishment inherently unconstitutional. The danger of executing the innocent is one the Supreme Court has long been aware of. *See, e.g., Furman v. Georgia*, 408 U.S. 238, 367-68 (1972) (Marshall, J., concurring) ("We have no way of judging how many innocent persons have been executed but we can be certain that there were some."); *Atkins v. Virginia*, 536 U.S. 304, 321 n.25 (2002) ("Despite the heavy burden that the prosecution must shoulder in capital cases, we cannot ignore the fact that in recent years a disturbing number of inmates on death row have been exonerated."). The Second Circuit has expressly rejected the same contention, *see United States v. Quinones*, 313 F.3d 49, 69 (2d Cir. 2002), and, as it observed, the contention is hardly novel. Mitchell's undeveloped argument therefore fails.

## H

**[49]** Mitchell argues that the death penalty is infrequently sought or imposed under the FDPA, making it an "unusual" penalty in violation of the Eighth Amendment. That federal executions are rare,[17] however, does not render the FDPA

---

[17]The Department of Justice reported in 2000 that "[f]rom 1930 to 1999, state governments executed over 4,400 defendants. During the same time period, the federal government executed 33 defendants and has not carried

unconstitutional. The relevant question — whether capital punishment in the abstract violates the Eighth Amendment — was answered in the negative by *Gregg*, 428 U.S. at 187. In a related claim, Mitchell maintains that the FDPA is applied irrationally because he is the first Native American to be sentenced pursuant to it for an intra-Indian crime. But it does not follow from that fact, or the fact that the government declined to seek the death penalty against Nakai, that sentences under the FDPA are inexplicably random. To the extent Mitchell suggests that such discrepancies of their own force render the FDPA unconstitutional, his claim is foreclosed by *McCleskey*. 481 U.S. at 314-18.

I

As § 3596 requires, Mitchell's judgment provides that his execution be carried out "in the manner prescribed by the law of the State of Arizona." Arizona presently executes prisoners by lethal injection. A.R.S. § 13-704. Mitchell contends that lethal injection constitutes cruel and unusual punishment. He recognizes that Arizona's lethal injection method has previously withstood constitutional challenge, *see LaGrand v. Stewart*, 133 F.3d 1253, 1264-65 (9th Cir. 1998); *Poland v. Stewart*, 117 F.3d 1094, 1105 (9th Cir. 1997), but requests reconsideration of those decisions "in light of evolving standards of decency" and a new study suggesting that inmates received insufficient anaesthesia, leaving them conscious but paralyzed as they die. It is not obvious that Mitchell may bring this claim on direct appeal of his conviction and regardless, we could not consider Mitchell's claim because review would be impossible on the present record. The point wasn't

_____

out any executions since 1963." U.S. Dep't of Justice, *The Federal Death Penalty System: A Statistical Survey (1988-2000)* 5 (2000). As of 2004, there have been three executions under the FDPA. *See* Joshua Herman, comment, *Death Denies Due Process: Evaluating Due Process Challenges to the Federal Death Penalty Act*, 53 DePaul L. Rev. 1777, 1895 n.182 (2004).

raised in district court and absolutely nothing pertinent to it appears. We therefore decline to address the issue. *See Hill v. McDonough*, 126 S. Ct. 2096, 2101-02 (2006) (indicating that a challenge could be brought in a 42 U.S.C. § 1983 action upon a conviction's becoming final).

J

Another challenge suffers a similar problem and is also misplaced — that the government has denied Mitchell's last rights by preventing him from participating in a sweat lodge ceremony in federal prison. Given that his current and future prison conditions are unrelated to his sentence, bringing this challenge on direct appeal is both inapposite (there is no way of telling when or whether Mitchell has requested a sweat lodge ceremony and what the prison's response was) and premature.

IX

Mitchell made the uncommon decision not to be present for the penalty phase. As a result, his counsel asked to withdraw. We must therefore consider whether the court abused its discretion in determining to proceed with the same counsel who represented Mitchell for the guilt phase, and whether Mitchell could (and did effectively) waive presence at the penalty phase.

A

On May 8, a few days before the penalty phase was to begin, counsel advised the court of Mitchell's intent to waive presence. The district judge carefully questioned Mitchell. Mitchell said he just didn't want to be present, and that his counsel could proceed without him. A similar colloquy occurred the next day; Mitchell clearly indicated that he had no issues with his attorneys' continuing to represent him. On the basis of these statements, the court denied counsels'

request to withdraw. It found no irreconcilable differences, or any actual conflict; to the contrary, Mitchell was not opposed to counsel presenting mitigation in his behalf. Further, it found that substituting counsel on the eve of the penalty phase would be detrimental to Mitchell's interests and would require considerable delay and likely empanelment of a new jury. A few days later counsel renewed their request, the judge again made inquiry of Mitchell, and again, based on his assurance that appointing another lawyer would make no difference in his position, denied the motion.

The denial of a motion for substitution of counsel is reviewed for abuse of discretion. *United States v. Cassel*, 408 F.3d 622, 637 (9th Cir. 2005) (internal citation and quotations omitted). Generally, three factors are considered in reviewing the trial court's decision: "(1) the adequacy of the court's inquiry into the defendant's complaint, (2) the extent of conflict between the defendant and counsel, and (3) the timeliness of the motion and the extent of resulting inconvenience or delay." *Id.* (citing *United States v. Gonzalez*, 113 F.3d 1026, 1028 (9th Cir. 1997)).

**[50]** There is no close question on any of the three. First, the district court's inquiry into the matter was more than adequate. The court gave Mitchell's counsel plenty of opportunity to make their case and questioned Mitchell several times before providing a reasoned explanation why it was denying the request. Second, the "complete communications breakdown," *United States v. Nguyen*, 262 F.3d 998, 1005 (9th Cir. 2001), resulted from Mitchell's desire no longer to participate in court proceedings, not from anything specific to his relationship with his attorneys. The district court found no actual conflict and sensibly concluded that appointing new counsel would not change Mitchell's behavior or be in his best interests. Finally, while Mitchell's attorneys were diligent in requesting withdrawal once Mitchell stopped cooperating, the timing could hardly have been worse. They were ready to go with the penalty phase, which Mitchell wanted them to do.

Delay, probably including the need to empanel a new jury, would be inevitable. Accordingly, the district court did not abuse its broad discretion in refusing the request. *United States v. Garcia*, 924 F.2d 925, 926 (9th Cir. 1991).

B

The more difficult questions arise out of Mitchell's waiver of presence: Should the court have held a competency hearing before accepting Mitchell's waiver? and could it allow him to waive presence under Fed. R. Crim. P. 43?

According to counsel, Mitchell had been contemplating a request to waive his presence at the penalty phase even before the jury verdicts in the guilt phase. On May 8, the day the verdicts were returned, Mitchell's attorneys informed the judge that he had become uncooperative and made clear that he no longer wanted to participate in court proceedings. Outside the presence of the jury and government counsel, the judge told Mitchell that waiver was ill-advised and would not be in his best interests. Mitchell responded: "I would just like to state the fact that I wish to waive my appearance." The district judge then told Mitchell to consider his decision and that they would discuss it again the next day.

The next day Mitchell again stated he did not want to be present at trial any longer. When asked why, Mitchell said, "I don't see no benefit or any relevance to me being here." The judge told Mitchell that in her opinion, it would be both relevant and beneficial. She explained in detail what the sentencing hearing was about, reemphasized that waiving presence was ill-advised, and told him in several different ways that his presence would substantially affect whether the jury sentenced him to death or not. Nevertheless, acknowledging that he understood the consequences and in the face of the court's advice that "your very life hangs in the balance and that your presence during the sentencing phase may affect the jury's decision," Mitchell repeated his position and gave the same

reason. Noting a strong argument could be made that a defendant may not waive his presence during a capital sentencing proceeding, the court denied the request and directed Mitchell to appear. Mitchell's counsel sought to counter the court's observation by citing *Johnson v. Zerbst*, 304 U.S. 458 (1938),[18] and representing that the right to be present at all critical stages of trial can be waived if the waiver is accepted by the court on the basis that it is voluntarily, knowingly, and intelligently made. Counsel added that to force Mitchell's presence would make things worse as he might become disruptive and refuse to dress out of his prison uniform. The court responded that it had no reason to doubt that Mitchell, who had been respectful throughout, would not follow the court's directive.

Another hearing was held on May 13th. Mitchell's attorneys reiterated that based on information received that morning, Mitchell would not dress out and if that were to happen it would be more detrimental than beneficial. The district judge meticulously explained again that she believed Mitchell was wrong in believing the jury had already made up its mind, that only one juror had to be persuaded that he did not deserve a sentence of death, and that his presence could tip the balance. She pointed out the significance of the fact that Orsinger was not looking at the death penalty, and indicated that Mitchell had a chance not to get the death penalty but his presence was critical. At sidebar, the court told counsel that it hoped Mitchell would reconsider, but if he did not, it would grant the waiver and have him watch the proceedings on a closed-circuit TV.

Another hearing was held on May 14th at noon, just prior to the start of trial. Mitchell appeared before the court shackled and in prison clothes. He indicated that he had refused to dress out because he had not changed his mind about wanting

---

[18]*Johnson v. Zerbst* is the leading case establishing that a waiver is an "intentional relinquishment or abandonment of a known right or privilege." 304 U.S. at 464.

to be present during the penalty phase. The court then engaged Mitchell in a lengthy colloquy to determine whether his decision was knowing and voluntary. Satisfied that his answers showed it was, the court granted his request, indicating that Mitchell at any time could change his mind about being present or about testifying. The court also found that it wanted to avoid any disruptiveness from Mitchell, who had informed the Marshal that he did not want to be in court and would fight being there for the sentencing phase, which would not be in his best interests. Following this ruling, counsel renewed their motion to withdraw, which was denied after confirming with Mitchell that he had no issues with his lawyers. Once the penalty phase got underway, the court admonished the jury not to draw any adverse inference from the fact that the defendant exercised his right not to testify or attend the proceedings.

i

Mitchell insists that given his "irrational behavior and demeanor," the court should have ordered a competency hearing *sua sponte*. "Due process requires a trial court to hold a competency hearing *sua sponte* whenever the evidence before it raises a reasonable doubt whether a defendant is mentally competent." *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997). The standard for competency is the "ability to understand the proceedings and to assist counsel in preparing a defense;" this is measured by "evidence of the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on his competence." *Id.* (citing *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). "On review, [the] inquiry is not whether the trial court could have found the defendant either competent or incompetent, nor whether [the reviewing court] would find the defendant incompetent . . . ." *Chavez v. United States*, 656 F.2d 512, 516 (9th Cir. 1981). Rather, the record is reviewed "to see if the evidence of incompetence was such that a reasonable judge would be expected to experi-

ence a genuine doubt respecting the defendant's competence." *Id.*

It is clear from the record that Mitchell understood the nature of the proceedings and that his chances of avoiding the death penalty could ride on his presence. He points to no psychiatric evidence that he was somehow clinically incompetent. Finally, Mitchell was not disruptive, did not launch into emotional outbursts, maintained appropriate demeanor, and did not behave erratically. *Cf. Torres v. Prunty*, 223 F.3d 1103, 1109 (9th Cir. 2000) (describing bizarre courtroom conduct by a habeas petitioner who had been diagnosed with a severe delusional disorder, which included wearing jailhouse blues; threatening to assault his attorney; continually disrupting the proceedings; and insisting that he be handcuffed as well as shackled). In short, Mitchell gave the judge no "reason to doubt [his] competence." *Godinez v. Moran*, 509 U.S. 389, 402 n.13 (1993).

**[51]** While Mitchell recognized that his decision might be self-defeating, he made it anyway. The court did its best to talk Mitchell out of doing something that it believed was imprudent and not in his best interests. Mitchell acknowledged what the court, and his counsel, thought but, as he put it at one point, "Isn't that my decision?" As manifest by the extensive exchanges, Mitchell was alert, understood what he was doing, and gave no hint of lacking a rational grasp on the proceedings. Accordingly, the district court did not err in failing to hold a more complete competency hearing *sua sponte*.

ii

Mitchell argues that Fed. R. Crim. P. 43 required his presence and that it could not be waived in a capital case. No objection was made on this basis. Indeed, Mitchell's attorneys argued *in support* of waiver before the district court.

Rule 43(a) requires a defendant's presence at every trial stage including sentencing, but when a defendant has initially been present at trial, Rule 43(c) allows for waiver of the right to be present when the defendant is voluntarily absent after the trial has begun; in a noncapital case, when the defendant is voluntarily absent during sentencing; or when the defendant persists in disruptive behavior after being warned.[19]

[52] The scope of a defendant's right to be present at every trial stage, derived from the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment, has evolved from *Diaz v. United States*, 223 U.S. 442 (1912), where the Court held that a defendant who was neither in custody nor charged with a capital offense could waive the right of presence by voluntarily absenting himself, to our current view that there is "no principled basis for limiting to noncapital offenses a defendant's ability knowingly, voluntarily, and intelligently to waive the right of presence." *Campbell v. Wood*, 18 F.3d 662, 672 (9th Cir. 1994) (en banc) (briefly surveying development of the law). That waiver of presence is constitutionally permissible, however, does not

---

[19]Rule 43(c) provides in full:

(1)   In General. A defendant who was initially present at trial, or who had pleaded guilty or nolo contendere, waives the right to be present under the following circumstances:

(A)   when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial;

(B)   in a noncapital case, when the defendant is voluntarily absent during sentencing; or

(C)   when the court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom.

(2)   Waiver's Effect. If the defendant waives the right to be present, the trial may proceed to completion, including the verdict's return and sentencing, during the defendant's absence.

necessarily mean that it is permissible under Rule 43. Mitchell points to no cases holding that waiver was not an option in the circumstances here, and we cannot read the Rule as precluding it. (The cases upon which he does rely, such as *United States v. Lumitap*, 111 F.3d 81 (9th Cir. 1997), and *United States v. Moore*, 466 F.2d 547 (3rd Cir. 1972), involve the quite different situation of a defendant trying to absent himself from trial in order to avoid in-court identification. Both upheld the district court's discretion to deny a proffered waiver.)

The default in Rule 43(c)(1) permits waiver when a defendant who was initially present at trial waives the right to be present by being voluntarily absent. No distinction is drawn between capital and noncapital defendants. Tellingly, Rule 43 *did* make such a distinction before 1975, when it provided: "*In prosecutions for offenses not punishable by death*, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict." Fed. R. Crim. P. 43 (1963) (emphasis added), *quoted in Bartone v. United States*, 375 U.S. 52, 53 n.1 (1963). Now, subsection (c)(1)(A) plainly applies regardless of the nature of the offense. *See* Neil P. Cohen, *Can They Kill Me If I'm Gone: Trial in Absentia in Capital Cases*, 36 U. Fla. L. Rev. 273, 276-77 n.24 (1984) (noting that the "1975 revision removed any distinction between capital and noncapital cases," so that under the current version, "in both capital and noncapital cases, a defendant can waive his right to be present provided he was initially present at the trial and was voluntarily absent after the trial commenced").[20]

---

[20]The 1974 amendment notes indicate that the question whether the right can be waived was then open for courts ultimately to clarify. Rule 43, Notes of Advisory Committee on Rules-1974 Amendment; *see also L'Abbe v. DiPaolo*, 311 F.3d 93, 97 (1st Cir. 2002) (observing that "the Supreme Court has never directly ruled on the issue of whether a criminal defendant can waive his right to presence in a capital case").

**[53]** Waiver under subsection (c)(1)(B), which relates to sentencing, does depend upon whether the case is capital or noncapital. It specifically authorizes waiver "in a noncapital case" when the defendant is voluntarily absent during sentencing; by negative implication, it doesn't do so in a capital case. However, subsection (c)(1)(B) applies only to "sentencing." Logically and structurally, "sentencing" connotes the proceeding when judgment is pronounced and sentence is imposed, not the proceeding during which it is determined whether the defendant is death eligible and what sentence to recommend.[21] In mandating presence, Rule 43(a) distinguishes among the initial appearance phase of a criminal proceeding, trial stages, and sentencing. Under this construct, the penalty phase of a capital case is plainly a "trial stage." Thus, subsection (c)(1)(B) does not preclude Mitchell's waiver.

**[54]** We conclude that Rule 43 presented no obstacle to Mitchell's waiver of presence for the penalty phase.

---

[21]The history of recent changes made to Rule 43 also indicates that "sentencing" means the pronouncement of sentence. Up until the 2002 Amendments became effective, Rule 43 used the term "imposition of sentence" rather than "sentencing." *See* Fed. R. Crim. P. 43 (2001). The Advisory Committee Notes to the 2002 Amendments, however, clarify that aside from a few exceptions not relevant here, "[t]he language of Rule 43 has been amended as part of the general restyling of the Criminal Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are *intended to be stylistic only* . . . ." Fed. R. Crim. P. 43 advisory committee's notes to 2002 Amendments (emphasis added). Rule 35, which governs corrections and reductions of sentences and is explicitly referenced by Rule 43 as an instance in which presence is not required, *see* Fed. R. Crim. P. 43(b)(4), also underwent the same stylistic change in 2002. There the Advisory Committee Notes address that specific revision and clarify that "[n]o change in practice is intended by using that term." Fed. R. Crim. P. 35 advisory committee's notes to 2002 Amendments. Courts had divided over whether "imposition of sentence" referred to the oral announcement of sentence or entry of judgment. Because ambiguity remained following the stylistic change to "sentencing," Rule 35 was amended again in 2004 to add subsection (c), which provides: "As used in this rule, 'sentencing' means the oral announcement of the sentence." *See* Fed. R. Crim. P. 35 advisory committee's notes to 2004 Amendments.

## X

Trial-related issues arising out the penalty phase include whether there were *Brady* violations, mistaken evidentiary rulings, instructional error, and prosecutorial misconduct in opening and closing.

## A

Beginning on December 5, 2001, Mitchell's attorneys wrote a number of letters to the government seeking *Brady* material, including material "relating to sentencing and mitigation." Soon thereafter, the government asked for victim impact statements from family members. On May 13, 2003, one day before the penalty phase began, the government turned over the statements it had obtained along with a January 2002 letter from the Attorney General of the Navajo Nation to United States Attorney Paul Charlton indicating opposition to capital punishment, both as a general matter and as to Mitchell.

[55] Assuming that the evidence was favorable and material (the Navajo letter certainly was, though it is unclear whether the victim impact statements would have been), there was no prejudice. *See Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (noting that to prevail on a *Brady* claim, a defendant must demonstrate that the evidence is favorable, it was suppressed, and prejudice resulted). Mitchell told the district court that his approach to the mitigation process would have been different if he had known about the information, particularly the letter from the Navajo Nation, but did not (and still does not) suggest how. He did not ask for a continuance. Nor is it evident that members of the family would have cooperated with Mitchell in any material way (or, indeed, what their opinion was); it appears that they knew Mitchell's counsel wanted to speak to them, but they did not wish to speak to him. Mitchell also claims that this information would have helped persuade the Department of Justice not to seek the

death penalty, but again, does not suggest how. The Department of Justice obviously knew the Tribe's position because the letter was sent to it; and Mitchell does not claim that the letter disclosed anything about the Tribe's opposition to capital punishment, or about its failure to opt in to the federal death penalty, that he didn't already know. Regardless, the court received the letter as evidence in mitigation, Mitchell made effective use of it, and seven jurors found the letter was an additional mitigating factor. In short, there is no reasonable probability that earlier disclosure would have produced a different result.

B

**[56]** Mitchell argues that his First Amendment, Eighth Amendment, and due process rights were violated when the government elicited testimony bearing on race, religion and cultural heritage, and made statements in closing argument impermissibly plying on the same factors. Plain error review applies because (as he concedes) Mitchell did not object at trial.

i

Geraldine Slim testified that, traditionally, the maternal side of the Tribe transmits Tribal values and culture to children and grandchildren. In a similar vein, Kimberly Houston and Marlene Slim testified that Slim was responsible for teaching her grandchildren about their Navajo heritage and passing down the Tribe's traditions and practices.

We see nothing untoward in this testimony. "Evidence about a victim's characteristics and the impact of the murder on the victim's family is relevant and admissible at a death penalty sentencing proceeding." *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997) (citing *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)). "Admission of such evidence will only be deemed unconstitutional if it is so unduly prejudicial that

it renders the sentence fundamentally unfair." *Id.* This evidence is not.

Slim's daughters did not call upon divine authority to condemn Mitchell, insinuate that he was atheist, or otherwise inflame the jury on the basis of race or religion. In the circumstances, it would have been difficult if not impossible to capture what Slim's loss meant to her family without reference to the significance that traditional Navajo religion and culture played in their lives. This was relevant victim impact evidence, and was not unduly prejudicial. *See Payne*, 501 U.S. at 825 ("Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question.")

The jury was instructed, as § 3593(f) directs, that it could not consider the race or religious beliefs of the defendant or of any victim.[22] We assume that jurors follow the instructions. In addition, § 3593(f) requires each juror to sign a certificate that neither race nor religion played a part in reaching the

---

[22]Section 3593(f) provides:

In a hearing held before a jury, the court, prior to the return of a finding [concerning a sentence of death], shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be. The jury, upon of a finding [concerning a sentence of death], shall also return to the court a certificate, signed by each juror, that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be.

decision. All of Mitchell's jurors certified this was true. Absent a substantial indication to the contrary, we accept the jurors' assurance that no impermissible considerations of race or religion factored into the verdict.

Geraldine Slim also testified more problematically that:

> It's been really hard . . . to know that someone within our own kind, our own people would be so disrespectful for our own culture and our own belief, our own traditional values, how we teach our young people.

This was an inadmissible opinion about Mitchell's crime and the error was obvious because victim impact statements "set[ting] forth the family members' opinions and characterizations of the crimes and the defendant" are "irrelevant to a capital sentencing decision." *Booth v. Maryland*, 482 U.S. 496, 502-03, 508-09 (1987), *overruled on other grounds*, *Payne*, 501 U.S. at 830 n.21; *see also Bernard*, 229 F.3d at 480 (holding that error in admitting a statement from the victim's father that the murder was "just a useless act of violence" was plain). But Mitchell fails to show that the error was prejudicial. Geraldine's comment was brief, isolated, and could not have had more than a marginal impact on the jury.

iii

The district court refused to permit defense witnesses to express their opinion on whether Mitchell should be given the death penalty, although witnesses were allowed to ask the jury to spare Mitchell's life.

Section 3593(c)'s standard for admissibility of information in a capital sentencing proceeding is more lenient than the standard for admissibility of evidence under the Federal Rules of Evidence. Information is admissible regardless of admissibility under the Rules, except that in the trial judge's discre-

tion, information "may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."[23] This assures that the jury "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982)).

**[57]** Here the court drew a fine, but appropriate, line for testimony as to whether Mitchell should receive the death penalty. It allowed witnesses to testify regarding their affection for Mitchell and their wish for his life to be spared, but did not allow them to offer an opinion about what they thought the jury's verdict should be. In doing so, the court kept the jury focused on relevant mitigating evidence, *i.e.*, "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)). Testimony that was adduced from Mitchell's family and teachers about his record and character was relevant mitigating evidence because it had a tendency to

---

[23]The statute provides in relevant part:

At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. The defendant may present any information relevant to a mitigating factor . . . . Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

18 U.S.C. § 3593(c).

show that imposition of the death penalty was not justified. *See* 18 U.S.C. § 3592(a)(8). By the same token, personal opinions about what the verdict should be are not probative of any statutory mitigating factor identified in § 3592(a)(1)-(8). *Id.* § 3592(a)(8). The district court had discretion to exclude irrelevant evidence, *see Lockett v. Ohio*, 438 U.S. 586, 605 n.12 (1978), and acted well within it here.

As we have already discussed, Mitchell wanted to put in evidence in the guilt phase about the details of the Sam and Begay murders to impeach Kinlicheenie, and he also wanted to do so in the penalty phase in order to contrast his culpability in connection with the Slim/Doe murders with Nakai's culpability in connection with the Sam/Begay murders. The district court declined to admit evidence about the details of the Nakai murders, as they had little apparent bearing on *Mitchell's* character or the circumstances of *Mitchell's* offense. However, the court did allow Mitchell to elicit testimony from FBI Agent Duncan that, as a result of an August 2001 double murder, Gregory Nakai was convicted on kidnapping, carjacking, and first degree/felony murder charges but did not face the death penalty, and to introduce a letter from the government to Nakai's attorney stating that the Attorney General of the United States had decided against seeking the death penalty for Nakai. From this Mitchell was able to highlight the fact that Nakai was a "stone killer" that "escaped the death penalty." We cannot see how the court abused its discretion in concluding that more information than this about these separate murders would confuse the issues and mislead the jury.

Over objection as to his expertise, Agent Duncan was permitted on rebuttal to explain how decisions are made to seek the death penalty. He indicated that decisions are made after the cases are referred to the Department of Justice and are made at a high level. Whether properly adduced or not, Duncan's testimony was of such a general nature and of such slight value that we cannot say it resulted in an unreliable sen-

tencing determination, as Mitchell now maintains. The jury was already aware that the Attorney General was involved in the decisionmaking process from the Attorney General's letter declining to seek the death penalty against Nakai, which Mitchell introduced.

C

**[58]** Mitchell asserts that the penalty phase jury instructions and verdict forms violated his right to due process and a reliable sentencing determination. No objection was made except to the "heinous, cruel or depraved" instruction, so our review is for plain error as to the rest.

*The Navajo Nation's letter*. It was not necessary for the jury to be specifically instructed that it should consider the letter from the Navajo Nation's Attorney General to the United States Department of Justice. The instructions, as given, clearly allowed for consideration of catch-all factors. That the jury understood it could consider the letter is manifest in the verdict form, where the letter was handwritten in as an additional mitigating factor.

*Guilt phase evidence*. The district court instructed the jury that it could consider evidence admitted in the guilt phase as well as information presented in the penalty phase. In Mitchell's view this allowed the government to use offenses charged only under the Major Crimes Act, which would not have been relevant or admissible in the penalty phase to obtain a death sentence on the carjacking offense. We have already explained why this is not so. Mitchell became subject to capital punishment by virtue of his conviction for carjacking resulting in death, not his other offenses, yet evidence detailing his double murder was necessarily relevant to proving the carjacking charge. *Cf. United States v. Cruz-Kuilan*, 75 F.3d 59, 61 (1st Cir. 1996). We have also explained why Mitchell's contention that this also allowed the government to inject race into the proceedings is unavailing; the fact of

Mitchell's race was unavoidable, and was important to his own case in mitigation.

*Gateway intent factors.* The court instructed that at step two, the jury should consider the gateway intent factors concerning the personal intent of the defendant "in regard to the homicides for which he was convicted." Mitchell takes issue with this focus on the footing that it misled the jury into thinking that the death penalty was available for the multiple murders rather than just the carjacking. "Gateway intent" is a threshold finding for death eligibility required by the FPDA. However, as the text of § 3591(a)(2) makes clear, the requisite mens rea is the mens rea involved in killing the victim, not the mens rea involved in committing the triggering offense. *Cf. Jones*, 527 U.S. at 376 (noting in a case where the defendant was convicted of kidnapping resulting in death that as "an initial matter, the sentencing jury was required to find that petitioner had the requisite intent, *see* § 3591(a)(2); it concluded that petitioner intentionally killed his victim and intentionally inflicted serious bodily injury resulting in her death"). Further, the jury could not have been confused about which of the convictions made Mitchell subject to the death penalty; the district court expressly informed them: "You previously found defendant guilty of . . . the capital offense of Carjacking Resulting in Death. The sole question before you now is whether Defendant should be sentenced for this offense . . . ."

*Standard of proof in weighing step.* Mitchell told the district judge that he thought the court was correct in believing that the jury did not have to find that aggravating factors sufficiently outweigh mitigating factors beyond a reasonable doubt. Now he claims this eliminated the burden of proof at the weighing stage, as well as on the issue whether death is the appropriate sentence, in violation of due process, a reliable sentencing determination, and *Blakely v. Washington*, 542 U.S. 296, 303 (2004); *Ring v. Arizona*, 536 U.S. 587, 588 (2002); and *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). He reasons that the FPDA makes these two findings

essential; *Apprendi* requires that essential facts be submitted to a jury and be found beyond a reasonable doubt; therefore the rule of *Apprendi* requires not only that the question whether aggravators outweigh mitigators and the question whether death is justified be submitted to a jury — but that they be proved beyond a reasonable doubt.

Under the FDPA, the burden was properly put on the government to prove that Mitchell was death eligible, *i.e.*, he was eighteen years old, at least one gateway intent factor existed, and at least one statutory aggravating factor existed. The jury was required to — and did — find these factors, making him death eligible, beyond a reasonable doubt. Once these core factors were established by the government, it did not offend the Constitution to put the burden on Mitchell to prove any mitigating factor by a preponderance of the evidence. *Walton*, 497 U.S. at 649 (plurality opinion); *Kansas v. Marsh*, 126 S. Ct. 2516, 2524 (2006) ("At bottom, in *Walton*, the Court held that a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances."); *Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994). Thereafter, the fact-finder's role is first, "to consider whether the aggravating factors found to exist sufficiently outweigh the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death," and then, to make a recommendation concerning the sentence. 18 U.S.C. § 3593(e). At this stage, the jury's task is no longer to find whether factors exist; rather, each juror is to "consider" the factors already found and to make an individualized judgment whether a death sentence is justified. *Id.* Thus, the weighing step is an "equation" that "merely channels a jury's discretion by providing it with criteria by which it may determine whether a sentence of life or death is appropriate." *See Marsh*, 126 S. Ct. at 2526. Mitchell does not suggest how a beyond-reasonable-doubt standard could sensibly be superimposed upon this process, or why it must be in order to comport with

due process, or to make his death sentence reliable, or to comply with the Sixth Amendment. Were it required, then the corollary obligation under the Fifth Amendment would presumably be triggered, and the "fact" that aggravating factors outweigh mitigating factors would need to be found by the grand jury and charged in the indictment. *See United States v. Allen,* 406 F.3d 940, 943 (8th Cir. 2005) (en banc); *see also Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) ("under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment"). This illustrates the flaw in Mitchell's position, for of course the grand jury has no way of knowing what mitigating factors the defendant will urge.

There is no authority suggesting that *Apprendi* extends as far as Mitchell would have it. Given plain error review, resolution of the question whether it was in fact error is not squarely presented. Therefore, we simply conclude that the court's weighing instructions are not plainly erroneous.

*Guilt phase findings*. Mitchell contends, for the first time, that the jury should not have been instructed that it could rely on findings in the guilt phase in determining the gateway intent factors. The point goes nowhere, as the jury was not so instructed. To the contrary, the court specifically told the jury that it may *not* rely upon its first-stage verdict of guilt or factual determinations therein with respect to Mitchell's intent, and must decide this issue again.

## D

### i

Mitchell criticizes the government's opening statement as consisting entirely of argument, though he made no such objection at the time either on that basis or for its content.

Several statements were inartfully phrased as summations that evidence established the gateway and aggravating factors. However, Mitchell's substantial rights were not affected as the jury had already heard this evidence. In terms of content, references to evidence adduced in the guilt phase were not improper because that evidence was properly considered in the penalty phase. *See* 18 U.S.C. § 3593(c). Finally, the AUSA's statement to the jury that they would hear members of the victims' family describe "what they went through and how this affected you" was an obvious slip of the tongue. Saying "you" instead of "them" in this context was neither misconduct nor prejudicial.

ii

**[59]** One of the statements made in closing about which Mitchell now complains was improvident but not plainly improper. The AUSA argued that "[t]he defendant, Lezmond Mitchell, has sentenced himself to death." Mitchell analogizes to *Caldwell v. Mississipi*, 472 U.S. 320 (1985), but the statements that *Caldwell* condemned were quite different. There, the prosecutor told the jury that "your decision is not the final decision" and that it is automatically reviewable by the Supreme Court. These statements — unlike those made to the jury here — had the effect of affirmatively misleading the jury by shifting the responsibility for a death sentence onto someone else. *Id*. at 328-29; *see Romano v. Oklahoma*, 512 U.S. 1, 9 (1994); *Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995) (rejecting a challenge to a similar statement as it did not lessen the jury's sense of responsibility).

Mitchell faults the government for asking the jury to consider how important a grandmother was to the community, and for suggesting that Mitchell turned his back on his religious and cultural heritage. "[R]eligious arguments [in closing] have been condemned by virtually every federal and state court to consider their challenge." *Sandoval v. Calderon*, 241 F.3d 765, 777 (9th Cir. 2001) (holding that prosecutor who

paraphrased the Bible and argued that the death penalty was sanctioned by God denied habeas petitioner his right to a fair penalty phase trial). However, the circumstances here are a far cry from those in *Sandoval*. Although the AUSA did, at least indirectly, allude to religion, it was in the same sense that the Navajo Nation's letter did when it stated:

> As part of Navajo cultural and religious values we do not support the concept of capital punishment. Navajo hold life sacred. Our culture and religion teach us to value life and instruct against the taking of human life for vengeance.

As the letter was in evidence and was relied upon by Mitchell in mitigation, it was not plainly erroneous for the government to challenge the credibility of Mitchell's reliance. *See Dawson v. Delaware*, 503 U.S. 159, 166 (1992) (recognizing that "just as the defendant has the right to introduce any sort of relevant mitigating evidence, the State is entitled to rebut that evidence with proof of its own"); *Payne*, 501 U.S. at 809 (observing that "[t]he State has a legitimate interest in counteracting [mitigating] evidence"). Similarly, what a grandmother meant to the Slim family in terms of culture and tradition was properly part of the government's case in aggravation. The government's argument did not implicate Mitchell's beliefs "simply because the jury would find these beliefs morally reprehensible." *Dawson*, 503 U.S. at 167.

Other statements that Mitchell cites were not improper as they were founded in the evidence or were obviously figurative.

This said, the government's closing argument was riddled with comments that should not have been made. For instance: "[I]nformation furnished in this case [to the Attorney General] as to this defendant, it rose to that level [to seek the death penalty] . . . . It was . . . rational, well-reasoned, based on information that you don't have before you that this case was

different [from Nakai's]." "What I like to call mitigating fac-
tors are excuses for murder because we have free will."
"What has Lezmond Mitchell done to earn a minimum sen-
tence for the slaughter of two people?" "Mitchell gets to come
before the jury and say 'Spare my life.' . . . I suppose that's
the beauty of the system. Doesn't work for the victims, but it
works for the defendant. And you need to keep that in mind
when asking why to spare the life of the defendant." "But we
live in a civilized society. Perhaps years ago, Tombstone, he
would have been taken out back, strung up. He would have
gotten a trial, nothing like this. We have been at this for seven
weeks." "The defendant has done nothing to earn an opportu-
nity to be a message to someone in prison. He has earned no
opportunity to live in a cell whether he likes the cell or not.
He has earned no opportunity to get a college degree while in
prison or to Internet chat with someone or to work in the shop
of a prison. He has earned nothing."

We disagree with the government that these were fair com-
ments on the evidence and were not, even arguably, calcu-
lated to arouse the passions of the jury or to suggest that
Mitchell bore a burden he did not bear. The question is
whether they were prejudicial, singly or collectively. In
reviewing for plain error, "reversal is appropriate 'only if the
prosecutor's improper conduct so affected the jury's ability to
consider the totality of the evidence fairly that it tainted the
verdict and deprived [Mitchell] of a fair trial." *United States
v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005) (quot-
ing *United States v. Smith*, 962 F.2d 923, 935 (9th Cir. 1992)).
The comments were not, in and of themselves, nearly as
inflammatory as the graphic evidence of the murders, or as
powerful as the extensive victim impact testimony, which was
quite properly before the jury. The jury was clearly instructed
on the burden of proof, and that the statements and argument
of counsel were not evidence; that it must avoid any influence
of passion, prejudice, or any other arbitrary consideration; and
that whether or not the circumstances call for a sentence of

death is a personal judgment that the law leaves entirely up to each member of the jury.

[60] The burden is Mitchell's to show that the misconduct tainted the verdict. In support, he points to a positive statement about his chances that the district judge made in trying to dissuade him from waiving presence, but her statement was just that, an effort to point out to Mitchell how critical his presence was, not a post-penalty phase assessment of the strength of the evidence.[24] As full review of the record shows, the evidence was overwhelming. By any reasonable measure, the mitigating factors proffered by Mitchell were weak when compared to the gruesome nature of the crimes and the impact they had on the victims' family. Without at all condoning prosecutorial excess, it is plain that the improper argument in this case could not possibly have "so affected the jury's ability to consider the totality of the evidence fairly" that it deprived Mitchell of a fair trial. We conclude that the misconduct, by

---

[24]According to Mitchell, the district court "noted [that] the government's case with regard to the sentence of death was not overwhelming." However, the district court noted no such thing. In responding to Mitchell's query whether waiving presence with its consequences wasn't his decision, what the court stated was as follows:

It is your decision, ultimately it's your decision. But, and I don't know what's factoring into your decision. I just know that you have a chance not to get the death penalty and your presence is critical. You only have to convince one — and you don't even have to convince. The government has to convince all of them. But if in the mitigation and these factors that your lawyers — and they have a lot of exhibits here that seem to be particularly compelling that will probably be introduced. Those exhibits, with your presence, and the adequacy of your lawyers, I think, give you as good a chance as any of not getting the death penalty. And so I would hope that you really give serious consideration

It may be difficult to listen to everything that's presented, but I hope that you will give serious consideration to being here, to dressing tomorrow, and to being here and listening at least to what is said and so that you can decide whether or not you are going to say something on your own behalf.

itself or when cumulated, did not affect Mitchell's substantial rights.

## XI

Mitchell was sentenced on the non-death counts to life on counts 1 (murder of Alyce Slim), 3 (felony murder of Alyce Slim and Jane Doe), 5 (murder of Jane Doe), 6 (felony murder of Jane Doe) and 7 (kidnapping); 180 months on each of counts 4 (robbery of the pickup truck), 8 (robbery of the Trading Post), and 10 (robbery of Charlotte Yazzie), to be served concurrently; 84 months on count 9 (brandishing a firearm during a crime of violence); and 300 months on count 11 (brandishing a firearm during a crime of violence). He raises *Booker* error, which does not appear to be preserved, and remand is unwarranted. On his firearm convictions, the district court sentenced Mitchell to the statutory minimums. *See* 18 U.S.C. §§ 924(c)(1)(A)(ii) (seven years); 924(c)(1)(C)(i) (25 years). Similarly, Mitchell was sentenced to life pursuant to statutory mandatory sentences. *See, e.g.*, 18 U.S.C. §§ 1111(b), 1201(a). Given his life sentences, his 180 month sentences on each of the robbery counts do not affect his substantial rights. Furthermore, in light of the fact that the district court sentenced Mitchell to the statutory maximum on his robbery counts, *see* 18 U.S.C. § 2111, we cannot imagine that the sentence would have been more favorable had the district court known the guidelines were advisory.

**AFFIRMED.**

**Volume 3 of 3**

REINHARDT, Circuit Judge, dissenting:

The majority errs both in affirming the conviction and upholding the death sentence of Lezmond Mitchell, a young Navajo tribe member found guilty of committing a robbery and two horrific murders on Navajo land in Arizona.[1] During the investigation of these crimes, federal agents convinced eagerly cooperative tribal authorities to arrest Mitchell, who was then held in tribal custody for twenty-five days without counsel or arraignment. Federal agents repeatedly interrogated Mitchell during his tribal detention, and unlawfully secured from him a series of confessions. The inculpatory statements, which were obtained in violation of Mitchell's federal rights, were then used to convict him at his trial. The trial court's failure to suppress the confessions warrants reversal of Mitchell's conviction.

Another significant error occurred during jury selection. The trial court allowed the prosecution to strike the only African-American juror, accepting its pretextual explanation that the juror was removed not because of his race but because more than twenty years earlier he had served on a jury that voted to acquit a defendant of unknown charges. Removal of this juror violated the constitutional guarantees of equal protection and due process, and, like the first error, requires reversal of Mitchell's conviction.

Finally, the sentencing phase of Mitchell's trial was rife with errors. Contrary to the provisions of the Federal Rules, the trial court permitted Mitchell to waive his presence at the sentencing phase; as a result, the jury heard this critical part of the proceedings, and voted for the death penalty, without facing or hearing from the individual whose life, or death, it was determining. This error in itself requires that the sentence

---

[1] Mitchell was subject to the death penalty under the Federal Death Penalty Act, because the murder resulted from an armed carjacking. *See* 18 U.S.C. §§ 3591-98.

of death that the jury imposed be vacated. Moreover, the government's closing sentencing argument was a compendium of improper statements, exacerbating the prejudice resulting from Mitchell's absence from the sentencing phase. Finally, the court erroneously failed to instruct the jury that the government had the burden of proving that aggravating factors outweighed mitigating factors. Considered cumulatively, the sentencing errors were sufficiently prejudicial that Mitchell's death sentence must be vacated.

Therefore, although I agree with the majority's resolution of a number of Mitchell's other claims, I respectfully dissent.

## I.    Conviction

### A.    Suppression of Post-Arrest Statements

Following a conference that led to an agreement between all the involved federal and tribal authorities, Mitchell was arrested on tribal charges on the morning of November 4, 2001. He was not presented to a federal magistrate until November 29, 2001. During this period of prolonged tribal detention, federal authorities interrogated him and obtained a set of increasingly incriminating statements. Mitchell argues that the district court should have suppressed these statements because they were obtained in violation of his federal right to timely arraignment and to counsel.[2] In order to determine whether these federal rights attached during Mitchell's detention, it is necessary to decide whether he was effectively in federal custody during the period between his tribal arrest and his federal arrest. The majority concludes that Mitchell was not in federal custody until he was formally arrested by federal agents on November 29. *See ante*, at 11589. I disagree.

---

[2]As the majority states, *ante*, at 11586 n.4, the Sixth Amendment right to counsel does not attach to defendants in tribal custody. *See United States v. Percy*, 250 F.3d 720, 725 (9th Cir. 2001).

Unlike the majority, *see ante*, at 11585-87, I would not review this issue for plain error. The Federal Rules of Criminal Procedure provide that "[a] party may preserve a claim of error by informing the court — when the court ruling or order is made or sought — of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." Fed. R. Crim. P. 51(b). Before trial, Mitchell moved for a hearing to determine whether his custodial statements were voluntary. At this time, Mitchell was still being tried jointly with co-defendants Johnny Orsinger and Gregory Nakai, both of whom participated in the voluntariness hearing. During the hearing, Orsinger's counsel argued that the FBI controlled the operation leading to the defendants' tribal arrest. He stated that the defendants were effectively in federal custody from the time of their tribal arrest and sought leave to file a new motion to suppress on the ground that Orsinger was deprived of procedural rights for juveniles established by 18 U.S.C. § 5033. Mitchell's counsel adopted this argument, stating:

> I would like to join in the remarks of [Orsinger's counsel] about what I think has happened in this case. I think this case is illustrative to all of us about FBI strategies and techniques in cases like this. Rather than file federal charges and implicate not only the juvenile rights that [Orsinger's counsel] said were violated with respect to Mr. Orsinger, but also the obvious rights that would have attended the filing of charges including the right to the immediate appointment of counsel for Mr. Mitchell, essentially Mr. Mitchell was stashed in the tribal jail for more than three weeks on these tribal charges which no one connected with this case believed were ever going to proceed.

Thus, Mitchell not only requested that the court suppress the custodial statements, but he also identified the failure to

afford him his pretrial rights as one ground for suppression. This complies with the requirements of Rule 51(b).

Turning to the merits of Mitchell's claim, Rule 5(a) of the Federal Rules of Criminal Procedure provides that a person who is arrested must be arraigned "without unnecessary delay." Rule 5(a) both reflects and is reinforced by Supreme Court decisions requiring exclusion of pre-arraignment statements obtained in violation of the prompt presentment requirement. *See McNabb v. United States*, 318 U.S. 332, 341 (1943); *Mallory v. United States*, 354 U.S. 499, 455 (1957). This judicially developed exclusionary rule is limited by 18 U.S.C. § 3501(c), which created a "safe harbor" for statements obtained within six hours of detention.

In *United States v. Alvarez-Sanchez*, 511 U.S. 350 (1994), the Supreme Court held that § 3501(c) authorizes suppression of a custodial statement only when a person has been held in *federal* custody for more than six hours before giving the statement. *Id.* at 358. However, the Court pointed to one circumstance in which delay would be viewed differently, "namely, the situation that would arise if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment." *Id.* at 359. Mitchell argues that his arrest and interrogations fall within this exception and that the district court was therefore required to suppress his confessions.

To establish collusion, a defendant must show a collaborative effort by the two authorities involved and "proof of a deliberate intent to deprive a defendant of [his] federal procedural rights." *United States v. Michaud*, 268 F.3d 728, 735 (9th Cir. 2001) (citing *United States v. Doe*, 155 F.3d 1070, 1078 (9th Cir. 1998)). Here, there is no question as to the former. As for the "deliberate intent" element, it is not necessary for the defendant to extract admissions from the federal and tribal authorities that such was their intent. Intent may be

shown from the objective circumstances surrounding the decision-making process and from subsequent occurrences. Undisputed facts in the record show that Assistant U.S. Attorney Joe Lodge and FBI agents persuaded tribal authorities to arrest Mitchell and then used the tribal detention to interrogate him. Two agents testified that tribal arrest was a way to get suspects into custody quickly so that they could interrogate them.[3] They also acknowledged that they were aware that taking a suspect into tribal custody would mean that he would not be entitled to certain federal rights, such as the right to appointed counsel and the right to a prompt arraignment. The agents offered no plausible explanation for why it was necessary to use a tribal arrest rather than simply to arrest Mitchell on federal charges. Instead, the circumstances surrounding Mitchell's arrest and interrogation compel the conclusion that the delay in filing federal charges was the result of a deliberate decision to have the federal agents question him in violation of his rights.

Although the record does not include Mitchell's tribal arrest warrant, review of the trial transcript indicates that Mitchell was most likely arrested for robbery.[4] Criminal conduct that would permit a defendant to be charged with robbery under the Navajo Nation Code would also allow the defendant

---

[3]The agents also testified that they wanted to get defendant into custody quickly to protect the public safety. Public safety is a concern whenever violent crimes are involved. The pertinent question is not whether there was a legitimate reason to detain the defendant, but rather whether the manner in which the authorities detained him — having him arrested by tribal rather than federal authorities — reflected a deliberate effort to avoid affording him his federal rights. *See Alvarez-Sanchez*, 511 U.S. at 359.

[4]Agent Purscell, one of the FBI agents involved in Mitchell's arrest and interrogation, stated that he believed the tribal arrest warrant was for robbery or assault. According to Orsinger, Mitchell's co-defendant, after the tribal arrest federal agents told him that he was arrested on an armed robbery charge. Orsinger also testified that three FBI agents, and no tribal agents, attended his first post-arrest interrogation.

to be charged with that offense under federal law.[5] The most significant difference in "robbery," as defined in the two codes, is the Navajo Nation Code's requirement that the threat or use of force be immediate, an element not described in the federal definition, creating a higher burden than under federal law. The statements made by FBI Agents Raymond Duncan and Bradley Purscell, that federal agents had determined that there was insufficient evidence to obtain a federal search warrant, but sufficient evidence to obtain a tribal arrest warrant, are clearly inconsistent with the governing law. Agent Purscell acknowledged that robbery on Indian land is subject to federal jurisdiction and could not offer any explanation for suggesting the existence of any difference in probable cause needed for a tribal versus a federal arrest warrant.[6] Agent

---

[5]The offense of robbery is similarly defined under the Navajo Nation Code and federal law. The Navajo Nation Code describes the elements of robbery and armed robbery as follows:

> 17 N.N.C. § 491 (A) A person commits robbery if in the course of committing theft, he or she threatens or uses immediate force against any person with intent either to coerce surrender of property or to forestall resistance to his or her taking or retaining of property.

17 N.N.C. §492 (A) A person commits armed robbery if in the course of committing robbery as defined in 17 N.N.C. § 491, he or she or an accomplice:

> (1)   Is armed with a deadly weapon; or

> (2)   Uses or threatens to use a deadly weapon or dangerous instrument.

The Federal Criminal Code describes the elements of robbery:

> 18 U.S.C.A. § 2111 Whoever, within the the special maritime and territorial jurisdiction of the United States, by force and violence, or by intimidation, takes or attempts to take from the person or presence of another anything of value, shall be imprisoned not more than fifteen years.

Armed robbery is encompassed by § 2111, *see United States v. Burns,* 701 F.2d 840, 841, 842 (9th Cir. 1983).

[6]As in the case of robbery, if the arrest were for assault the type of assault involved here would constitute a federal crime as well as a tribal crime, *compare* 18 U.S.C. §§ 113, 1153 *with* 17 N.N.C. § 314-15, and the probable cause requirement would be the same.

Duncan said that they discussed trying to obtain a federal warrant for robbery but rejected that approach because they could not connect the robbery to a house. However, as described above, federal robbery does not include any element requiring that the offense take place in a house. Moreover, that the arrest for a tribal offense was a ruse arranged to allow federal officers to interrogate Mitchell without affording him the opportunity to consult counsel becomes evident from a comparison of the possible penalties under tribal and federal law. The maximum penalty for any offense under tribal law, including criminal homicide, is one year. *See* 17 N.N.C. §§ 223, 303(b). The maximum under federal law for robbery and homicide is fifteen years and death respectively. Accordingly, there can be little doubt that the authorities always intended that Mitchell and his co-defendants would be tried on federal rather than on tribal charges. Even if the district court's finding that the agents' testimony was credible were not clearly erroneous, and I think that it was, the circumstances surrounding the decision to take Mitchell into tribal custody establish collusion with the requisite intent, despite the claim that officials never explicitly discussed depriving defendant of his rights. Both FBI agents made it quite clear in their testimony that a significant motivation underlying the arrest was to be able to interrogate the defendant and that if he were in tribal rather than federal custody, the interrogation could be conducted without affording him substantial rights designed to protect him against self-incrimination.

Moreover, if federal agents did not have probable cause to obtain a federal warrant at the time of the November 3 meeting (in which case the tribal officers also lacked probable cause for the tribal arrest), the agents clearly had probable cause to arrest Mitchell after November 4, when he confessed to participating in the robbery. However, he remained in tribal custody and was questioned further. A federal indictment was not filed until November 21. On November 29, FBI agents conducted at least one more extensive pre-arraignment interrogation precisely because they knew that a lawyer would be

appointed shortly thereafter, when Mitchell would appear before a magistrate. This evidence establishes that Mitchell was effectively in federal custody from the time of his tribal arrest. Therefore, federal rights attached and the violation of these rights requires suppression of statements obtained during this period.

The majority errs in the analysis that leads it to a contrary conclusion. First, the majority fails to consider the federal agents' conduct after Mitchell's tribal arrest. This court has made clear that the post-arrest activity of federal agents is directly relevant to a finding of collusion or lack thereof. *See Michaud*, 268 F.3d at 734-35. Critical to the *Michaud* court's conclusion that the defendant offered "no evidence of actual collusion . . . to deny her federal right to appear before a magistrate judge," *id.* at 735, was the timeliness with which federal charges were brought against her. Although Michaud had first been arrested by state authorities for kidnap and sexual assault, "[a]s soon as the federal agents gathered sufficient evidence against Michaud from the search of her van, they obtained an arrest warrant and took the steps necessary to prosecute her in federal court." *Id.* at 734-35. An initial search of Michaud's hotel room on December 2 led to her arrest by state officials, but a search of her van later that day revealed additional evidence that allowed the federal agents to obtain a federal warrant on December 5. Four days after that, on December 9, the federal agents executed the warrant.

Here, the federal agents made no similar effort to obtain a federal search warrant as "soon as [they] gathered sufficient evidence against [Mitchell]." To the contrary, the record suggests that the agents deliberately delayed bringing Mitchell under federal jurisdiction. On November 4, the FBI and tribal officials executed the tribal warrant, and Mitchell was taken into custody. After agreeing to take a polygraph test and failing, Mitchell made a statement to a federal agent inculpating himself in the robbery. Although this confession should have given the FBI agents sufficient evidence to establish probable

cause to obtain a federal warrant to arrest Mitchell, two hours later FBI agents successfully sought to have Mitchell record that confession. In this recorded statement, Mitchell admitted for the first time that he was present when "things happened" to the victims. Then, the next day, Mitchell led tribal officers to the crime scene, where he confessed to participating in both murders and provided graphic details about the murders and post-mortem dismemberment. Even after this last statement, the FBI agents did not seek a federal warrant, but instead waited sixteen days to file an indictment and eighteen days to have a warrant issued. They then interrogated Mitchell one last time while he was in federal custody and shortly before they presented him to a federal magistrate — a full twenty-four days after he had taken federal agents to the crime scene and confessed to committing the crime of which he was convicted.[7]

The actions of the federal agents in taking one final inculpatory statement from Mitchell before his arraignment provides especially strong evidence of deliberate intent to deprive him of his rights. On November 29, FBI agents arrested Mitchell on a federal warrant and drove him to the courthouse in Flagstaff. At the courthouse, they took him to a conference room and obtained another statement from him before bringing him before a magistrate judge. In this final and most

---

[7]The majority's reliance on *U.S. v. Percy*, 250 F.3d 720 (9th Cir. 2001), for the proposition that this delay does not compel a finding of collusion is unavailing. First, in *Percy*, the delay occurred between the time defendant was detained and the time federal agents questioned him. *Id.* at 724. The defendant was transferred into federal custody the day after the interview. *Id.* Here, Mitchell remained in tribal custody long after the first interrogation by federal officials, and through successive rounds of additional questioning. Clearly, there is a difference between delaying the initial interrogation and delaying the transfer into custody once the interrogation has taken place. Second, the defendant in *Percy* did not challenge the district court's finding that there was no collusion, so the court was bound by that finding on appeal and did not conduct its own analysis of the question. *Id.* at 727. Thus, *Percy* is of no assistance to the majority here.

incriminating statement, Mitchell gave a detailed confession describing the robbery scheme, carjacking, and murders. *See ante*, at 11559. One of the agents admitted at trial that they talked to Mitchell this one last time because they knew that a lawyer would be appointed at his upcoming appearance and that they would not have another opportunity to interrogate him without counsel. This is a direct admission of deliberate intent to deprive Mitchell of his federal rights.

To conclude that these facts do not satisfy the "deliberate intent" requirement would turn an already difficult evidentiary burden into a free pass for FBI agents who know full well that the rights under federal and tribal law differ substantially, and who take purposeful actions to deny defendants their federal rights. Under the majority's approach, federal agents could meet with tribal agents, as they did here, and encourage a tribal arrest with the express purpose of interrogating defendants and with the knowledge that these interrogations will occur without counsel and before arraignment. Yet so long as the agents do not explicitly state that they sought to avoid affording the defendants their federal protections and as long as they also testify that a purpose of the arrest was to protect the public, they would be free to interrogate repeatedly a defendant held indefinitely without counsel or any arraignment. I do not believe that this court intended such a result when it held that the defendant must show "deliberate intent" to deprive a defendant of procedural rights.

Because Mitchell has shown collusion, his right to federal presentment attached at the time of his tribal arrest, and statements made during the period of unnecessary delay before arraignment should be suppressed. Mitchell's first statement may have fallen within the six hour safe harbor established by 18 U.S.C. § 3501(c), but his subsequent confessions did not.[8]

---

[8]During his first round of questioning, Mitchell denied involvement in the disappearances and the robbery, and an inability to suppress this statement would therefore be of little consequence.

Although this court does not require exclusion of all non-safe harbor statements, the delay in Mitchell's arraignment is not justified by either of the reasons we recognize for admitting such statements. *See United States v. Mendoza*, 157 F.3d 730, 731 (9th Cir. 1998) ("We will admit a statement made outside of the safe harbor if the delay was reasonable or if public policy concerns weigh in favor of admission." ) (citing *United States v. Van Poyck,* 77 F.3d 285, 289 (9th Cir. 1996)). We have held that an overnight or weekend delay due to the unavailability of a magistrate is reasonable. *Van Poyck*, 77 F.3d at 289. However, Mitchell's arraignment was delayed twenty-five days, not one or two. Furthermore, as there was no intent to take Mitchell before a magistrate when he was arrested, the delay in his arraignment does not fall within that exception. Additionally, given the deliberate delay in arraignment, public policy concerns weigh in favor of suppression, not admission.[9] *Cf. Van Poyck*, 77 F.3d at 290 (finding public policy did not require suppression and explaining "[t]his is not a case where the officers intentionally postponed arraignment so they could interrogate the defendant").

In sum, the district court erred in not suppressing Mitchell's inculpatory statements. The confessions were highly incriminating and highly prejudicial. Thus, this error warrants reversal of Mitchell's conviction.

## B.   Jury Selection

Mitchell also contends that the trial court erred in allowing the prosecution to strike Juror #30, the only African-American juror on the venire at the time he was struck. As the

---

[9]With respect to public policy concerns, some of the federal agents' statements emphasized the importance of arresting Mitchell and his co-participants in order to remove them from the streets for public safety reasons. However, this goes to the reason for the arrest, not the reason for the subsequent retention of Mitchell in tribal custody or the inordinate delay in his arraignment after probable cause unquestionably existed.

Supreme Court recognized in *Batson v. Kentucky*, 476 U.S. 79 (1986), and subsequent cases, the constitutional guarantee of equal protection forbids a prosecutor from excluding jurors because of their race.[10] To determine whether a prosecutor violated this guarantee by using peremptory strikes in a racially discriminatory manner, courts apply the three prong analysis announced in *Batson*. First, a defendant must establish a prima facie case by showing that relevant circumstances support an inference that the prosecutor excluded venirepersons because of their race. *Id*. at 96. At the second step, the burden shifts to the prosecution to justify the strikes by articulating a "neutral explanation related to the particular case to be tried." *Id*. at 98. Finally, the trial court must determine whether the defendant established purposeful discrimination. *Id*. At this third stage, "[t]he trial court must not simply accept the proffered reasons at face value; it has a duty to evaluate meaningfully the persuasiveness of the prosecutor's race-neutral explanation to discern whether it is a mere pretext for discrimination." *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004) (internal punctuation omitted) (quoting *United States v. Alanis*, 335 F.3d 965, 969 (9th Cir. 2003)).

In this case, the prosecution struck the only Native American and African-American jurors surviving to the peremptory stage of jury selection. Mitchell raised *Batson* challenges to both strikes, and the court disallowed the strike of the Native American juror (#29) but overruled the objection to the strike of the African-American (#30). In permitting the prosecution to strike juror #30, the court found that Mitchell did not make out a prima facie case of discrimination and that the government presented a persuasive non-discriminatory reason for the strike that was not pretextual. Mitchell contends that these

---

[10]Although the prima facie case described in *Batson* required a defendant to show that the prosecutor used peremptories to remove venirepersons of the same race as the defendant, 476 U.S. at 96, in *Powers v. Ohio*, 499 U.S. 400, 402 (1991), the Supreme Court removed the requirement that the defendant and the stricken jurors be of the same race.

findings are clearly erroneous and that they warrant reversal of his conviction. He is correct.

In assessing the prima facie case of discrimination with respect to juror #30, the trial court gave no weight to its previous finding that the prosecution violated *Batson* by striking juror #29, the only Native American remaining on the panel.[11] However, as this Court recognized in *Fernandez v. Roe*, 286 F.3d 1073, 1079 (9th Cir. 2002), the prosecution's strikes of jurors of one race are relevant in assessing strikes of jurors of another race. This is particularly true when the absolute number of jurors of a particular racial group is small, and the use of challenges against that group may be insufficient to support an inference of discrimination. *Id* at 1078. In *Fernandez*, we held that peremptory strikes against Hispanic jurors helped establish a prima facie case of discrimination against African-American jurors. Similarly, in this case, the prosecution's unlawful strike of the only Native American juror is a relevant circumstance giving rise to an inference of discrimination in

[11]The majority suggests it cannot determine whether in ruling on juror #30 the district court factored in its ruling on juror #29. However, the record makes quite clear that the trial court found *no* relevant circumstances other than juror #30's being African-American. The Court stated:

> I do not find that a prima facie case has been made strictly because #30 is an African-American male. I see nothing else in the facts and circumstances that have been presented or that the Court is aware of surrounding the exercise of the peremptory challenge that would raise an inference of discrimination.

Although the Court did discuss its previous ruling on juror #29, it did so only to contrast the two strikes, and not as a circumstance relevant to the strike of juror #30:

> #30 is different from #29, although both are members of a recognizably protected group. For the reasons I stated previously with #29 because of the totality of the circumstances of this particular case involving Native Americans and #29 being the only Native American venireperson, and the other reasons stated I think distinguish #29 from #30 and my consideration that a prima facie case has been made.

the strike of the only African-American juror. The trial court erred in failing to consider this evidence and in concluding that Mitchell did not establish a prima facie case of discrimination.

Turning to the second step of the *Batson* analysis, the government may have offered a facially "legitimate" reason for its decision to dismiss juror #30. *See Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (quoting *Batson*, 476 U.S. at 98) ("[T]he prosecutor must give a clear and reasonably specific explanation of his *legitimate* reasons for exercising the challenge.") (emphasis added). The government stated that it struck juror #30 because he had served on a past jury that acquitted a criminal defendant. The record indicates that on the jury questionnaire, juror #30 stated that over twenty years earlier he had participated in a state criminal trial in which the verdict was not guilty. During voir dire, the prosecution asked him no questions about this prior jury service. In contrast, defense counsel asked juror #30 whether he remembered the nature of the offense or anything about the prior case. Juror #30 responded: "I think it occurred like two or three years earlier [prior to the trial]. And we just had a little information. I guess I really don't." However, despite the prosecution's apparent lack of interest in the issue during voir dire, and despite juror #30's statement that he did not recall anything of significance about the case, the prosecution declared that it struck the one African-American juror because of his prior jury service. The district court held that this was "clearly allowed."

The district court and the majority accept without question the proposition that the government can permanently prevent someone from serving on all juries simply because, several decades previously, that individual once voted to acquit a person accused of a crime, possibly in a case involving a minor non-violent offense, even a misdemeanor, in which the defendant established his innocence beyond question. Such a proposition, if accepted generally, would place a substantial

burden on the exercise by any citizen of the right to serve on a jury. As the Supreme Court recognized in *Powers v. Ohio*, 499 U.S. 400 (1991), "[j]ury service is an exercise of responsible citizenship by all members of the community, including those who otherwise might not have the opportunity to contribute to our civic life." *Id.* at 402. Like voting, jury service is both an opportunity to participate in the affairs of government and a means by which our government maintains its legitimacy:

> Jury service preserves the democratic element of the law, as it guards the rights of the parties and ensures continued acceptance of the laws by all of the people. *See Green v. United States*, 356 U.S. 165, 215[ ] (1958) (Black, J., dissenting). It "affords ordinary citizens a valuable opportunity to participate in a process of government, an experience fostering, one hopes, a respect for law." *Duncan*, *supra*, 391 U.S., at 187[ ] (Harlan, J., dissenting). Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process.

*Id.* at 406-07.

A strike based solely on a juror's participation along with all of his fellow jurors in a prior acquittal in a trial of an undetermined nature, held many years earlier, threatens the institution of the jury by penalizing a juror for his past lawful and proper "exercise of responsible citizenship." In addition to infringing upon the juror's right to serve, such strikes create an incentive for jurors to vote to convict in order to retain the possibility of serving on other juries in the future. This undermines the jury's role in "guard[ing] the rights of the parties" and encourages jurors to violate their constitutional duty to acquit when required by the law and the evidence. As a society, we benefit from having jurors who can exercise their responsibilities fully and fairly without the government seek-

ing improperly to influence their decisions. Permitting prosecutors to strike jurors who have once voted to acquit an unknown defendant on an unknown charge authorizes them to prevent those who have previously stood between the state and the individual from ever again "being part of the judicial system of the country [and] prevent[ing] its arbitrary use or abuse." *Id*. at 406 (quoting *Balzac v. Porto Rico*, 259 U.S. 298 (1922)). It is enough to disqualify from serving on death penalty juries those citizens who have reservations about capital punishment or who would reserve that penalty for the most extreme offenses. *See Uttecht v. Brown*, 127 S. Ct. 2218, 2224-29 (2007). To also disqualify all those who might have ever believed that a defendant could be innocent would seem to cross the line between providing a fair jury — a jury of one's peers — and adopting a system that is inherently pro-prosecution and weighted overwhelmingly in favor of conviction.

Even though a strike for the reasons suggested by the prosecution is not truly legitimate in the ordinary sense of the word, it nonetheless survives the *de minimus* burden placed on the prosecution at the second of the *Batson* analysis. Although *Batson* spoke of "legitimate" reasons, 476 U.S. at 98 n.20, and recent Supreme Court cases continue to use this language, *see, e.g.*, *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005), courts applying this step have equated "legitimate" with "race-neutral." *See, e.g.*, *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (quoting *Hernandez,* 500 U.S. at 360) ("At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."); *Tolbert v. Page*, 182 F.3d 677, 680 (9th Cir. 1999) (en banc) ("Whether the justification offered by a prosecutor is an adequate race-neutral explanation is a question of law reviewed de novo.") (quoting *United States v. Bishop,* 959 F.2d 820, 821 n. 1 (9th Cir. 1992)) (internal quotation marks omitted). On its face, the explanation that a juror was removed because he once voted to acquit

a defendant is race-neutral. Under that standard, the reason advanced here by the prosecution is "legitimate" for purposes of step two of *Batson*.

An absolute bar on jury service for a citizen who once voted, long ago, to acquit an unknown defendant on unknown charges is, however, so divorced from the individual consideration of jurors required by *Batson* and so damaging to the fairness and independence of the jury system that, when exercised to remove the sole African-American on the panel, it must, under the third step, be viewed as a pretext. So improper and arbitrary a justification cannot be presumed to be the prosecution's true motive.

"Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial." *Batson*, 476 U.S. at 87. When a juror has recently served on a jury that voted to acquit, individualized assessment of that juror may well lead the prosecution to conclude that he might be inclined to favor the defense. *See, e.g.*, *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (noting the challenged juror "had recently completed service on another jury" and the prosecutor "feared the juror might be hostile to the government for calling him to serve again so soon after his service as a juror in a long prior trial"); *United States v. Thompson*, 827 F.2d 1254, 1256 n.1 (9th Cir. 1987) (quoting the prosecution's explanation that it struck a juror "because he acquitted in a case just a couple of weeks ago"). However, when the past jury service was over two decades ago, and of such minimal consequence that the juror cannot recall the substance of the case, there is no basis for inferring that his prior vote to acquit would influence his vote in the present case. The prosecution's questions during voir dire did not address the past acquittal at all, much less reveal information supporting a genuine concern that the experience would affect juror #30's present deliberations. Under these circumstances, the proffered explanation for striking juror #30 must be deemed a pretext for what was, in

fact, a race-based strike. The district court's decision to the contrary was clearly erroneous, and this error as well requires reversal of Mitchell's conviction. *See Powers v. Ohio*, 499 U.S. 400, 412 (1991); *Batson*, 476 U.S. at 100.

## II. Sentencing

On appeal, Mitchell raises numerous errors to which he failed to object during trial. I now consider the effect of three of the most significant of these errors that occurred during the sentencing phase of this case. The three errors are as follows: First, the district court erred in permitting Mitchell to be absent from the sentencing phase, in direct violation of the Federal Rules. This is a structural error requiring automatic reversal of Mitchell's sentence. However, were the error deemed not to be structural, it would then constitute a part of the cumulative error analysis. *See* Section D, *infra* at 11685. While individual errors "may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial to the appellants that reversal is warranted." *United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir. 1988) (citing *United States v. Berry*, 627 F.2d 193, 200-01 (9th Cir. 1980)). In addition to Mitchell's absence from the penalty phase, the two other errors on which I rely are (a) the prosecution's numerous improper statements during closing arguments and (b) the court's failure to instruct the jury on the correct standard of proof for finding that aggravating factors outweigh mitigating factors. I conclude that the cumulative effect of these three errors is prejudicial, and I would, accordingly, vacate Mitchell's death sentence.

### A. Defendant's Absence From the Sentencing Phase

As the majority opinion describes, *ante*, at 11633-35, Mitchell unequivocally stated that he did not wish to attend the sentencing phase of the proceedings. The district judge strongly urged him to exercise his right to be present on several occasions, and carefully explained the reasons why he

should do so. Ultimately, with considerable misgivings, she reluctantly allowed him to be absent. Mitchell now argues that the Federal Rules of Criminal Procedure require a capital defendant's presence during sentencing proceedings and that the district court erred in permitting him to waive his presence. He is correct, and notwithstanding the majority's difficulty with the issue, the error is plain.

Rule 43(a)(3) provides that a defendant must be present at sentencing. Although a non-capital defendant may waive this right, a capital defendant may not.[12] The majority makes the perplexing assertion that Rule 43(a)(3) does not apply because the sentencing phase of a capital trial is not part of "sentencing." *See ante*, at 11639. This contradicts both the common understanding of the nature of the sentencing phase and the rule's purposes in requiring a capital defendant's presence at sentencing, as well as the plain meaning of the rule itself.

In a capital trial, the term sentencing phase is synonymous with the term penalty phase. The two terms are used interchangeably, along with the statutory term sentencing hearing. *See, e.g.*, *Rice v. Wood*, 77 F.3d 1138 (9th Cir. 1996) (en banc) (observing that a capital defendant's trial "was bifurcated into separate guilt and sentencing phases, with the same jury sitting in both"). *Cf. Black's Law Dictionary* (8th ed. 2004) (noting that "penalty phase" is "[a]lso termed sentencing phase"). Indeed, the Federal Death Penalty Act specifi-

---

[12]Rule 43(a)(3) states "Unless this rule . . . provides otherwise, the defendant must be present at . . . sentencing." The rule is limited by 43(c)(1)(B), which permits waiver of that provision "in a noncapital case, when the defendant is voluntarily absent during sentencing." As the majority concedes, Rule 43(c)(1)(B) by negative implication does not permit a *capital* defendant to waive his presence during sentencing by being voluntarily absent. Because Rule 43(c)(1)(B) does not apply to capital defendants, and the facts do not support any of the other reasons for waiver, *see* Fed. R. Crim. P. 43(c)(1)(A) and (B), we are presented with a straightforward question about the meaning of "sentencing" as the term is used in Rule 43(a)(3).

cally provides that if a defendant is found guilty of a death eligible offense, the trial judge "shall conduct a separate *sentencing hearing* to determine the punishment to be imposed." 18 U.S.C. § 3593(b) (emphasis added). It is at the sentencing hearing (a.k.a. the sentencing phase or the penalty phase) that the evidence is adduced, the arguments are made by counsel, the defendant has the opportunity to address the jury — the body that determines what his punishment — and the ultimate decision is made as to the defendant's sentence.

The conclusion that "sentencing" includes the sentencing hearing is also required by an examination of the reasons for requiring a defendant's presence at sentencing. In non-capital cases, the requirement that a defendant be present at sentencing, inter alia, "serves the defendant's interest by facilitating allocution . . . ." *United States v. Curtis*, 523 F.2d 1134, 1135 (D.C. Cir. 1975). It is at sentencing that the defendant has "the opportunity to address any issues relevant to his sentence." *United States v. Robinson*, 390 F.3d 853, 887 (6th Cir. 2004). Additionally, the mere presence of the defendant in the courtroom during sentencing proceedings exerts a psychological influence on the jury. *See, e.g., United States v. Canady*, 126 F.3d 352, 362 (2d Cir. 1997) ("In the jury context, several courts, in rejecting the argument that the defendant's presence is useless, have pointed to the fact that the defendant's mere presence exerts a "psychological influence upon the jury." (quoting *United States v. Santiago*, 977 F.2d 517, 523 n.6 (10th Cir. 1992)).

In a federal capital case, the reasons for requiring a defendant's presence at sentencing are applicable primarily to the sentencing hearing rather than to the formal pronouncement of sentence by the judge, although the defendant's presence is required at both.[13] As noted, it is during the sentencing phase of the proceedings — the sentencing hearing — that a

---

[13]In contrast, in a non-capital case the hearing regarding the sentence and the pronouncement of the sentence occur at a single proceeding.

capital defendant has the opportunity to present any mitigating evidence, and to ask the jury — the body deciding on his sentence — for mercy. Additionally, the psychological influence of the defendant's presence on the jury is most significant during the time when it is hearing the argument as to whether he should live or die and when it is receiving the information that serves as the basis for its decision. Finally, to the extent that a defendant's presence legitimizes a sentence, this legitimizing function is most critical in the sentencing phase, when the State argues that there is cause to exercise the full measure of its power by taking the life of a defendant and the defendant seeks the alternative of life imprisonment. In short, the process of determining a capital defendant's sentence occurs during the sentencing or penalty phase. The Federal Death Penalty Act provides that at the conclusion of this phase, the jury "shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." 18 U.S.C. 3593(e). If the jury recommends death and, the judge is *obligated* to impose that sentence and has no discretion to impose a lesser penalty. *See* 18 U.S.C. 3594 ("Upon a recommendation under section 3593(e) that the defendant should be sentenced to death or life imprisonment without possibility of release, the court shall sentence the defendant accordingly."). Thus, although Mitchell was present when the jury returned its verdict and, months later, when the judge entered the death sentence, he was no more than a passive audience on these occasions. The decision-making process was over. The time when Mitchell's presence was important, when he could have been an active participant in the sentencing proceedings and influenced the determination as to his sentence, was during the sentencing or penalty phase. Any remarks he may have been permitted to make to the judge subsequent to the jury's decision were of no legal or practical consequence. His absence during the sentencing hearing violated the plain language as well as the purposes of Rule 43(a).[14]

---

[14]The majority argues that Fed R. Crim. P. 35(c), which defines the word "sentencing" as "the oral announcement of the sentence," should

There is little room for doubt that Rule 43(a)(3)'s requirement that a defendant be present at sentencing applies to the sentencing or penalty phase of a capital trial: to the sentencing hearing. Because Rule 43(a) states that only a noncapital defendant may waive his presence during sentencing, the district court erred in allowing Mitchell to be voluntarily absent during the penalty phase. Furthermore, this error is a structural error that requires reversal even without a specific showing of prejudice. Although we generally consider structural error within the context of constitutional errors, "numerous errors are subject to automatic reversal even though they do not violate constitutional rights." *United States v. Annigoni*, 96 F.3d 1132, 1144 (9th Cir. 1996) (en banc). *See, e.g.*, *Gomez v. United States,* 490 U.S. 858, 874-76 (1989) (holding defendant did not need to show prejudice resulting from a magistrate supervising voir dire in violation of the Federal Magistrate's Act because the defendant's right "to have all

_____

govern the interpretation of Rule 43. Rule 35(c) specifically states that the definition applies to the term sentencing "[a]s used in *this* rule." *Id.* (emphasis added). Even aside from that express limitation, there is no reason to believe that the definition should carry over to other rules. Indeed, there is every reason to believe that it should be limited to Rule 35, because that rule contains several provisions that set deadlines based on the date of sentencing. Rule 35(c) simply clarifies how those deadlines should be calculated. Rule 43 serves a completely different purpose. The fact that it explains in one section that "sentence correction" is a proceeding under Rule 35 is of no relevance whatsoever to the question before us. The majority also relies on the legislative history of the amendments to Rule 43. I find this history inconclusive. Although the earlier version allowed a defendant in a noncapital case to be absent from the "imposition of sentence" while the current version allows a noncapital defendant to be absent from "sentencing," there is no practical difference between the terms as applied to a noncapital defendant. There is one sentencing proceeding in noncapital cases and it is at that proceeding that imposition of the sentence occurs. The word "sentencing" and the term "sentencing proceeding" have far broader meanings with respect to a capital defendant. A negative implication under such circumstances is also broader. Thus, general committee notes, which are ambiguous as applied, are hardly conclusive of critical questions that otherwise would be resolved by looking to the plain meaning or ordinary construction of the terms in question.

critical stages of a criminal trial conducted by a person with jurisdiction to preside" is "among the basic fair trial rights that can never be treated as harmless"). In determining whether an error requires automatic reversal, we look at whether the error is a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Here, Mitchell's absence throughout the penalty phase affected the very nature of the proceedings. The absence of a defendant when his presence is required is as fundamental as the absence of his lawyer, *see Gideon v. Wainright*, 372 U.S. 335, 344 (1963), or even of the judge. *See Tumey v. Ohio*, 273 U.S. 510, 535 (1927). The defendant's presence is required so that he may assist his counsel and plead for mercy from the jury. Additionally, his presence could well have significantly affected the course of the proceedings, the presentation of the mitigating and aggravating evidence. In contrast to cases in which the defendant was absent only during the pronouncement of the verdict, *see, e.g., Rice v. Wood*, 77 F.3d 1138 (9th Cir. 2002), a conversation between a judge and a juror, *see, e.g., Rushen v. Spain,* 464 U.S. 114, 119 (1983), or the readback of testimony, *see, e.g., Hegler v. Borg*, 50 F.3d 1472, 1474-75 (9th Cir. 1995), a capital defendant has an "active role to play" during the penalty phase of his trial. *Cf. Rice*, 77 F.3d at 1142. Because Mitchell's absence was an error that permeated the entire penalty phase, it may *not* be "quantitatively assessed in the context of other evidence presented . . . ." *Fulimante,* 499 U.S. at 308. It is impossible to determine from a review of a record whether the penalty imposed would have been different if an absent defendant had been present during the sentencing phrase.

I would reverse the death sentence on the basis of the court's fundamental error in allowing Mitchell to be absent from the sentencing hearing. *See Annigoni*, 96 F.3d at 1147 (holding that a violation of Rule 24(b) of the Federal Rules of Criminal Procedure, regarding peremptory challenges, is an

error requiring automatic reversal). In the alternative, I will consider the Rule 43 error below as if it were mere trial error, in which case it would constitute part of the cumulative error analysis. *See* section D at pp. 11685.

### B.  Closing Arguments

As the majority opinion acknowledges, *ante*, at 11651, the government made many improper statements in its closing arguments. In determining whether these improper statements alone warrant reversal, "[t]he critical inquiry is whether, in the circumstances of the trial as a whole, the remarks were so prejudicial that they likely influenced the jury adversely to the defendant and deprived the defendant of a fair trial." *United States v. Patel*, 762 F.2d 784, 795 (9th Cir. 1985).

Much of the argument consisted of prohibited statements intended to arouse the passion of the jury. *See Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999) ("Prosecutors may not make comments calculated to arouse the passions or prejudices of the jury."). For instance, the prosecution commented: "What I like to call mitigating factors are excuses for murder because we have free will." Regarding defense witness who offered mitigation testimony, the prosecution stated: "By the way, the defendant's using these people, too. Manipulating them. They are up there begging for his life. Do you think [Jane Doe] begged when she was told to lay down and die?" In arguing a death sentence would be a "message" to Mitchell, the prosecution suggested the jury could consider its own trauma in hearing about the murders: "It is a message all right, it is a message to the defendant, that you have challenged us, you have come before us with things that are going to cause us nightmares as long as we are alive."

In a similar vein, the prosecution suggested Mitchell had already received mercy by virtue of the trial itself: "Perhaps years ago, Tombstone, he would have been taken out back, strung up. He would have gotten a trial, nothing like this. We

have been at this for seven weeks. We've gone to great lengths to choose the jury. We have presented a trial. You have made your findings. And yet still he gets to come before you and say, 'Spare my life.' "

Other statements improperly shifted the burden of proof to Mitchell to show that death was not warranted. The prosecutor asked: "What has Lezmond Mitchell done to earn a minimum sentence for the slaughter of two people? Nothing." Similarly, he remarked: "The defendant has done nothing to earn an opportunity to be a message to someone in prison. He has earned no opportunity to live in a cell whether he likes the cell or not. He has earned no opportunity to get a college degree while in prison or to Internet chat with someone or to work in the shop of prison. He has earned nothing." In contrast with cases where the prosecution clarified its comments by reminding the jury that the government had the burden of proof, *see, e.g.*, *United States v. Cabrera*, 201 F.3d 1243, 1249 (9th Cir. 2000), the prosecution in this case offered no such reminder.

However, in the context of the entire trial, I cannot conclude that these statements alone warrant reversal. It is not clear that by themselves, they were so prejudicial that they violated due process and "deprived the defendant of a fair trial." *Patel*, 762 F.2d at 795. Nonetheless, the prosecutor's numerous improper statements were contrary to applicable law and constituted sentencing phase error. The effect of these errors must therefore be considered as a part of our cumulative error analysis.

## C.    Failure to Include "Beyond a Reasonable Doubt" in Weighing Instruction

Finally, Mitchell argues that the district court erred by failing to instruct the jury that the government bore the burden of proving beyond a reasonable doubt that aggravating factors outweighed mitigating factors. Instead, the instructions stated:

> This weighing process asks whether you are unanimously persuaded that the aggravating factors sufficiently outweigh any mitigating factors or, in the absence of any mitigating factors, that the aggravating factors are themselves sufficient to justify a sentence of death.

The "beyond a reasonable doubt" standard applies if the finding that aggravating factors outweigh mitigating factors is a finding of fact that serves to increase the maximum sentence a judge may impose on a defendant. "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). In *Ring v. Arizona*, the Supreme Court held that *Apprendi* applies to the sentencing phase of capital trials. *Ring v. Arizona*, 536 U.S. 587, 588 (2002) ("Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."). In so holding, it overruled *Walton v. Arizona*, 497 U.S. 639 (1990), "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Ring*, 536 U.S. at 609.

There is no doubt that the finding that aggravating factors outweigh mitigating factors increased Mitchell's maximum punishment. The Federal Death Penalty Act provides that as the final step in determining whether death is justified, the jury must consider:

> whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death.

18 U.S.C. §3593(e). Absent this finding, the maximum sentence the court could have imposed would have been life imprisonment without the possibility of release. *See* 18 U.S.C. § 3594. Thus, the only question is whether this finding is a finding of *fact*. The majority suggests that it is not, although it concludes that it is unnecessary to resolve the question on plain error review. I conclude that it is necessary to make the determination if only because the failure to instruct the jury on the burden of proof is a serious error that must be considered as part of our cumulative error analysis.

The majority suggests that the weighing process merely channels the jury's discretion and that it does not result in a finding of essential fact. *Ante*, at 11648. The majority supports this suggestion with two observations. First, it cites dicta from *Kansas v. Marsh*, 126 S. Ct. 2516, 2526 (2006), to the effect that the weighing step simply channels jury discretion by giving jurors criteria to use in deciding whether or not to recommend a death sentence. While the majority is correct that this step channels juror discretion, the same can be said of every other step in the Federal Death Penalty Act's sentencing process. Channeling discretion is not incompatible with finding essential facts. Rather, it is precisely by instructing juries which facts are essential that the Act channels juror discretion.

Second, the majority suggests that Mitchell's argument is inconsistent with the Fifth Amendment requirement that facts increasing the maximum penalty be found by the grand jury and charged in the indictment. *See Jones v. United States*, 526 U.S. 227, 243 n.6 (1999). According to the majority, since the grand jury cannot know which mitigators the defendant will urge, it cannot find that aggravators outweigh mitigators. Thus, the majority concludes that Mitchell's position is flawed because it characterizes as an essential fact something that cannot be found by the grand jury. *Ante*, at 11648. However, the majority creates conflict where none exists. The weighing process mandated by the Act applies regardless of

whether jurors have found mitigating factors. As the Act explains, "in the absence of a mitigating factor, [the jury shall consider] whether the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e). The grand jury, working without knowledge of mitigating facts, is capable of making a similar determination based upon the aggravating factors before it. In fact, grand juries regularly make factual determinations, for the purposes of that body's limited function, without having heard the defendant's opposing facts that might have caused it to reach an opposite conclusion. Hearing only one-side of the story and rendering a judgment is a hallmark of the grand jury system.

This court has not yet decided whether the weighing of aggravators and mitigators results in a finding of fact. It is apparent to me that it does. Pre-*Apprendi* decisions in other circuits rejected the Eighth Amendment claim that the "beyond a reasonable doubt" standard applies to the weighing of aggravators and mitigators, but these decisions did not consider whether the weighing decision was a "fact." *See United States v. Flores*, 63 F.3d 1342, 1376 (5th Cir. 1995); *United States v. Chandler*, 996 F.2d 1073, 1091-93 (11th Cir. 1993). The one circuit court that has considered this question since *Apprendi* held, in the context of a Fifth Amendment claim, that the Federal Death Penalty Act's weighing process did not result in a finding of fact that must be charged in an indictment. *See United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005) (noting the weighing process is not an elemental fact but instead merely "the lens through which the jury must focus the facts that it has found to produce an individualized determination"). However, this reasoning is faulty. As noted, the weighing process does have a discretionary aspect, but it also requires the jury to make an ultimate factual determination about whether aggravating factors sufficiently outweigh mitigating factors so as to justify a sentence of death. Unless it so determines, the death penalty cannot be imposed.

Notwithstanding the discretionary elements of the weighing step, three state supreme courts have held that *Apprendi*

applies to similar weighing provisions in state death penalty statutes. *See Missouri v. Whitfield*, 107 S.W.3d 253 (Mo. 2003) (en banc) (noting that weighing "require[s] factual findings that are prerequisites to the trier of fact's determination that a defendant is death eligible"); *Woldt v. People*, 64 P.3d 256, 265 (Colo. 2003) (en banc) (invalidating a superseded Colorado death penalty statute because three steps of the sentencing process, including weighing, "required judges to make findings of fact that render a defendant eligible for death"); *Johnson v. State*, 118 Nev. 787, 802-03 (Nev. 2002) (holding *Apprendi* and *Ring* apply to the finding that mitigation does not outweigh aggravation). As stated succinctly by the Nevada Supreme Court, the jury's finding on this issue "is in part a factual determination, not merely discretionary weighing." *Johnson*, 118 Nev. at 802-03.

Ultimately, the majority's attempt to characterize the weighing step as resulting in something other than an *Apprendi* finding of fact reflects a level of formalism rejected by both *Apprendi* and *Ring*. As *Apprendi* emphasized, "the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" 530 U.S. at 494. In *Ring v. Arizona*, the Court relied on this approach in holding that aggravating factors must be proven to a jury beyond a reasonable doubt. 536 U.S. at 609 ("Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury.") (internal citation omitted). From this functional perspective, there is no practical difference between the increase in punishment due to the finding of an aggravating factor and the increase due to the finding that aggravators outweigh mitigators. Because the Federal Death Penalty Act requires both findings in order for a judge to sentence a defendant to death, the Sixth Amendment requires a jury to make these findings beyond a reasonable doubt. The district court erred in concluding otherwise.

### D.  Cumulative Error

Considered cumulatively, each of the errors discussed above combined to prejudice Mitchell with respect to the jury's final determination to impose the death penalty. Mitchell's absence from penalty phase proceedings meant that he was not present to participate in the sentencing hearing, a critical point in the determination of his fate. His absence also meant that the jury was not required to face him in the immediate period before it decided that he should die. The government's improper closing arguments appealed to the jury's emotions and undoubtedly exacerbated their revulsion at the offenses. Finally, the jurors were not required to decide beyond a reasonable doubt whether aggravating factors outweighed mitigating factors, and thus were allowed to opt for death without having to make the more difficult and stringent decision required by law.

Given the nature of the jury's function in determining whether to impose capital punishment, it seems apparent that the cumulative effect of these errors was not harmless. Each affected in an important way a significant aspect of the jury's decision-making process. Cumulative error may include violations that fail the plain error test, but are nevertheless errors. *See United States v. Fernandez*, 388 F.3d 1199, 1256-57 (9th Cir. 2004) (considering errors that did not rise to the level of plain error in a cumulative error analysis); *United States v. Wallace*, 848 F.2d 1464, 1476 n.21 (9th Cir. 1988) (holding that an error that was not objected to at trial, and may not have amounted to plain error, should be considered in the cumulative error analysis). Multiple errors, even if harmless when considered individually, may have a cumulative prejudicial effect that deprives the defendant of the due process right to a fair trial. *See Karis v. Calderon*, 283 F.3d 1117, 132 (9th Cir. 2002); *Ceja v. Stewar*t, 97 F.3d 1246, 1254 (9th Cir. 1996). Here, the combined effect of multiple sentencing phase errors may well have caused at least one juror to vote for death when he or she would otherwise have decided not to do

so. In light of this probability, I would vacate Mitchell's death sentence.

## III.   Conclusion

I respectfully dissent. For the reasons set forth above, I would reverse Mitchell's conviction and remand for a new trial. Should his conviction stand, however, I would, for the additional reasons explained in this opinion, vacate Mitchell's sentence and remand for a new sentencing hearing.